No. 26-1437

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

CAMERON JOHNSON; LUKE THOMAS; and TRACE STEVENS,

*Plaintiffs-Appellants*,

v.

A. SCOTT FLEMING, in his official capacity as the Director of the State Council of Higher Education for Virginia; JOHN JUMPER, in his official capacity as the Chair of the State Council of Higher Education for Virginia; MAJOR GENERAL JAMES W. RING, in his official capacity as the Adjutant General of Virginia; and DONALD L. UNMUSSIG, in his official capacity as the Chief Financial Officer of the Virginia Department of Military Affairs,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:25-cv-00407-RCY

# APPELLANTS' OPENING BRIEF

| | |
|---|---|
| James A. Campbell | John J. Bursch |
| Jacob E. Reed | ALLIANCE DEFENDING FREEDOM |
| ALLIANCE DEFENDING FREEDOM | 440 First Street NW, Suite 600 |
| 44180 Riverside Pkwy | Washington, DC 20001 |
| Lansdowne, VA 20176 | (616) 450-4235 |
| (571) 707-4655 | jbursch@ADFlegal.org |
| jcampbell@ADFlegal.org | |
| jreed@ADFlegal.org | |

Ryan J. Tucker
Jeremiah J. Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

David A. Cortman
Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFflegal.org

*Counsel for Plaintiffs-Appellants*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiffs-Appellants Cameron Johnson, Luke Thomas, and Trace Stevens are individual citizens and Virginia residents.

# TABLE OF CONTENTS

Corporate Disclosure Statement...................................................................i

Table of Authorities...............................................................................iv

Statement of Jurisdiction.........................................................................1

Statement of Issues ...............................................................................2

Statement of the Case ............................................................................4

I.     Virginia's historic tradition of maximizing religious liberty and including people of faith in public benefits..........................4

II.    Virginia's 20th-century experiment in excluding people of faith from public benefits. ...............................................9

III.   The grants at issue...........................................................13

      A.    Virginia Tuition Assistance Grant Program (VTAG)...........13

      B.    Virginia National Guard State Tuition Assistance Program (VANGSTAP) ........................................20

IV.   Defendants reject Plaintiffs' grant requests...............................23

      A.    Cameron Johnson.......................................................23

      B.    Luke Thomas............................................................24

      C.    Trace Stevens ..........................................................25

V.    Procedural history.............................................................26

Summary of Argument.........................................................................28

Standard of Review .............................................................................29

Argument..........................................................................................30

I.     Plaintiffs will likely prevail on the merits...................................30

      A.    *Locke* is distinguishable. .............................................30

B. *Hall* doesn't control. ...............................................................40

C. Virginia's grant programs violate the Religion Clauses in four ways. ................................................................................42

1. Virginia's grants discriminate based on religious character, activity, or use. ..........................................42

2. Virginia's grant programs aren't neutral or generally applicable. .................................................45

3. Virginia's grants impose a denominational preference. ...................................................................50

4. Virginia's grant programs result in excessive entanglement. ............................................................53

D. Virginia can't satisfy strict scrutiny. ...................................55

II. Plaintiffs are experiencing irreparable harm. .............................57

III. The public interest and balance of the equities favor Plaintiffs. ...........................................................................................58

Conclusion .........................................................................................59

Request for Oral Argument.................................................................59

Certificate of Compliance...................................................................61

Certificate of Service .........................................................................62

Addendum

iii

# TABLE OF AUTHORITIES

**Cases**

*Alabama Association of Realtors v. HHS,*
594 U.S. 758 (2021) ...................................................................57

*American Legion v. American Humanist Association,*
588 U.S. 29 (2019) ....................................................................10

*Bennett v. United States Securities & Exchange Commission,*
844 F.3d 174 (4th Cir. 2016) ......................................................31

*Brown v. Board of Education,*
349 U.S. 294 (1955) ...................................................................11

*Carson ex rel. O.C. v. Makin,*
596 U.S. 767 (2022) ............................................................. passim

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry
Review Commission,*
605 U.S. 238 (2025) ............................................................. passim

*Centro Tepeyac v. Montgomery County,*
722 F.3d 184 (4th Cir. 2013) ......................................................58

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................... 30, 47, 48, 49

*Clark v. Sweeney,*
607 U.S. 7 (2025) .......................................................................38

*Colorado Christian University v. Weaver,*
534 F.3d 1245 (10th Cir. 2008) ............................................. passim

*Commodity Futures Trading Group v. Kimberlynn Creek Ranch,*
276 F.3d 187 (4th Cir. 2002) ......................................................29

*Doe by Doe v. South Carolina,*
No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) ..............30

*Employment Division, Department of Human Resources of Oregon*
*v. Smith,*
494 U.S. 872 (1990) ....................................................................48

*Espinoza v. Montana Department of Revenue,*
591 U.S. 464 (2020) ............................................................. passim

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ...................................................... 48, 49, 55

*Goldman v. Landsidle,*
552 S.E.2d 67 (Va. 2001) .........................................................58

*Griffin v. County School Board of Prince Edward County,*
377 U.S. 218 (1964) ............................................................ 11, 12

*Griffin v. State Board of Education,*
239 F. Supp. 560 (E.D. Va. 1965)............................................11

*Grimmett v. Freeman,*
59 F.4th 689 (4th Cir. 2023)....................................................29

*Hall v. Fleming,*
__ F.4th __, No. 25-1574, 2026 WL 1314675 (4th Cir. May 13,
2026) ................................................................................. passim

*Illinois Bible Colleges Association v. Anderson,*
870 F.3d 631 (7th Cir. 2017) ...................................................32

*Kennedy v. Bremerton School District,*
597 U.S. 507 (2022) ..................................................... 45, 47, 48, 49

*Lackey v. Stinnie,*
604 U.S. 192 (2025) .................................................................30

*Larson v. Valente,*
456 U.S. 228 (1982) ...................................................... 50, 52, 53

*Leaders of a Beautiful Struggle v. Baltimore Police Department,*
2 F.4th 330 (4th Cir. 2021)......................................................29

*Locke v. Davey,*
540 U.S. 712 (2004) ................................................................ passim

*Lyons v. PNC Bank, National Association,*
26 F.4th 180 (4th Cir. 2022) .......................................................... 1

*Masterpiece Cakeshop v. Colorado Civil Rights Commission,*
584 U.S. 617 (2018) .............................................................. 46, 47

*Mirabelli v. Bonta,*
146 S. Ct. 797 (2026) ................................................................. 57

*Mitchell v. Helms,*
530 U.S. 793 (2000) .................................................................. 10

*Mountain Valley Pipeline LLC v. West Pocahontas Properties
Limited Partnership,*
918 F.3d 353 (4th Cir. 2019) ...................................................... 57

*New York v. Cathedral Academy,*
434 U.S. 125 (1977) .................................................................. 55

*NLRB v. Catholic Bishop of Chicago,*
440 U.S. 490 (1979) .................................................................. 55

*Perry v. Marteney,*
172 F.4th 315 (4th Cir. 2026) ...................................................... 31

*Perry v. Sindermann,*
408 U.S. 593 (1972) .................................................................. 55

*Pierce v. North Carolina State Board of Elections,*
97 F.4th 194 (4th Cir. 2024) ....................................................... 30

*Polk v. Montgomery County Public Schools,*
166 F.4th 400 (4th Cir. 2026) ....................................................... 1

*Scott v. Family Dollar Stores, Inc.,*
733 F.3d 105 (4th Cir. 2013) ........................................................ 1

*Tandon v. Newsom,*
593 U.S. 61 (2021) ................................................................... 30

*The Eir,*
  60 F.2d 124 (4th Cir. 1932) .............................................................31

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) ................................................................. passim

*Vick v. Williams,*
  233 F.3d 213 (4th Cir. 2000) .........................................................31

*Vlaming v. West Point School Board,*
  895 S.E.2d 705 (Va. 2023) .........................................................6, 9

*Wages & White Lion Investments, LLC v. FDA,*
  16 F.4th 1130 (5th Cir. 2021) .......................................................57

*Waters v. Churchill,*
  511 U.S. 661 (1994) ...............................................................38, 41

*Zelman v. Simmons-Harris,*
  536 U.S. 639 (2002) ...............................................................10, 46

**Statutes**

28 U.S.C. § 1292 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343 ...............................................................................1

28 U.S.C. § 2107 ...............................................................................2

42 U.S.C. § 1983 ...............................................................................1

8 Va. Admin. Code § 40-71-10........................................................ passim

8 Va. Admin. Code § 40-71-40................................................. 13, 14, 49

Va. Code § 23.1-610 .................................................................... 20, 49

Va. Code § 23.1-628 ...........................................................................14

Va. Code § 23.1-629 ...........................................................................13

Va. Code § 23.1-631 ...................................................................... 13, 14

Va. Code § 23.1-632 ...................................................... 13

Va. Code § 57-1 ........................................................ 6, 8

**Other Authorities**

4 Cong. Rec. 205 (1875) ................................................ 10

4 Cong. Rec. 5189 (1876) .............................................. 10

4 Cong. Rec. 5453 (1876) .............................................. 10

4 Cong. Rec. 5595 (1876) .............................................. 10

*About IES*, INST. OF EDUC. SCIENCES ................................ 14

*Accreditation*, Reformed Theological Seminary ...................... 22

*Bachelor of Arts in Religious Studies*, HAMPTON UNIV. ............ 16

Brent Tarter, *Constitutional History of Virginia* (2023) ........ 12

*Chaplain Support*, VA. NAT'L GUARD ................................ 22

Chavis Hall, WASHINGTON & LEE UNIV. ................................. 7

*Commercial Music (B.M.) – Performance*, LIBERTY UNIV. COURSE
    CATALOG ......................................................... 37

*Commission on Constitutional Revision*, The Constitution of
    Virginia (1969) ............................................ 39, 46

*Course Catalog – Religious Studies Major*, VA. UNION UNIV ....... 16

David N. Hempton, *What is a Multireligious Divinity School?*,
    HARVARD DIVINITY BULLETIN (Winter 2017) .................... 34

*Detail for CIP Code 38*, NCES ....................................... 15

*Detail for CIP Code 38.0203*, NCES ................................. 17

*Detail for CIP Code 39*, NCES ....................................... 15

*Detail for CIP Code 39.0201*, NCES ................................. 17

*Emp. Outcomes - Earnings, Va. Insts.*, STATE COUNCIL FOR HIGHER ED. OF VA. ..................................................................................18

*Graduate Dual Degrees - Theology*, VA. WESLEYAN UNIV. .....................17

*Introduction to the Classification of Instructional Programs: 2020 Edition (CIP-2020)*, NCES .........................................................15

James Madison, *Memorial and Remonstrance against Religious Assessments (1785)*, NATIONAL ARCHIVES .....................................5

John M. Bullard, *Church Music in the United States, 1760-1901*, THE DIAPASON ..................................................................36

Kyle Duncan, *Secularism's Laws: State Blaine Amendments & Religious Persecution*, 72 FORDHAM L. REV. 493 (2003)................10

*Lee Named New VNG State Chaplain*, VA. NAT'L GUARD......................22

Liberty Hall History, WASHINGTON & LEE UNIV.....................................7

*Liberty Univ. Acad. Programs – CIP Codes*, LIBERTY UNIV....................37

Mark Storslee, *Church Taxes & the Original Understanding of the Establishment Clause*, 169 U. PA. L. REV. 111 (2020) ........... passim

*Music & Worship (B.S.) – Resident*, LIBERTY UNIV. COURSE CATALOG...36

*Music (BA)*, BLUEFIELD UNIV. ...............................................................16

Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023)......................... passim

Policy Number 72 – 25, VA. ADJUTANT GENERAL (May 19, 2025)..........21

*Religion (REL) Program*, AVERETT UNIV. UNDERGRADUATE CATALOG ...17

*Religious Leadership & Ministry (Minor)*, MARY BALDWIN UNIV...........19

*Religious Studies*, VA. WESLEYAN UNIV. ..............................................17

*Seung Lee*, LinkedIn profile .................................................................22

The Va. Declaration of Rights § 16 (1776), NATIONAL ARCHIVES ............ 4

Thomas C. Berg & Douglas Laycock, *The Mistakes in* Locke v. Davey *and the Future of State Payments for Services Provided by Religious Institutions*, 40 TULSA L. REV. 227 (2004) ................ 32

Thomas E. Buckley, *Church and State in Revolutionary Virginia 1776–1787* (1977) ............................................................................ 5, 6

Ulysses S. Grant, Seventh Annual Message (Dec. 7, 1875) .................... 9

*Va. Tuition Assistance Grant Program*, STATE COUNCIL OF HIGHER EDUC. FOR VA. ................................................................................ 14

*VANGSTAP Summary*, VA. NAT'L GUARD ...................................... 20, 23

Vincent Blasi, *School Vouchers & Religious Liberty: Seven Questions from Madison's Memorial & Remonstrance*, 87 CORNELL L. REV. 783 (2002) ........................................................ 5

*VTAG and Other Virginia State Aid - Religious Undergraduate Degree Programs*, LIBERTY UNIV. ......................................... 18, 33

## Rules

Fed. R. App. P. 4(a)(1)(A) ....................................................................... 2

Fed. R. App. P. 8 ................................................................................... 27

Fed. R. Civ. P. 12(b)(6) .......................................................................... 2

Fed. R. Civ. P. 65 ................................................................................... 2

Local Rule 8 .......................................................................................... 27

## Constitutional Provisions

Va. Const. art. I, § 16 .......................................................................... 6, 8

Va. Const. art. IV, § 16 .......................................................................... 44

Va. Const. art. IV, § 67 (1902) .............................................................. 11

Va. Const. art. VIII, § 10 ....................................................................... 44

Va. Const. art. VIII, § 11 ...................................................... 12, 14, 38, 44

Va. Const. art. VIII, § 11 (1971) ............................................. 12

**STATEMENT OF JURISDICTION**

Plaintiffs-Appellees Cameron Johnson, Luke Thomas, and Trace Stevens brought claims pursuant to the First Amendment's Religion Clauses under 42 U.S.C. § 1983. JA.32–73. The district court had jurisdiction over those claims under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction to review the district court's order denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

This Court has pendant jurisdiction to review the district court's order dismissing Cameron's and Luke's claims under Rule 12(b)(6) because "an award of preliminary injunctive relief in [their] favor—predicated[ ] … on the now-dismissed Free Exercise … claims—would necessitate reinstatement of … those claims." *Polk v. Montgomery Cnty. Pub. Schs.*, 166 F.4th 400, 411 (4th Cir. 2026). Put differently, the "partial" dismissal order "is 'inextricably intertwined' with the district court's [injunction] denial … because [this Court's] consideration of the latter order necessarily resolves the former," *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 191 (4th Cir. 2022), and "review of the nonappealable issue is necessary to ensure meaningful review of the appealable one," *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013) (quotation omitted).

The district court entered an order denying the motion for a preliminary injunction and dismissing Cameron's and Luke's claims on March 31, 2026. JA.22. Plaintiffs timely filed a Notice of Appeal on

1

April 9, 2026, JA.342, within the 30-day period set by 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES

The issues on appeal are:

1. Whether the district court erred in denying Plaintiffs-Appellants' motion for a preliminary injunction. Fed. R. Civ. P. 65.

2. Whether the district court erred in dismissing Cameron's and Luke's First Amendment claims. Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

Virginia provides grants worth thousands of dollars to college students—including for religious degrees—yet denies them to Plaintiffs Cameron Johnson, Luke Thomas, and Trace Stevens simply because they chose the "wrong" religious degrees. The district court blessed that discrimination based on *Locke v. Davey*, 540 U.S. 712 (2004). But the grant program that *Locke* considered is nothing like Virginia's programs, which use conflicting exclusions, discriminate *among* religions, and allow for individualized exemptions. So normal First Amendment rules apply—not *Locke*. Under those established principles, Virginia's grant programs blatantly violate the First Amendment.

The Commonwealth has already denied Cameron, Luke, and Trace thousands of dollars in grants based solely on their religious exercise. An injunction is needed to prevent further irreparable harm while this case proceeds. The Court should reverse and remand with instructions to enter a preliminary injunction without delay.

## STATEMENT OF THE CASE

**I.    Virginia's historic tradition of maximizing religious liberty and including people of faith in public benefits.**

Virginia had a "rigid, coercive, and comprehensive … Anglican establishment[ ]" in the colonial era. Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 64 (2023). The American Revolution changed that. Virginia's new Constitution stated that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." The Va. Declaration of Rights § 16 (1776), NATIONAL ARCHIVES, https://bit.ly/4w7qyCG. The same generation that drafted this declaration repealed compulsory church attendance laws and suspended mandatory church taxes (*i.e.*, tithes) during the Revolutionary War. Chapman & McConnell, *supra*, at 64–65.

After the war, the question was whether Virginia should reinstate mandatory tithes or abolish them. *Id.* at 65–66, 68–70. That issue sparked perhaps the greatest religious liberty debate in American history. Patrick Henry supported a modified system of compulsory tithes and introduced A Bill Establishing a Provision for Teachers of the Christian Religion to levy a tax "for the support of Christian teachers" that taxpayers could direct to their chosen "society of Christians." Thomas E. Buckley, *Church and State in Revolutionary Virginia 1776–*

*1787* 188 (1977).[1] The leaders of each "religious society" would then use the money "for a Minister or Teacher of the Gospel of their denomination" or "places of divine worship" and "*none other use whatsoever.*"[2] *Id.* at 189 (emphasis added).

Opposing the bill, James Madison drafted his famous Memorial and Remonstrance Against Religious Assessments. His primary objection was that "the [financial] duty which we owe to our Creator" is a matter between each individual and God and must be left to "the conviction and conscience of every man." James Madison, *Memorial and Remonstrance against Religious Assessments (1785)*, NATIONAL ARCHIVES, https://perma.cc/DXU3-ZPST. Madison thought it was "the duty of every man to render to the Creator such homage [*i.e.*, tithe] … as he believes to be acceptable to him." *Id.* So he proposed "a restoration" of early Christian practice where tithes were voluntary and "[t]eachers depended on the voluntary rewards of their flocks." *Id.*; *accord* Storslee, *supra*, at 125–26.

---

[1] *Accord* Vincent Blasi, *School Vouchers & Religious Liberty: Seven Questions from Madison's Memorial & Remonstrance*, 87 CORNELL L. REV. 783, 818 (2002) (reproducing the bill).

[2] The bill gave a narrow exception to Quackers and Mennonites. They were allowed to use the money how they thought "best calculated to promote their particular mode of worship." Buckley, *supra*, at 189. If someone paid the tax without designating a denomination, the money would be used to fund "seminaries of learning," *id.*, which were religious, Mark Storslee, *Church Taxes & the Original Understanding of the Establishment Clause*, 169 U. PA. L. REV. 111, 130 (2020).

Ultimately, the voluntary-support faction prevailed, Storslee, *supra*, at 124–25, 129, based on backing from Baptists, Presbyterians, and other evangelical Christians, Buckley, *supra*, at 140, 143, 149. The General Assembly later passed Thomas Jefferson's Act for Religious Freedom, which prohibited forcing citizens to support teachers of their "own religious persuasion" and guaranteed the freedom to "give[ ] contributions to the particular pastor whose morals [citizens] would make [their] pattern, and whose powers [they] feel[ ] most persuasive to righteousness." Va. Code § 57-1. Ever since, Virginia law has provided that no one "shall be compelled to frequent or support any religious worship, place or ministry whatsoever"—*i.e.*, subject to compulsory tithes—or "bur[d]ened, in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but … all men shall be free to profess … their opinions in matters of religion," which "shall in no [way] diminish … or affect their civil capacities." *Id.*; Va. Const. art. I, § 16.

The Act for Religious Freedom abolished compulsory tithes. *Accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 757–58 (Va. 2023) (Mann, J., concurring in part and dissenting in part). But Virginia's founding generation had no objection to "providing money for education"—religious or otherwise. Storslee, *supra*, at 135. The General Assembly directed that a portion of surveyor fees paid to secure land grants go to religious schools, including the College of William and Mary (Anglican/Episcopal), Transylvania Seminary (Presbyterian), and

Randolph Academy (Presbyterian). *Id.* at 130–31. Contemporaries knew that "some of those funds would be used to pay for religious activity," including "prayers and singing … hymns and psalms," which "were an essential part of every student's daily routine." *Id.* at 130, 133 (citation modified). Yet no one thought this violated the act. *Id.* at 131–32.

When the General Assembly decided to sell glebes, *i.e.*, land formerly set aside to support Anglican ministers, it channeled the profits to schools like Liberty Hall (Presbyterian). *Id.* at 134. A main purpose of such institutions was producing "a well-educated clergy [that] could produce informative sermons." Liberty Hall History, WASHINGTON & LEE UNIV., https://perma.cc/ZM8X-W8SF; *accord* Chapman & McConnell, *supra*, at 70–71. In fact, one of Liberty Hall's most famous students was John Chavis—the first African American known to have received a college education in the United States—who became a Presbyterian preacher and missionary. Chavis Hall, WASHINGTON & LEE UNIV., https://perma.cc/8DZR-M9KV. Early Virginians didn't consider "providing money for [this] education" problematic, even if it resulted in ministry. Storslee, *supra*, at 135.

Virginia's founders saw mandatory tithes as "coerced religious observance," *id.* at 127, 129, or "government[ ] enforcement of specifically religious duties," Chapman & McConnell, *supra*, at 70. But they had no concern about "ordinary taxation to support a public good." Storslee, *supra*, at 133. More specifically, "[c]hurches were not to receive

public money *solely* to support their worship, because such funding essentially required each citizen to make a religious offering. But the same was not true of funding for things like *education*, even if beneficiaries used some of the funds for religion." *Id.* at 183 (emphasis added). When the Commonwealth's "interest in providing funding rested on something other than financing *religion for its own sake*, even the most extreme advocates of religious liberty viewed [government funding] as wholly unobjectionable." *Id.* at 185–86 (emphasis added).

Summed up, though "Virginia … rejected proposals to impose taxes for the support of religious worship and instruction, [the Commonwealth] frequently and uncontroversially provided state support to schools and colleges that educated aspiring clergy." Chapman & McConnell, *supra*, at 71. No one during the founding era viewed "these decisions [as] inconsistent." *Id.* Even "Baptists and Presbyterians, who opposed religious taxes, received state grants of aid for their institutions of higher learning …, which trained clergy along with law, medicine, science, classics, and other subject matter." *Id.*; *accord* Storslee, *supra*, at 132–33, 136, 143, 147.

Virginia's history of *religious inclusion* in public benefits lines up with the Act for Religious Freedom's promise that Virginians would not "suffer on account of [their] religious … belief[s]" or have their "civil capacities" in any way "diminish[ed]" because of them. Va. Code § 57-1; Va. Const. art. I, § 16. And it accords with the Virginia Constitution's

protection of free exercise, which is *broader* than the First Amendment. *Vlaming*, 895 S.E.2d at 728–29 ("[R]eligious liberties in this Commonwealth do not vanish simply because a purely secular law says so ….").

## II. Virginia's 20th-century experiment in excluding people of faith from public benefits.

Virginia's *inclusion* of religion in public benefits lasted for 126 years. The religious *exclusion* that followed turned not on early history but on the federal Blaine Amendment whose anti-Catholic foundations were laid by President Grant in an address to Congress. Grant's request for a constitutional amendment mandating "free public schools" was based on "educati[ng] the masses" so they would "vote with a right understanding," not as "directed … by *priestcraft*"—an anti-Catholic stereotype. Ulysses S. Grant, Seventh Annual Message (Dec. 7, 1875) (emphasis added), https://perma.cc/Y66F-WBPW. Grant's solution was public schools and "prohibiting the granting of any school funds or school taxes, or any part thereof, either by legislative, municipal, or other authority, for the benefit or in aid, directly or indirectly, of any *religious sect or denomination*." *Id.* (emphasis added).

Representative James Blaine of Maine answered Grant's call. He proposed a constitutional amendment stating that no public-school tax money or lands designated to support them "shall ever be under the control of any *religious sect*, nor shall any money so raised or lands so devoted be divided between *religious sects* or *denominations*." 4 Cong.

Rec. 205 (1875) (emphasis added). As President Grant's address shows, this proposal "was born of bigotry and arose at a time of pervasive hostility to the Catholic Church and to Catholics in general." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (citation modified); *accord id.* at 499–505 (Alito, J., concurring); *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 77 n.3 (2019) (Thomas, J., concurring in the judgment); *Zelman v. Simmons-Harris*, 536 U.S. 639, 720–21 (2002) (Breyer, J., dissenting).

The Blaine Amendment passed the house with the first phrase modified to read "*religious sect or denomination*" and a proviso that the amendment didn't "vest, enlarge, or diminish legislative power in the Congress." 4 Cong. Rec. 5189–92 (1876) (emphasis added). But "it was an open secret that 'sectarian' was code for 'Catholic.'" *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion). The Senate proposed even stronger language, 4 Cong. Rec. 5453 (1876), that failed to garner sufficient votes, 4 Cong. Rec. 5595 (1876). So the federal amendment failed. Yet many States introduced versions of the Blaine Amendment into their own constitutions. Kyle Duncan, *Secularism's Laws: State Blaine Amendments & Religious Persecution*, 72 FORDHAM L. REV. 493, 517–20 (2003).

Virginia was late to the effort. The Commonwealth's 1902 Constitution added an unprecedented bar on the General Assembly granting funds or property "to any church, or *sectarian* society,

association, or institution of any kind whatever, which is entirely or partly, directly or indirectly, controlled by any church or *sectarian* society." Va. Const. art. IV, § 67 (1902) (emphasis added), https://bit.ly/4d6kjHT. And "sectarian was [still] code for Catholic." *Espinoza*, 591 U.S. at 501 (Alito, J., concurring) (citation modified). Curiously, Virginia's Blaine-Amendment-inspired provision specifically allowed "appropriations to *nonsectarian* institutions for the reform of youthful criminals."[3] Va. Const. art. IV, § 67 (1902).

What made Virginia reconsider this ban on religious-school funding wasn't pluralism but "'massive resistance' to desegregation." *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 221 (1964). Virginia responded to the Supreme Court's public-school-desegregation order in *Brown v. Board of Education*, 349 U.S. 294 (1955), by amending its constitution. *Griffin*, 377 U.S. at 221. This 1956 amendment allowed state and local governments to "appropriate funds for educational purposes" spanning "elementary" school to "graduate education" in both "public and *nonsectarian* private schools and institutions of learning."[4] *Griffin v. State Bd. of Educ.*, 239 F. Supp. 560, 562 (E.D. Va. 1965) (emphasis added). This nonsectarian language was a carryover from the 1902 Blaine-Amendment-inspired provision.

---

[3] The 1902 provision is now Article IV, § 16 of the Virginia Constitution.
[4] The 1956 provision is now Article VIII, § 10 of the Virginia Constitution.

Virginia's plan to avoid *Brown* was "clos[ing] any [integrated] public schools" and "pay[ing] tuition grants to children in *non-sectarian* [*i.e.*, non-Catholic] private schools" that remained segregated. *Griffin*, 377 U.S. at 221 (emphasis added). Specifically, "[t]he amendment … allowed the government to support private schools for white children," *i.e.*, *non-sectarian* or non-Catholic schools, which kept "them out of public schools that were desegregated." Brent Tarter, *Constitutional History of Virginia* 294 (2023). But the Commonwealth's highest court ruled that "closing mixed schools … violated the Virginia Constitution['s]" public-school mandate. *Griffin*, 377 U.S. at 221.

When Virginia adopted its current constitution in 1971, massive resistance to desegregation was over. Still, Virginia continued its Blaine-Amendment-inspired practice of excluding religious people from public benefits—but in modified form. A new constitutional provision allowed the legislature to "provide for loans to, and grants to or on behalf of, students attending [private] nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide *religious training* or *theological education*." Va. Const. art. VIII, § 11 (1971), https://bit.ly/3PDQxkK. That religious exclusion is only 55-years old and grounded in Blaine Amendment sentiment, which is "not a reflection of [Virginia's] Founding-era history." Storslee, *supra*, at 186.

In sum, Virginia has no historic and substantial tradition of discriminating against certain students based on their pursuit of religious training or theological education. The founding-era concern was "government[ ] enforcement of specifically religious duties," not "the financial assistance of religious organizations" or people. Chapman & McConnell, *supra,* at 70.

## III. The grants at issue.

Virginia denies Cameron Johnson, Luke Thomas, and Trace Stevens generally available college grants based *solely* on their religious exercise. This case involves two grant programs administered under conflicting rules. This section reviews each program separately.

### A. Virginia Tuition Assistance Grant Program (VTAG)

The State Council of Higher Education for Virginia "administer[s]" the Virginia Tuition Assistance Grant Program (VTAG) and "may adopt regulations" to implement the grant. Va. Code § 23.1-629. All "Virginia students … obligated to pay tuition as full-time undergraduate, graduate, or professional students" qualify, Va. Code § 23.1-631(A), if they comply with selective-service requirements, Va. Code § 23.1-632. But to be considered "[p]riority students" and guarantee "a full award," new recipients must apply for VTAG "by July 31." 8 Va. Admin. Code § 40-71-40(B).

Currently, most undergraduates receive $5,250 annually, *Va. Tuition Assistance Grant Program*, STATE COUNCIL OF HIGHER EDUC. FOR VA., https://perma.cc/PN4N-VM45 (VTAG Summary), for up to "four academic years," Va. Code § 23.1-631(B). The result is a generally available grant to undergraduates worth up to $21,000.

There are two requirements. First, students must attend "an eligible institution," Va. Code § 23.1-631(A), which "means a nonprofit private institution of higher education whose primary purpose is to provide collegiate, graduate, or professional education and not to provide *religious training or theological education*," Va. Code § 23.1-628(A) (emphasis added); *accord* 8 Va. Admin. Code § 40-71-10. Liberty University, which Plaintiffs attend, is eligible. VTAG Summary.

Second, students must study "in an eligible program," 8 Va. Admin. Code § 40-71-40(C)(2), which is statutorily defined as "under-graduate, graduate, or professional collegiate work in educational programs other than those providing *religious training or theological education.*" Va. Code § 23.1-631(C) (emphasis added); *accord* Va. Const. art. VIII, § 11. Regulations specify that VTAG's religious exclusion applies to study in "CIP [Classification of Instructional Programs] Code 39-series programs," 8 Va. Admin. Code § 40-71-10, as defined by the National Center for Education Statistics (NCES), a component of "the U.S. Department of Education" (DOE), *About IES*, INST. OF EDUC. SCIENCES, https://perma.cc/9SSH-NTKS.

14

DOE developed the CIP code to facilitate tracking and "reporting of fields of study and program completions" activity. *Introduction to the Classification of Instructional Programs: 2020 Edition (CIP-2020)* at 1, NCES, https://perma.cc/549R-8G2C. The code contains "general categories" for data placement, "*not* exact duplicates of a specific major or field of stud*y*." *Id.* (emphasis added). NCES says the code is "*not* a prescriptive list of officially recognized … programs" and is "*not* intended to be a regulatory device." *Id.* (emphasis added). Indeed, schools construe the code differently in "select[ing] the particular CIP [designation] that best describes their instructional program[s]," *id.* at 4.

Despite these warnings, the State Council of Higher Education treats the CIP code as "a regulatory device." *Id.* at 1. Studying religion in Code 39-series programs—loosely defined as "programs that *focus on* the intramural study of theology and that prepare individuals for the professional practice of religious vocations"—is VTAG *ineligible. Detail for CIP Code 39*, NCES, https://perma.cc/CD9T-8B8Q (emphasis added). Conversely, studying religion in Code 38-series programs—generally described as "programs that *focus on* logical inquiry, philosophical analysis, and the academic study of organized systems of belief and religious practices"—is VTAG *eligible. Detail for CIP Code 38*, NCES, https://perma.cc/ESD9-LZTZ (emphasis added); *accord* 8 Va. Admin.

Code § 40-71-10 ("Programs that provide religious training or theological education, classified as CIP Code 39-series programs, are not [VTAG] eligible programs.").

The supposed distinctions between these two categories make no functional difference. *First*, Code 38-series programs can prepare students for religious vocations or advanced seminary training—just like their Code 39-series counterparts. JA.40–41. Take Virginia Union University's (Code 38-series) Religious Studies program, which prepares students "for graduate work in the discipline of religion and ministerial studies" or to "pursue religious vocations (i.e., youth ministers, pastoral assistants, associate ministers, etc." *Course Catalog – Religious Studies Major* at 49, VA. UNION UNIV., https://perma.cc/PNM2-3YYA. Or consider Bluefield University's (Code 38-series) Music program, where students may "focus on … church music" and "prepare[ ] … for a professional vocational music ministry in the church." *Music (BA)*, BLUEFIELD UNIV., https://perma.cc/VW7M-HXBS. Those degrees are geared towards ministry, yet VTAG eligible.

Hampton University's (Code 38-series) major in Religious Studies is also "designed to sharpen the skills of students already in ministry" and "to prepare students for advanced studies, especially in religious education and theology." *Bachelor of Arts in Religious Studies*, HAMPTON UNIV., https://perma.cc/3XST-5FB4. So is Averett University's (Code 38-series) Religion program, which "is designed to prepare the

student for continuing seminary/graduate study or for an immediate career in Christian ministry." *Religion (REL) Program*, AVERETT UNIV. UNDERGRADUATE CATALOG, https://perma.cc/DJ98-Q3SP. And Virginia Wesleyan University's (Code 38-series) Religious Studies major, which "prepares students well for careers in … ministry," *Religious Studies*, VA. WESLEYAN UNIV., https://perma.cc/3Z7G-ZQTP, offers a fast track to Master of Divinity studies at Boston University, Duke, Emory, or United Theological Seminary, *Graduate Dual Degrees - Theology*, VA. WESLEYAN UNIV., https://bit.ly/4tw2SFz. VTAG funds all these majors, which prepare students for current or future ministry, while excluding other (Code 39-series) majors that often serve an identical function.

*Second*, Code 38-series programs—those that Virginia will fund with grants—are indisputably religious. They may "focus[ ] on the philosophy and teachings of Jesus Christ and his apostles," "[i]nclude[ ] instruction in Christian sacred scripture," and "stud[y] … one … of the main branches of the faith." *Detail for CIP Code 38.0203*, NCES, https://perma.cc/K4V9-MWZ9.

That means Code 38-series programs may concentrate on Christian theology, scripture, and a denomination's traditions, which is functionally indistinguishable from Code 39-series programs that may "focus[ ] on the Christian … Bible … with an emphasis on understanding and interpreting the theological, doctrinal, and ethical messages contained therein." *Detail for CIP Code 39.0201*, NCES,

https://perma.cc/89Z9-V3VC. In fact, course requirements for Code 38-series and Code 39-series majors are often materially indistinguishable. JA.197–204. (showing Code 38-series and Code 39-series degrees with very similar course requirements).

Liberty's degree catalog is a case in point. "Christian Studies" is VTAG eligible; "Biblical Studies" is not. *VTAG and Other Virginia State Aid - Religious Undergraduate Degree Programs*, LIBERTY UNIV., https://bit.ly/4eP2ePV. VTAG will fund studying "Religion: Christian Ministries" but not "Youth Ministries: Sport Outreach." *Id.* VTAG funds schooling in "Religion: Evangelism" and "Religious Studies: Theology and Apologetics" but not "Music and Worship: Worship Tech" or "Church Ministries: Adventure Leadership and Outdoor Ministry." *Id.* These distinctions make no sense.

*Third*, Code 39-series degrees don't guarantee religious career paths. Most undergraduate degrees are now fungible. And most students graduating from Code 39-series programs don't enter the ministry; they take *secular jobs*. Consider students who graduated from Liberty University with a Code 39-series designation of "Theology and Religious Vocations" from 2016–2018. A year after graduation, they overwhelmingly reported secular employment. *Emp. Outcomes - Earnings, Va. Insts.*, STATE COUNCIL FOR HIGHER ED. OF VA.,

https://bit.ly/4emSA6C.[5] So a Code 39-series major is a strong indicator of *personal* faith. But it's a poor gauge of *professional* religious calling.

VTAG's arbitrariness doesn't stop there. It funds students in Code 39-series programs if they "*double-major*" in a secular program that requires "an equal or greater number of courses." 8 Va. Admin. Code § 40-71-10 (emphasis added). Same funds, same major, but a different result for those who pursue a secular degree too. VTAG also funds students who study for a religious *minor* that may "prepar[e] [them] for religious leadership" or "more formal training in … seminaries," *Religious Leadership & Ministry (Minor)*, MARY BALDWIN UNIV., https://perma.cc/D3ZE-TYDF. Only students who *major* in a Code 39-series program arbitrarily lose the grant. 8 Va. Admin. Code § 40-71-10 (regulating "eligible major[s] or concentration[s]" within a major). The upshot is that VTAG draws a line between *approved* religious majors and *disapproved* religious majors, funding the former and not the latter, even though both may be launching pads for ministry or secular careers.

VTAG also funds *disapproved* religious majors if students add a secular double major with an equal number of courses. And VTAG funds religious minors that would be *disapproved* if they were a major.

---

[5] To view this data, select "Liberty University," "Four-Year Bachelor's Degree," "Theology and Religious Vocations," "2016-2018 cohort," and "1 year" postgrad. Then "Employment by Industry" appears at the bottom.

So only a limited category of religious students are excluded from VTAG—those with a sole CIP Code 39-series major.

### B. Virginia National Guard State Tuition Assistance Program (VANGSTAP)

The Adjutant General of Virginia oversees the Virginia National Guard State Tuition Assistance Program (VANGSTAP) and can issue regulations to implement it. Va. Code § 23.1-610(A). This grant is available to Virginia National Guard members with "a minimum remaining obligation of two years" who have completed their "initial active duty service" and "satisfactorily perform[ed]" their duties if they're enrolled—and in good standing—at an eligible institution. *Id.*

Eligible schools are statutorily defined as "institution[s] of higher education" that are public or that are private and "accredited non-profit[s] … whose primary purpose is to provide collegiate or graduate education and not to provide *religious training or theological education.*" *Id.* (emphasis added). All agree that Liberty University is an eligible institution. Currently, this grant provides students between $4,500 and $10,000 a semester, depending on the level of participation and funding allocated each year. *VANGSTAP Summary*, VA. NAT'L GUARD, https://perma.cc/7EC5-TEDK (VANGSTAP Summary).

The Adjutant General sets additional limits on the grant via a Command Policy. JA.96–106. Most limits are benign, such as generally requiring students to attend schools located in Virginia and to maintain

20

a minimum cumulative GPA. JA.100, 102. But one expressly discriminates based on religion, stating that "theological degrees," an undefined term, "are ineligible for [VANGSTAP] award (e.g., seminary school)."[6] JA.99; *accord* JA.108. Students who apply for VANGSTAP are required to sign a promissory note that says the grant "cannot be used to fund *degrees in religious training or theological education.*" JA.120 (all-caps omitted) (emphasis added); *accord* JA.123.

The Guard broadly construes this religious exclusion, even contradicting the State Council of Higher Education as to what programs are forbidden. It tells Guard members that "religious degrees" or "religious studies" aren't eligible for VANGSTAP. JA.152, 154. And the Guard applies the ban even to CIP Code 38-series religious majors, which are VTAG-eligible. JA.123; JA.154–155. The plain import of the Guard's language is that VANGSTAP excludes *all* religious majors, though it might "pay for a particular religious 'required' course for another type of degree." JA.110; *accord* JA.111.

Virginia suggests, without record support, that the Guard considers whether a religious major is housed in a divinity school—if so, the major is excluded. Opp. to Inj. Pending Appeal at 19. So at worst, VANGSTAP excludes *all* religious degrees and exercises unfettered

---

[6] An updated policy online contains the same language. Policy Number 72 – 25 at 3, VA. ADJUTANT GENERAL (May 19, 2025)1, https://perma.cc/TQ3N-NB4U.

discretion in determining which majors are religious—and thus barred. At best, VANGSTAP discriminates *among* religions based on "how … institution[s] structure[ ] the[ir] program[s]" and arbitrarily punishes those with a "school of divinity." *Id.*

The Guard is aware that the State Council of Higher Education makes VTAG grants available to some students pursuing religious majors. But the Guard declines to follow suit, stating that "VTAG[ ] is managed by another organization within the State government that [the Guard] has nothing to do with." JA.123; *accord* JA.125 ("The VTAG is a separate grant program from [VANGSTAP], and they do not work together.").

Ironically, the Guard employs—and its members benefit from—individuals who train for and pursue religious vocations. The Guard has an official Chaplains Office that "provide[s] the highest levels of religious support" and is led by a "State Chaplain"—an ordained, bi-vocational minister who holds the rank of colonel and earns commensu-rate pay. *Chaplain Support*, VA. NAT'L GUARD, https://perma.cc/3T2U-YQ35; *accord Lee Named New VNG State Chaplain*, VA. NAT'L GUARD, https://perma.cc/EB7R-M7QQ. Virginia's State Chaplain holds a Master of Arts in Religion from Reformed Theological Seminary—a CIP Code 39-series program that VTAG and VANGSTAP exclude. *Seung Lee*, LinkedIn profile, https://bit.ly/4frfRVF; *Accreditation,* Reformed Theological Seminary, https://perma.cc/NJ2M-77R3.

Students must register for VANGSTAP by July 1 for the Fall Semester. VANGSTAP Summary. Once grants are awarded, the Guard sends an "[a]pproval roster … to [each] school at the beginning of each semester[,] and the school will invoice [the Guard] for tuition only." *Id.* (all-caps omitted).

## IV.  Defendants reject Plaintiffs' grant requests

Virginia denies VTAG grants to Cameron and Luke and VANG-STAP grants to Trace, penalizing their religious exercise.

### A.  Cameron Johnson

Cameron Johnson is a lifelong Virginia resident. JA.36, 43. He is a Christian of the Baptist denomination who believes that the Bible is the supreme, authoritative, true Word of God. JA.43. The Bible teaches Cameron that *every* Christian—regardless of their occupation, position, or circumstances—must share the good news about Jesus. JA.43–44. He feels called to share his faith but doesn't know if he will do that within a religious vocation or a secular career. JA.44. Either way, Cameron seeks to be a Christian leader who pursues whatever career God has for him. JA.44.

Cameron is pursuing an undergraduate degree in Pastoral Leadership at Liberty University to develop his leadership skills, lay a foundation for graduate school, and prepare for vocational ministry if that is what God has in store. JA.44. But Cameron also has an interest

in secular careers, including real estate or leading a community-building nonprofit. JA.45. So he plans to minor in business. JA.45. He is an upcoming sophomore at Liberty.

Cameron submitted a VTAG application to Liberty's financial-aid office last year. But that application was denied because Pastoral Leadership is "a CIP code 39 program." JA.94. Unless this Court reverses with instructions to enter a preliminary injunction, Cameron will be deprived of a VTAG grant again and forced to take out more student loans. JA.216–217.

### B. Luke Thomas

Luke Thomas is a lifelong Virginian. JA.36, 46. He is a non-denominational Christian who believes that the Bible is the Word of God. JA.46. Luke's view of scripture is that *every* Christian is compelled to tell others about the Gospel, regardless of their occupation, position, or circumstances. JA.46. Luke is passionate about music and serves on his church's worship team. JA.46.

Luke originally planned to enter a trade or start a small business but later decided to pursue music. JA.46. He believes that God gifted him with musical talent to minister to people but doesn't know whether that means becoming a worship pastor or pursuing a commercial music career as a singer/songwriter. JA.47. Either way, he plans to start his own business someday. JA.47.

Luke chose to study at Liberty University, which has a Music and Worship major that would further his musical education and prepare him for potential ministry. JA.47. That degree is a CIP Code 39-series program and thus ineligible for VTAG. JA.47. So Luke initially declared a Music Vocal major to begin taking instrument classes and maintain his grant. JA.340. But Luke—an upcoming sophomore at Liberty—still intends to major in Music and Worship and must declare that major after a few more semesters to take certain required courses. JA.220–221, 339–340. Unless this Court reverses with instructions to enter an injunction, Luke will lose VTAG when he declares a Music and Worship major.

### C.    Trace Stevens

Trace Stevens is a longtime Virginia resident. JA.36, 51. He is a Christian of the Assemblies of God denomination. JA.51. Trace believes that *every* Christian is called to share their faith, no matter their occupation, position, or circumstances. JA.51.

Trace felt called to pursue a ministry degree but was hindered by cost. JA.51–52. A Virginia National Guard recruiter told Trace that VANGSTAP would help him pay for a ministerial degree, so he joined the Guard. JA.52. Later, Trace discovered that it wouldn't pay, though a federal grant would assist. JA.52–53. Given the National Guard recruiter's mistake, Trace asked the Governor's office for an exception,

but the Adjutant General said that his "theological degree program [was] ineligible." JA.108; *accord* JA.110–111, 152. Trace pointed out that his undergraduate Religion Degree was a Code 38 and thus eligible for VTAG—but the Guard said it didn't matter and denied him anyway. JA.123.

Trace is now a Specialist in the Guard with a Bachelor of Science in Religion (General Track) from Liberty that is VTAG *eligible* but VANGSTAP *ineligible*. JA.53, 55–56. Trace has enrolled in a Master of Divinity program at Liberty that is also VANGSTAP ineligible, while he pursues becoming a commissioned officer and Guard chaplain. *Accord* JA.59, 337. Unless this Court enters an injunction, Trace will continue to be deprived of VANGSTAP and struggle to pay for a chaplaincy-related degree that directly benefits the Guard and the Commonwealth. JA.337.

## V.    **Procedural history**

Cameron, Luke, and Trace filed suit in the U.S. District Court for the Eastern District of Virginia, asserting that Virginia law violated the Religion Clauses four ways: (1) excluding Plaintiffs from otherwise available public benefits, (2) failing to be neutral and generally applicable, (3) favoring certain denominations, and (4) causing excessive entanglement. JA.62–67.

They also moved for a preliminary injunction. JA.158–230. Nearly eight months after briefing completed, the district court denied the motion and dismissed Cameron's and Luke's claims. JA.1–21. The court held that "so long as [*Locke v. Davey*, 540 U.S. 712 (2004),] remains good law, [Cameron's and Luke's] claims against the State Council Defendants, as administrators of the VTAG Program, must fail." JA.9. Though it "suspect[ed] that *Locke* also dooms Plaintiffs' claims against the administrators of [VANGSTAP]," the court declined to dismiss Trace's claims against the Guard based on "the limited factual record before the Court." JA.9.

Plaintiffs filed a timely notice of appeal, JA.342, and moved for an injunction pending appeal in the district court, Pls.' Mot. for Inj. Pending Appeal, ECF No. 37. *Accord* FRAP 8(a)(1)(C); Local Rule 8. The court denied that motion. Mem. Order at 2, ECF No. 40. But the district court granted the parties' request for a stay of the proceedings until this interlocutory appeal is resolved. *Id.* at 3.

Plaintiffs also moved for an injunction pending appeal in this Court. On April 30, 2026, that motion was fully briefed. On May 18, 2026, the Court denied the motion without written explanation. The next day, Plaintiffs moved to expedite this appeal.

# SUMMARY OF ARGUMENT

Virginia's only defense is *Locke*. But that ruling should not be extended to the materially different facts at issue here. Unlike *Locke*, Virginia's grants use conflicting exclusions, pick religious favorites, and impose government religiosity standards. The interest *Locke* identified—withholding support for clergy—also doesn't fit Plaintiffs, especially given novel music and military contexts that set them apart. *Locke* didn't resolve Plaintiffs' legal arguments, which are almost wholly new. Nor did *Locke* address the Blaine-Amendment concerns that are squarely presented here. For similar reasons, this Court's ruling in *Hall v. Fleming*, __ F.4th __, No. 25-1574, 2026 WL 1314675 (4th Cir. May 13, 2026), doesn't control this appeal.

Under established First Amendment rules, Virginia's grant programs violate the Religion Clauses. They discriminate based on students' religious use of a government benefit, penalizing free exercise.

Virginia's grants also defy neutrality and general applicability. The grants' exclusions aren't neutral because they are an outgrowth of the Blaine Amendment, are targeted to suppress religious conduct, and discriminate against particular religious beliefs. And general applicability is lacking because the grants contain formal mechanisms for individualized exemptions.

By picking and choosing religious favorites, Virginia's grants engage in textbook denominational discrimination. Yet both Religion Clauses forbid favoring certain theological choices. So *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025)—not *Locke*—is directly on point.

The grant's exclusions also result in excessive entanglement with religion, which is of particular concern in the religious-school context. That violates the Establishment Clause.

Because Virginia can't satisfy strict scrutiny and the other preliminary-injunction factors favor Plaintiffs, this Court should reverse with instructions to enter a preliminary injunction.

## STANDARD OF REVIEW

The Court reviews the denial of a preliminary injunction for abuse of discretion, applying a de-novo standard to legal conclusions and a clear-error standard to factual findings. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc). An abuse of discretion includes "mak[ing] an error of law or ignor[ing] unrebutted, significant evidence." *Id.* Here, the district court's ruling turned on "legal questions reviewed de novo," so this Court "analyze[s] the parties' positions with fresh eyes." *Grimmett v. Freeman*, 59 F.4th 689, 692 (4th Cir. 2023); *accord Commodity Futures Trading Grp. v. Kimberlynn Creek Ranch*, 276 F.3d 187, 191 (4th Cir. 2002).

A preliminary injunction is proper if plaintiffs show they are "likely to succeed on the merits," there is a "risk of irreparable harm," "the balance of equities" favor them, and an injunction is in "the public interest." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025). The first two factors are most critical. *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at \*8 (4th Cir. Aug. 15, 2025). And the second two merge when the government opposes the motion. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024); *accord Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (analyzing only the public interest).

## ARGUMENT

## I. Plaintiffs will likely prevail on the merits.

### A. *Locke* is distinguishable.

The district court viewed *Locke* as preempting all First-Amendment challenges to scholarship programs' religious exclusions. JA.9–18. That's wrong. *Locke* itself refused to "extend the [*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33 (1993)] line of cases well beyond not only their *facts* but their *reasoning*." 540 U.S. at 720 (emphasis added). So too here. *Locke* doesn't apply to this case's materially different facts and claims.

*First*, this Court routinely distinguishes Supreme Court precedent in appropriate cases. The high court's decision may involve materially

30

different facts. *E.g.*, *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 185–86 (4th Cir. 2016); *The Eir*, 60 F.2d 124, 125 (4th Cir. 1932) (per curiam). The challenged law may raise different legal questions than the provision the Supreme Court considered. *E.g.*, *Vick v. Williams*, 233 F.3d 213, 218 (4th Cir. 2000). Or "[t]he burden imposed" by the law may be of a fundamentally different "character" than what the high court faced. *Perry v. Marteney*, 172 F.4th 315, 327 (4th Cir. 2026). Here, *Locke* is distinguishable for all these reasons, as discussed below.

*Second*, the Supreme Court's recent precedent shows that *Locke* is narrow—not broad or all-encompassing. The high court refused to apply *Locke* three times in five years. *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 788–89 (2022) (distinguishing *Locke*); *Espinoza*, 591 U.S. at 479–81 (same); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 464–65 (2017) (same). And Justices, judges, and scholars have roundly criticized *Locke* as wrongly decided, which is true. (*Locke* was wrongly decided, conflicts with intervening Supreme Court precedent, and should be overruled. *E.g.*, *Espinoza*, 591 U.S. at 492 (Thomas, J., concurring); *id.* at 512–14 (Gorsuch, J., concurring); *Trinity Lutheran*, 582 U.S. at 468 (Thomas, J., concurring in part); *Locke*, 540 U.S. at 726–34 (Scalia, J., dissenting); *Hall*, 2026 WL 1314675, at *5–8 (Richardson, J., concurring); *see generally* Thomas C. Berg & Douglas Laycock, *The Mistakes in* Locke v. Davey *and the Future of State*

*Payments for Services Provided by Religious Institutions*, 40 TULSA L. REV. 227 (2004).)

So *Locke* should be given a narrow reach. It should "not [be] extend[ed] … to [this] novel setting, *Hall*, 2026 WL 1314675, at *7 (Richardson, J., concurring), which is nothing like the single, uniform, and denominationally neutral funding exclusion that *Locke* considered.

*Third*, lower courts have recognized *Locke*'s bounds. *E.g.*, *Ill. Bible Colls. Ass'n v. Anderson*, 870 F.3d 631, 640 (7th Cir. 2017) (asking whether a "regulatory scheme" falls on the *Trinity Lutheran* or *Locke* "side of the line"). The Tenth Circuit, for example, has *rejected* the "argument that *Locke* subjects all state decisions about funding religious education to no more than rational basis review," *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1254–55 (10th Cir. 2008) (quotation omitted), which is essentially Virginia's position here. This Court should do the same: *Locke* "does not imply that [S]tates are free to discriminate in funding against religious institutions however they wish, subject only to a rational basis test." *Id.* at 1256.

*Fourth*, *Locke* didn't approve all religion-based scholarship exclusions. The Court merely "uph[eld] the Promise Scholarship Program *as currently operated* by the State of Washington." 540 U.S. at 725 (emphasis added). Virginia's programs operate differently in material ways, rendering *Locke* inapposite.

Washington uniformly excluded "devotional theology" degrees from its scholarship, burdening all religious adherents equally. *Id.* at 717; *accord id.* at 721. But Virginia picks and chooses between religious programs and people. VTAG funds CIP Code *38-series* religious majors but excludes CIP Code *39-series* religious majors, even though these programs may be virtually indistinguishable and equally prepare students for secular careers or religious ministry. *E.g.*, JA.198–204. (showing Code 38-series and Code 39-series degrees with materially indistinguishable requirements); *VTAG and Other Virginia State Aid - Religious Undergraduate Degree Programs*, LIBERTY UNIV., https://bit.ly/4eP2ePV (listing "Christian Studies" as VTAG-eligible and "Biblical Studies" as VTAG-ineligible); *supra* pp. 13–20.

VTAG "singles out" some religious people "for special burdens on the basis of religious calling," an issue that wasn't present in *Locke*. 540 U.S. at 724 n.8 (citation modified). Consider that the ineligible plaintiff in *Locke* was "a double major in pastoral ministries and business management/administration." *Id.* at 717. Here, he would fall under VTAG's double-major exception and receive a substantial scholarship that Cameron Johnson is denied because Cameron was called to major *only* in Pastoral Leadership. So no "distinct category of instruction" is barred, as in *Locke. Id.* at 721.

Nor is VANGSTAP anything like Washington's program. Washington's scholarship was available to those pursuing *non*-devotional

religious degrees, *i.e.*, degrees not "designed to induce religious faith," *Id.* at 716 (quotation omitted), so the program went "a long way toward including religion in its benefits," *id.* at 724. But under the worst reading of VANGSTAP, all "religious degrees" are ineligible, which excludes religion completely. JA.152. Even under the alternative reading—where VANGSTAP bars only majors housed in a divinity school—the program plays denominational favorites because "'divinity school' generally connotes Christian." David N. Hempton, *What is a Multireligious Divinity School?*, HARVARD DIVINITY BULLETIN (Winter 2017), https://perma.cc/ZR75-A6BA. Other faiths eschew the term "divinity school" or that form of internal religious organization, as do some Christian denominations. And the Guard also has unbridled discretion to determine when the exclusion applies, for the Command Policy makes no mention of divinity-school programs. JA.97–106. So VANGSTAP "singles out [certain religious students] for special burdens," contrary to *Locke.* 540 U.S. at 724 n.8 (citation modified).

Summed up, Washington barred "fund[ing] a distinct category of instruction," *id.* at 721, but Virginia does no such thing. VTAG and VANGSTAP employ conflicting rules that exclude different instruction. Consider Trace and Cameron: both chose majors that could be used for professional ministry or secular careers. But Cameron's Pastoral Leadership major is VTAG *ineligible, supra* p. 24, while Trace's Religion (General Track) major was VTAG *eligible, supra* p. 26. And those who

enter Guard service—like Trace—are *denied* VANGSTAP even when they pursue Code 38-series majors, while those who take a civilian route and pursue the same majors *receive* VTAG. *Supra* p. 21. So Virginia favors some religious callings over others.

*Fifth*, *Locke* didn't approve exclusions based on government-imposed religiosity standards. *Colo. Christian Univ.*, 534 F.3d at 1266. Washington allowed each private educational "institution" to "determine[ ] whether the student's major is devotional" under its own religious principles. *Locke*, 540 U.S. at 717. But here, Virginia makes these sensitive religious decisions itself, either by imposing the CIP Code's standards on private institutions (VTAG) or by drawing lines between devotional and non-devotional majors with no standards or guidelines on a case-by-case basis (VANGSTAP). The Supreme Court faced nothing similar in *Locke. Id.*

*Sixth*, the unique facts of *Locke* aren't present here. The *Locke* Court made an exception to general First Amendment rules based on a historic interest in not "supporting the clergy." *Id.* at 723. Joshua Davey implicated that interest because his "only reason" for pursing "a college degree" was "to prepare himself … for a lifetime of ministry, specifically as a church pastor." *Id.* at 717, 721 (citation modified). *Locke* regarded "[t]raining someone [intent on] lead[ing] a congregation" as akin to "support[ing] church leaders." *Id.* at 721–22; *accord Trinity Lutheran*, 582 U.S. at 464 (emphasizing what Davey "proposed *to do*").

But Cameron isn't set on leading a congregation. He always planned to attend college, JA.215, and pursued a Pastoral Leadership major to keep the door to professional ministry open, JA.215–216. Yet he remains interested in a real-estate career or leading a community-based nonprofit—secular jobs often pursued by those with pastoral training. JA.215. Because Cameron isn't committed to becoming a church leader, Virginia lacks a historic interest in excluding him from VTAG, especially as VTAG funds *other* religious majors that prepare students for ministry. *Supra* p. 13–20.

Luke's Music & Worship major is even further afield from *Locke.* The Supreme Court considered only "a degree in devotional theology," not a degree in music. *Locke*, 540 U.S. at 717. America saw no "uprisings against procuring taxpayer funds to support" people who make their living by playing religious music. *Id.* at 722. In fact, music in "early churches in America" came from "volunteer choirs of laymen," not professional musicians. John M. Bullard, *Church Music in the United States, 1760-1901*, THE DIAPASON, https://perma.cc/9ZU6-7XZK.

Plus, Luke chose college to prepare for "a religious or secular music career," JA.220, such as a "singer or songwriter." JA.222. A Music and Worship degree prepares for both. The course requirements for a Commercial Music – Performance degree are remarkably similar, especially with a concentration in Creative Worship. *Compare Music & Worship (B.S.) – Resident*, LIBERTY UNIV. COURSE CATALOG,

36

https://perma.cc/S5M6-NQ6Y, *with Commercial Music (B.M.) – Performance*, LIBERTY UNIV. COURSE CATALOG, https://perma.cc/Z4TS-LNP8. Yet VTAG *excludes* Music and Worship (CIP Code 39.0501) majors, while *including* Commercial Music – Performance (CIP Code 50.0999) majors. *Liberty Univ. Acad. Programs – CIP Codes*, LIBERTY UNIV., https://perma.cc/MD9H-437Z. So there's no meaningful line between "religious calling[s]" and "academic pursuit[s]." 540 U.S. at 721.

Trace's situation also materially differs from *Locke*. VANGSTAP denied him undergraduate grants for a Religion – General Track (CIP Code 38.0201) degree that VTAG would fund. And Trace's current pursuit of a Master of Divinity to become a Guard chaplain, *supra*, p. 26, involves a military scenario that *Locke* never considered. Even Virginia concedes that military "chaplains … [implicate] a *different history and interest*" than a "decision not to fund religious vocational training." Opp. to Inj. Pending Appeal at 25 (emphasis added). Because that "historic and substantial state interest" doesn't apply to Trace, there's no justification for applying *Locke* to him. 540 U.S. at 725.

*Seventh*, *Locke* addressed a narrow legal argument. The Court rejected Davey's claim that "the denial of funding for vocational religious instruction *alone* is inherently constitutionally suspect" and "*presumpti[vely]* … unconstitutional[ ]." *Id.* at 725 (emphasis added). *Locke* denied this "presumption of unconstitutionality" but didn't

"venture further" into the "Religion Clauses … to uphold the Promise Scholarship Program" challenged there. *Id.* at 725. Here, the Court must delve deeper into the First Amendment because Plaintiffs raise new arguments based, at least in part, on precedent that did not exist. As explained below, they contend that Virginia's grants violate the Religion Clauses because they (1) deny public benefits based on religious use, (2) aren't evenhanded or generally applicable, (3) favor certain denominations, and (4) result in excessive entanglement.

*Locke* didn't rule on any of these claims because Davey didn't raise them. The party presentation rule holds that "[t]he parties frame the issues for decision" and "the court serves as neutral arbiter of matters the parties present." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (citation modified). So *Locke* "cannot be read as foreclosing … argument[s] that [it] never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994).

*Finally*, the state constitutional provision that *Locke* considered wasn't "connect[ed] [to] the Blaine Amendment." 540 U.S. at 723 n.7. So "the Blaine Amendment's history" wasn't relevant there. *Id.* But here, the opposite is true. VTAG's and VANGSTAP's religious exclusions are based on Article VIII, § 11 of the Virginia Constitution, which prohibits aid to students at schools "whose primary purpose is to … provide religious training or theological education." That prohibition was based on "the wall of separation between church and state so carefully erected

38

in *other sections* of the [Virginia] Constitution." *Comm'n on Constitu- tional Revision*, The Constitution of Virginia 274 (1969), https://perma.cc/6UWF-EEFQ (emphasis added).

This is a direct signpost to Article IV, § 16 of the Virginia Constitution (the Commonwealth's Blaine-Amendment-inspired provision), which drew a *sectarian* vs. *nonsectarian* line for aid to private organizations, and Article VIII, § 10 of the Virginia Constitution, which carried over this *nonsectarian* limit on aid to private schools. *Locke* accepted that bars on "sectarian" aid are grounded in the Blaine Amendment. 540 U.S. at 723 n.7; *accord Espinoza*, 591 U.S. at 482; *id.* at 498–501 (Alito, J., concurring).

Virginia recognized the Blaine-Amendment connection too. In drafting its current constitution, Virginia left Article VIII, § 10's *nonsectarian* language intact to avoid "the bitter fight in New York … when a constitutional convention proposed to repeal the so-called '*Blaine Amendment*' in New York's Constitution (prohibiting state aid to *sectarian* schools)." *Comm'n on Constitutional Revision*, *supra*, at 272 (emphasis added). Virginia's explanation for retaining Article IV, § 16's *sectarian*-related language further solidifies the Blaine-Amendment link, noting that "Section 10 of the proposed Education article … limits appropriations of state money for private education to *nonsectarian* schools." *Id.* at 155 (emphasis added).

Because of Article VIII, § 11's Blaine connection, *Locke* doesn't control. There, the Court was clear that "the Blaine Amendment's history [was] simply not before" it. 540 U.S. at 723 n.7. Here, the Blaine Amendment's "shameful [anti-Catholic] pedigree" spawned Virginia's religious exclusion, and such a late-breaking prohibition "cannot … establish [the kind of] early American tradition" on which *Locke* relied. *Espinoza*, 591 U.S. at 482.

**B.** *Hall* **doesn't control.**

While this appeal was pending, the Court decided *Hall v. Fleming*, __ F.4th __, No. 25-1574, 2026 WL 1314675 (4th Cir. May 13, 2026), which rejected a challenge to VTAG's religious exclusion based "only" on the argument that "the Supreme Court in *Trinity Lutheran*, *Espinoza*, and *Carson* abrogated *Locke*." *Id.* at *3. Because that case is materially different from this one, *Hall* doesn't control.

Bethany Hall is a Liberty University student who seeks to major in Worship and Music and receive VTAG grants. *Id.* at *1–2. That is where the similarities end. On one hand, Bethany "concede[d] that the facts [of her case] were on all fours or identical with *Locke*." *Id.* at *3 (citation modified). On the other hand, Cameron, Luke, and Trace seek VTAG and VANGSTAP grants, which operate under conflicting religious rules. They show that *Locke* is distinguishable at every turn.

For instance, in *Locke*, Washington had a single uniform and denominationally neutral religious exclusion with no Blaine-Amendment connection. Yet here, Virginia has two contradictory and denominationally discriminatory religious exclusions that stem from a Blaine Amendment. And because Bethany isn't a Guard member, she lacked standing to challenge VANGSTAP. That alone distinguishes *Hall*.

Bethany also raised the single argument that *Trinity Lutheran*, *Espinoza*, and *Carson* "effectively abrogated and overruled *Locke*, and thus *Locke* should now be explicitly overruled." *Id.* at *2 (citation modified). While the Supreme Court should overrule it, *id.* at *5–8 (Richardson, J., concurring), that's not the primary thrust of this appeal.

Here, *Locke* is distinguishable based on the Blaine Amendment and a myriad of other factors. So Plaintiffs contend that normal First Amendment rules apply, and VTAG's and VANGSTAP's religious exclusions fail them by (1) denying public benefits based on religious use, (2) lacking neutrality and generally applicability, (3) favoring certain denominations, and (4) resulting in excessive entanglement. Because Bethany didn't raise these arguments, *Hall* didn't consider them, and *Hall* "cannot be read as foreclosing … argument[s] that [it] never dealt with." *Waters*, 511 U.S. at 678.

At bottom, *Hall* rested on the maxim that lower courts "must follow the case which directly controls." 2026 WL 1314675, at *5 (citation modified); *accord id.* at *7 (Richardson, J., concurring). True. But Virginia's grant programs discriminate *among* religions. So as explained below, *Catholic Charities Bureau*—not *Locke*—controls here.

## C. Virginia's grant programs violate the Religion Clauses in four ways.

When *Locke* doesn't apply, normal First Amendment rules do. *E.g., Carson*, 596 U.S. at 780–81; *Espinoza*, 591 U.S. at 475–79; *Trinity Lutheran*, 582 U.S. at 458–463. Virginia's grant programs violate those foundational principles in four ways.

### 1. Virginia's grants discriminate based on religious character, activity, or use.

Because *Locke*'s exception is inapposite, the free-exercise analysis is straightforward. A trilogy of Supreme Court cases bars governments from denying public benefits based on religious character, activity, or use. That is exactly what Virginia does in denying VTAG and VANGSTAP grants based on students' choice of religious major.

*Trinity Lutheran* held that religious citizens have "a right to participate in a government benefit program without having to disavow [their] religious character." 582 U.S. at 463. It made no difference that a church could still "worship[ ]" and "subscribe to a certain view of the Gospel" *without* a scrap-tire upgrade to its preschool playground. *Id.*

Such "indirect coercion or penalties on the free exercise of religion" violate the Free Exercise Clause by "deter[ring] or discourage[ing] the exercise of First Amendment rights." *Id.* (citation modified). So Missouri's "decision to exclude [the church] for purposes of [a] public program [had to] withstand the strictest scrutiny." *Id.*

Next, *Espinoza* applied *Trinity Lutheran* to a tax-credit program that enabled scholarships to private schools. 591 U.S. at 467–68. Barring "[a]id … to sectarian schools … singles out schools based on their religious character." *Id.* at 476 (citation modified). And it punishes "parents who wish to send their children to a religious school," denying them the "same benefits" that the state accords everyone else based on "a school['s] … religious … affiliation." *Id.* at 476, 478. This violated the Free Exercise Clause, regardless of Montana's "goal[ ]" of "preventing religious organizations from putting aid to religious uses." *Id.* at 478. So "the strictest scrutiny [was] required." *Id.* at 484 (citation modified).

Eventually, *Carson* applied *Trinity Lutheran* and *Espinoza* to strike down a nonsectarian requirement for state tuition assistance. *Carson*, 596 U.S. at 771–73, 789. The law's "effect" was to "disqualify some private schools [and families] from funding solely because they are religious." *Id.* at 780 (citation modified). Maine's "antiestablishment interest" didn't justify this "discrimination against religion" because the First Amendment bars excluding people of faith "from an otherwise generally available public benefit because of their religious exercise." *Id.*

43

at 781. It was irrelevant whether Maine's prohibition was based on a benefit recipient's religious character/status or the recipient's religious use of the funds. *Id.* at 779–88. Programs that "carve[ ] out private religious [citizens] from" public benefits are "subject[ ] to the strictest scrutiny." *Id.* at 780 (quotation omitted).

Here, Virginia bans Cameron, Luke, and Trace from using VTAG and VANGSTAP benefits to pursue religious majors that it considers too "sectarian," Va. Const. art. IV, § 16; Va. Const. art. VIII, § 10, because they involve "religious training or theological education," Va. Const. art. VIII, § 11. That penalizes Plaintiffs for taking their faith seriously and indirectly coerces them to pursue secular majors instead. *Trinity Lutheran*, 582 U.S. at 463. And it denies Plaintiffs equal benefits based on their religious affiliation with Liberty's School of Divinity. *Espinoza*, 591 U.S. at 476, 478. The Free Exercise Clause bars Virginia from excluding Cameron and Luke from VTAG and Trace from VANGSTAP based on their "use of the benefits" to prepare for professional or lay ministry. *Carson*, 596 U.S. at 789. Plaintiffs "are members of the community too, and their exclusion from the scholarship program[s] here is odious to our Constitution and cannot stand." *Espinoza*, 591 U.S. at 488–89 (citation modified).

All Virginia offers in response is its anti-establishment interest. But the Commonwealth's efforts to achieve "greater separation of church and State than is already ensured under the Establishment

Clause of the Federal Constitution[ ] is limited by the Free Exercise Clause." *Trinity Lutheran*, 582 U.S. at 466 (quotation omitted). While "[o]ur federal system prizes state experimentation," Virginia has no leeway to "experiment[ ] in the suppression of … the free exercise of religion." *Espinoza*, 591 U.S. at 485 (quotations omitted). The First Amendment rule is that "[a] State's antiestablishment interest *does not* justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson*, 596 U.S. at 781 (emphasis added).

### 2. Virginia's grant programs aren't neutral or generally applicable.

The Free Exercise Clause prohibits burdening Cameron's, Luke's, and Trace's "sincere religious practice pursuant to … [laws] that [are] not neutral or generally applicable." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quotations omitted). No one disputes Plaintiffs' sincere belief that God called them to pursue particular religious majors, *e.g.*, JA.216, 220, 227, 229, or that excluding Plaintiffs from VTAG and VANGSTAP burdens this religious practice, *e.g.*, JA.216, 336–337, 339–340. The only question is whether Virginia's laws are neutral and generally applicable. They're not.

### a. Virginia's grants aren't neutral.

Neutrality is lacking here for three reasons. *First*, as noted, VTAG's and VANGSTAP's religious exclusions are based on sections of

the Virginia Constitution directly tied to the Blaine Amendment. Those provisions are part of a "checkered tradition" that "was born of bigotry and arose at a time of pervasive hostility" to religion—specifically, "the Catholic Church and … Catholics in general." *Espinoza*, 591 U.S. at 482 (citation modified); *accord id.* at 498–507 (Alito, J., concurring); *Zelman*, 536 U.S. at 720–21 (Breyer, J., dissenting). Statements by the drafters of the current Virginia Constitution confirm this fact. *Supra* p. 10–12; *accord Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018) (instructing courts to consider "historical background," "events leading to the enactment," and "legislative … history").

So does the Virginia Constitution's text, which "retains the bigoted [sectarian] code language used throughout state Blaine Amendments." *Espinoza*, 591 U.S. at 501 (Alito, J., concurring). This language keeps the Virginia Constitution "tethered to its original bias," which the Commonwealth didn't "confront" but *intentionally avoided* in the 1971 "reenact[ment]." *Id.* at 507 (citation modified); *e.g., Comm'n on Constitutional Revision, supra*, at 156 (discussing good reasons to modify Article IV, § 16 but declining to "relax[ ] the present prohibition" to avoid "open[ing] a Pandora's Box"); *id.* at 272 (opting "to leave [Article VIII, § 10]" "as it is" to avoid "stir[ring] deep animosities" and "split[ting] Virginia's people along religious lines"); *id.* at 274 (drafting Article VIII, § 11 "to avoid involving the Commonwealth in religious activities" based on these "other [unchanged] sections").

In short, Virginia's grant exclusions stem from the Blaine Amendment and "a time of pervasive [religious] hostility." *Espinoza*, 591 U.S. at 482 (quotation omitted). They represent far more than a "subtle departure[ ] from neutrality" and evince a strong, not "slight[,] suspicion … [of] animosity to religion." *Masterpiece Cakeshop*, 584 U.S. at 638–39 (quotation omitted). Because the government "cannot impose regulations that are hostile to the religious beliefs of affected citizens," VTAG's and VANGSTAP's religious exclusions should be "set aside." *Id.* They have no legitimate application to Plaintiffs.

*Second*, "[a] government policy will not qualify as neutral if it is specifically directed at religious practice." *Kennedy*, 597 U.S. at 526 (citation modified). VTAG's and VANGSTAP's exclusions target religious training and theological education, "discriminat[ing] on [their] face" against two quintessentially religious activities. *Id.* (quotation omitted). By definition, the "object or purpose" of these exclusions "is the suppression of religion or religious conduct." *Lukumi*, 508 U.S. at 533. Virginia's "impermissible attempt to target [Plaintiffs'] religious practices" for disfavor violates the Free Exercise Clause. *Id.* at 535.

*Third*, laws aren't neutral if they "discriminate[ ] against some … religious beliefs," such as by "prohibit[ing] preaching" by one group and "permit[ting] preaching" by another. *Id.* at 532–33. On this score, Virginia's grants fail neutrality twice over. VTAG *funds* CIP Code 38-series religious majors, which may prepare students for ministry, but

*excludes* CIP Code 39-series religious majors, which often do the same. *Supra* p. 13–20. And VANGSTAP *excludes* Guard members from religious training—even to become a Guard chaplain—when VTAG *funds* the same theological study for others. *Supra* p. 22. In both ways, Virginia law "disfavor[s] [Plaintiffs'] religion." *Lukumi*, 508 U.S. at 532.

### b. Virginia's grants aren't generally applicable.

Virginia's grants aren't generally applicable, either, because they "provide[ ] … mechanism[s] for individualized exemptions." *Kennedy*, 597 U.S. at 526 (quotation omitted). The free-exercise rule is that "a formal mechanism for granting exceptions renders a policy not generally appliable, regardless whether any exceptions have been given, because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021) (citation modified). So the state can't "refuse to extend [a] system" of individualized exemptions "to cases of religious hardship without compelling reason." *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990) (quotation omitted).

Both VTAG and VANGSTAP contain formal mechanisms for individualized exemptions. VTAG's eligibility regulations specifically authorize "case-by-case" exemptions to the full-time-student rule for "disability or other medical reasons." 8 Va. Admin. Code § 40-71-

40(C)(2)(c). They also allow discretionary exemptions to the double-major rule "based on circumstances beyond the control of the student." 8 Va. Admin. Code § 40-71-10.

VANGSTAP is similar. It gives "the Adjutant General" virtually unlimited and "final authority" over the program, including the power to issue "regulations." Va. Code § 23.1-610(A); JA.104. The General used this authority to implement a Command Policy that explicitly authorizes "case-by-case" exemptions to the eligibility rules for those studying "outside of Virginia," "unable to re-enlist," or subject to "recoupment" in some instances. JA.99–100, 105. Plus, the ban on "theological degrees … (e.g., seminary school)" is of the General's own making. JA.99. He has the power to define and apply that prohibition—or make exceptions—on an individualized basis. Here, for instance, the General refused to interpret VANGSTAP's exclusion the same way the State Council of Higher Education construes VTAG's. *E.g.*, JA.108, 123, 154.

One thing is clear: Virginia's grants aren't "applied in an evenhanded, across-the-board way." *Kennedy*, 597 U.S. at 527. They both "incorporate[ ] a system of individual exemptions." *Fulton*, 593 U.S. at 535. The First Amendment doesn't allow Virginia to "devalue[] [Plaintiffs'] religious reasons" for an exception to the eligibility rules, *allowing* discretionary exceptions for others but *denying* such an exemption to them. *Lukumi*, 508 U.S. at 537.

### 3. Virginia's grants impose a denominational preference.

Virginia's grants pick and choose religious favorites, which violates the Establishment Clause's "clearest command"—"that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

*Catholic Charities Bureau* reaffirmed this principle when assessing the religious exemption to an unemployment benefits tax. 605 U.S. at 242. Wisconsin denied the exemption to Catholic Charities because it didn't proselytize or limit employment and services to coreligionists and secular organizations could mirror its activities. *Id.* at 245–46. In the State's view, that meant Catholic Charities wasn't "operated primarily for religious purposes." *Id.* at 245 (quotation omitted).

The Supreme Court reversed based on the "principle of denominational neutrality," which prevents "favoritism among sects." *Id.* at 247–48 (quotation omitted). Wisconsin granted "a denominational preference by explicitly differentiating between religions based on theological practices" and making the "exemption … turn[] on inherently religious choices." *Id.* at 250. Specifically, the exemption "require[d] proselytization or exclusive service of co-religionists," establishing "a preference for certain religions based on the commands of their religious doctrine." *Id.* Such "differentiat[ion] between religions

along theological lines is textbook denominational discrimination." *Id.* at 248.

Virginia's grant programs violate the Religion Clauses for identical reasons. VTAG favors students who pursue (purportedly more secular) CIP Code 38-series majors over those who pursue (ostensibly more devotional) CIP Code 39-series majors. 8 Va. Admin. Code § 40-71-10. But the extent to which "religious education" should "inculcate religious doctrine" is a "fundamentally theological choice[,] driven by … different religious [beliefs or] doctrines." *Cath. Charities Bureau*, 605 U.S. at 252. Plaintiffs' "eligibility for [VTAG] ultimately turns on inherently religious choices" (namely, whether to pursue a certain religious degree). *Id.* at 250. Virginia *punishes* majors that typically focus more on devotionalism and *rewards* majors that tend to focus more on objective study. That "establishes a preference for certain religio[us]" beliefs, *id.* at 250, and "facially favors some [religious students] over others," *id.* at 252.

VANGSTAP also "differentiat[es] on theological lines." *Id.* at 249. The Guard says that "theological degrees," "religious studies," and "religious degrees" are barred. JA.99, 150, 154. But these terms are subject to conflicting interpretations. Drawing this line requires the Guard "to decide how religious beliefs are derived and to discern the boundary between religious faith and academic" study. *Colo. Christian*

*Univ.*, 534 F.3d at 1262. Inevitably, the Guard "imposes a denominational preference by differentiating between [degrees] based on theological choices." *Cath. Charities Bureau*, 605 U.S. at 250.

Virginia also claims that VANGSTAP's main criterion is whether a degree is housed in a "school of divinity." Opp. to Inj. Pending Appeal at 19. That largely "burden[s] … [Christian] denominations" that name and organize religious learning in a particular way and "favor[s]" predominantly non-Christian (or less traditional Christian) denominations that take a different approach. *Larson*, 456 U.S. at 255; *accord Cath. Charities Bureau*, 605 U.S. at 248 (describing official favoritism of sects that are more "ritualistic" or "formal" as "textbook denominational discrimination") (quotation omitted). Programs "that excludes religious [students] from [benefits] on such grounds facially favors some denominations over others." *Cath. Charities Bureau*, 605 U.S. at 252.

In multiple ways, VTAG and VANGSTAP "distinguish[ ] among religions based on theological differences in their provision of" education funding and "impose[ ] a denominational preference." *Id.* at 254. That violates the Religion Clauses, which require "government … neutrality between religion and religion." *Id.* (quotation omitted); *accord id.* at 248 (affirming that denominational neutrality "is inextricably connected with the continuing vitality of the Free Exercise Clause") (quotation omitted). States that "wish[ ] to choose among" religious programs must avoid criteria that implicate "contested

religious questions and practices." *Colo. Christian Univ.*, 534 F.3d at 1266. Because Virginia's grants fail that test, "the highest level of judicial scrutiny" applies. *Cath. Charities Bureau*, 605 U.S. at 254.

### 4. Virginia's grant programs result in excessive entanglement.

The First Amendment bars excessive "state entanglement with religion." *Carson,* 596 U.S. at 787. This entanglement occurs when States delve into "how a religious school pursues its educational mission," including how colleges formulate, structure, and distinguish among religious degrees. *Id.* Any "state inspection and evaluation of the religious content of a religious organization is fraught with … entanglement" concerns. *Larson*, 456 U.S. at 255. But Virginia pays these constitutional principles no heed.

VTAG forces religious universities like Liberty to apply a government-imposed religion quotient—CIP Code 38-series vs. 39-series programs—that bears no relation to their own doctrine of what constitutes a devotional degree. But the Commonwealth can't tell religious institutions how "to discern the boundary between religious faith and academic theological beliefs." *Colo. Christian Univ.*, 534 F.3d at 1262. These distinctions are for religious colleges to make: "the government is not permitted to have an ecclesiology, or to second-guess the ecclesiology espoused by" religious organizations. *Id.* at 1265.

Simply put, when students' right "to receive the equal benefits of public support for higher education" is at stake, "the Constitution interposes its protection." *Id.* at 1263. The Religion Clauses don't "permit government officials to sit as judges of the 'indoctrination' quotient of theology classes." *Id.* But here, that is what they do. VTAG preempts religious schools' own beliefs about what is "consistent with scholarly objectivity." *Id.* at 1266. And that is "an excessive entanglement and intrusion into religious affairs." *Id.*

VANGSTAP is equally problematic. The Guard bars "theological degrees," "religious studies," or "religious degrees." JA.99, 152, 154. Officials have broad discretion to construe these terms. And Virginia says they look to a major's description and whether it's part of a divinity school to make this call. Opp. to Inj. Pending Appeal at 10, 19. The Guard thus makes "contentious religious judgments" and "second-guess[es]" religious schools' classification of their own programs. *Colo. Christian Univ.*, 534 F.3d at 1266. This magnifies "the intrusiveness problem" and could lead to "litigating in court about what … [has] religious meaning." *Id.* at 1262, 1266 (quotation omitted).

(Virginia also relies on a "promissory note" that VANGSTAP applicants must sign, which says grants can't "be used to fund degrees in religious training or theological education." Opp. to Inj. Pending Appeal at 8. But the government can't "deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v.*

*Sindermann*, 408 U.S. 593, 597 (1972). So this unconstitutional condition is irrelevant.)

Barring excessive entanglement "protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices." *Colo. Christian Univ.*, 534 F.3d at 1261. VTAG's and VANGSTAP's "elaborate procedures for ensuring that educational services … reimbursed by the [s]tate [are] kept free of religious [sectarian] influences" violate this ban. *New York v. Cathedral Acad.*, 434 U.S. 125, 129 (1977) (citation modified). The problem isn't just Virginia's independent religious "conclusions," it's the intrusion into religious colleges' inner workings that "the very process of inquiry" entails. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979).

## D.   Virginia can't satisfy strict scrutiny.

To satisfy strict scrutiny, Virginia must show that applying its religious exclusions to Plaintiffs advances highest-order interests and is narrowly tailored. *Carson*, 596 U.S. at 780. Virginia can do neither.

There's no historic and substantial state interest in funding *some* degrees that train for professional ministry but not *others. Accord Fulton*, 593 U.S. at 542. Virginia's use of conflicting religious exclusions—*granting* funding for CIP Code 38-series majors through VTAG, but *denying* funding for the same majors through VANGSTAP, borders on the irrational and serves no compelling interest. *Cf. Colo. Christian*

*Univ.*, 534 F.3d at 1267 (concluding "the State scarcely has any justification at all").

Plus, Virginia's founding generation didn't object to state grants that aided clerical training alongside other professions. Chapman & McConnell, *supra*, at 71. Blaine-Amendment era concerns about not aiding sectarian religious activity can't "establish an early American tradition." *Espinoza*, 591 U.S. at 482. Yet that's when Virginia's limits on educational funding began. And provisions "born of bigotry" don't "evince a tradition that should inform our understanding of the Free Exercise Clause." *Espinoza*, 591 U.S. at 482 (quotation omitted).

Virginia's only interest is in pursuing greater church-state separation than the Constitution requires. But that interest "cannot qualify as compelling" where Plaintiffs' First Amendment rights are "infringe[d]." *Carson*, 596 U.S. at 781 (quotations omitted). A violation of the Religion Clauses isn't "justified by a State's alternative view that the infringement advances religious liberty." *Espinoza*, 591 U.S. at 485.

Virginia's religious exclusions aren't narrowly tailored either. The Commonwealth indicts itself on this point. On one hand, the Guard deems VTAG's exclusion underinclusive. On the other, the State Council considers VANGSTAP's exclusion overinclusive.

Virginia doesn't "stop students from [using] scholarship money" for degrees that offer religious training, "it stops them only from [using] scholarship money to a narrow set of [degrees] that state officials regard

as too" religious. *Colo. Christian Univ.*, 534 F.3d at 1268. And state agencies can't agree what those degrees are. This over- and under-inclusiveness is the *opposite* of narrow tailoring. *Id.*; *cf. Cath. Charities Bureau*, 605 U.S. at 254 (noting "the poor fit between the State's asserted anti-entanglement concern and the line it has drawn among religious organizations cannot be described as narrow tailoring").

## II.   Plaintiffs are experiencing irreparable harm.

Virginia is depriving Plaintiffs of thousands of dollars in grant funds. That harm is irreparable not only because Virginia is violating Plaintiffs' free exercise rights, *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (per curiam), but also because Virginia will claim "sovereign immunity for any [*past*] monetary damages," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *accord Mountain Valley Pipeline LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). A speedy injunction is necessary for Plaintiffs to receive *future* grants and avert the "risk of [additional] irreparable harm" caused by Virginia denying them additional "payments with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam).

### III. The public interest and balance of the equities favor Plaintiffs.

An injunction benefits Plaintiffs and the public while harming no one. Rulings that "uphold[ ] constitutional rights" serve "the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quotation omitted). Virginia "is in no way harmed by issuance of [an] injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Id.* (quotation omitted).

When there's a First Amendment violation, Virginia has no valid interest in "protect[ing] the [so-called] religious liberty of taxpayers." *Espinoza*, 591 U.S. at 485. That is especially true here because Virginia minimizes this alleged interest by denying taxpayers standing to challenge state programs like VTAG and VANGSTAP. *Goldman v. Landsidle*, 552 S.E.2d 67, 71–72 (Va. 2001).

Because Plaintiffs seek the same grants available to everyone else, the equities also favor them. A few thousand dollars is life-changing for students. But it's of no consequence to Virginia, which pours millions into VTAG and VANGSTAP each year.

## CONCLUSION

For these reasons, the Court should reverse and remand with instructions for the district court to enter a preliminary injunction barring Defendants from denying—or delaying—Cameron and Luke VTAG grants, and Trace VANGSTAP grants, based on their chosen religious degree program.

## REQUEST FOR ORAL ARGUMENT

To expedite this appeal, Plaintiffs are prepared to waive oral argument. But if the Court believes that oral argument would be helpful, Plaintiffs request an expedited date and decision.

Dated: May 26, 2026

Respectfully submitted,

s/*Rory T. Gray*

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlega.org
jreed@ADFlegal.org

Ryan J. Tucker
Jeremiah J. Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFflegal.org

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,305 words, excluding parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: May 26, 2026

*s/Rory T. Gray*

Rory T. Gray

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by that system.

<u>s/Rory T. Gray</u><br>
Rory T. Gray<br>
<em>Counsel for Plaintiffs-Appellants</em>

# ADDENDUM

# TABLE OF CONTENTS

## Constitutional Provisions

U.S. Const. amend. I ........................................................................1

U.S. Const. amend. XIV, § 1 ........................................................1

U.S. Const. art. VI, cl. 2 ...............................................................1

Va. Const. art. IV, § 16................................................................2

Va. Const. art. VIII, § 10.............................................................2

Va. Const. art. VIII, § 11.............................................................3

## Statutes and Regulations

Va. Code § 23.1-610 .....................................................................3

Va. Code § 23.1-628 .....................................................................5

Va. Code § 23.1-629 .....................................................................6

Va. Code § 23.1-631 .....................................................................6

Va. Code § 23.1-632 .....................................................................7

8 Va. Admin. Code § 40-71-10....................................................7

8 Va. Admin. Code § 40-71-30..................................................12

8 Va. Admin. Code § 40-71-40..................................................13

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**U.S. Const. amend. XIV, § 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**U.S. Const. art. VI, cl. 2**

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**Va. Const. art. IV, § 16**

The General Assembly shall not make any appropriation of public funds, personal property, or real estate to any church or sectarian society, or any association or institution of any kind whatever which is entirely or partly, directly or indirectly, controlled by any church or sectarian society. Nor shall the General Assembly make any like appropriation to any charitable institution which is not owned or controlled by the Commonwealth; the General Assembly may, however, make appropriations to nonsectarian institutions for the reform of youthful criminals and may also authorize counties, cities, or towns to make such appropriations to any charitable institution or association.

**Va. Const. art. VIII, § 10**

No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof; provided, first, that the General Assembly may, and the governing bodies of the several counties, cities and towns may, subject to such limitations as may be imposed by the General Assembly, appropriate funds for educational purposes which may be expended in furtherance of elementary, secondary, collegiate or graduate education of Virginia students in public and nonsectarian private schools and institutions of learning, in addition to those owned or exclusively controlled by the State or any such county, city or town; second, that the General Assembly may appropriate funds to an agency, or to a school or institution of learning owned or controlled by an agency, created and established by two or more States under a joint agreement to which this State is a party for the purpose of providing educational facilities for the citizens of the several States joining in such agreement; third, that counties, cities, towns, and districts may make appropriations to nonsectarian schools of manual, industrial, or technical training, and also to any school or institution of learning owned or exclusively controlled by such county, city, town, or school district.

**Va. Const. art. VIII, § 11**

The General Assembly may provide for loans to, and grants to or on behalf of, students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education. The General Assembly may also provide for a State agency or authority to assist in borrowing money for construction of educational facilities at such institutions, provided that the Commonwealth shall not be liable for any debt created by such borrowing. The General Assembly may also provide for the Commonwealth or any political subdivision thereof to contract with such institutions for the provision of educational or other related services.

**Va. Code § 23.1-610**
**Virginia National Guard State Tuition Assistance Program; grants**

A. Subject to regulations as prescribed by the Adjutant General, any individual who (i) is a member of the Virginia National Guard and has a minimum remaining obligation of two years, (ii) has satisfactorily completed required initial active duty service, (iii) is satisfactorily performing duty in accordance with regulations of the National Guard, and (iv) is enrolled in and in good standing at any public institution of higher education or accredited nonprofit private institution of higher education whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education is eligible for a grant in the amount of the difference between the full cost of tuition and any other educational benefits for which he is eligible as a member of the National Guard. Grants provided under this section shall be subject to limitation based on the amount of funds appropriated for such purpose. If applications for grants exceed the amount of funding appropriated, the Department of Military Affairs (the Department) shall issue grants to eligible recipients based on the order in which applications were received.

B. Application for a grant shall be made to the Department no later than 30 days prior to the beginning of an academic semester. The Department shall determine whether an applicant is eligible for the grant as described in subsection A and communicate acceptance and any additional requirements determined by the Department in writing no later than 30 days after receipt of an application. Upon acceptance, grant funds shall be disbursed to the applicable institution of higher education for credit against the recipient's student account.

C. Any member of the Virginia National Guard shall be eligible to receive a grant under this section if such member has two years remaining on his service obligation to the Virginia National Guard as of the last day of the last term or semester for which tuition assistance is requested. Service in the inactive National Guard, the active duty or reserve forces of the United States, or the National Guard of any other state shall not count as applicable service toward fulfilling this service obligation. Federal active duty mobilizations occurring while still a member of the Virginia National Guard and state active duty for the Commonwealth shall count toward the two-year service obligation.

D. The Department may utilize grant funding in order to recruit qualified applicants for service in the Virginia National Guard. The yearly funding amount for such recruitment shall be at the discretion of the Adjutant General and the Department and not exceed $50,000 per fiscal year.

**Va. Code § 23.1-628**
**Tuition Assistance Grant Program**

A. As used in this article, unless the context requires a different meaning:

"Eligible institution" means a nonprofit private institution of higher education whose primary purpose is to provide collegiate, graduate, or professional education and not to provide religious training or theological education.

"Grant" means a Tuition Assistance Grant.

"Principal place of business" means the single state in which the natural persons who establish policy for the direction, control, and coordination of the operations of the institution as a whole primarily exercise that function, considering the following factors: (i) the state in which the primary executive and administrative offices of the institution are located; (ii) the state in which the principal office of the chief executive officer of the institution is located; (iii) the state in which the board of trustees or similar governing board of the institution conducts a majority of its meetings; and (iv) the state from which the overall operations of the institution are directed.

"Program" means the Tuition Assistance Grant Program.

B. From such funds as may be provided for such purpose, the Tuition Assistance Grant Program is established to provide Tuition Assistance Grants to or on behalf of Virginia students who attend eligible institutions.

C. Eligible institutions admitted to this program on or after January 1, 2011, shall (i) be formed, chartered, established, or incorporated within the Commonwealth; (ii) have their principal place of business within the Commonwealth; (iii) conduct their primary educational activity within the Commonwealth; and (iv) be accredited by a nationally recognized regional accrediting agency.

**Va. Code § 23.1-629**
**Council designated as administering agency**

The Council is designated as the administering agency for the Program and may adopt regulations consistent with this article and appropriate to the administration of the Program. The Council may define by regulation such terms used in this article as "full-time," "undergraduate," "graduate," "professional," and "financial aid."

**Va. Code § 23.1-631**
**Eligibility; duration**

A. Virginia students who are obligated to pay tuition as full-time undergraduate, graduate, or professional students at an eligible institution are eligible to receive a grant for the academic year for which they enroll.

B. Eligibility for grants under the Program is limited to a total of four academic years for undergraduate students, pharmacy students, and medical students and a total of three academic years for other graduate students and professional school students. The academic years for which grants are awarded need not be in succession.

C. Grants under the Program shall be used only for undergraduate, graduate, or professional collegiate work in educational programs other than those providing religious training or theological education.

**Va. Code § 23.1-632**
**Eligibility; Selective Service registration**

Individuals who have failed to meet the federal requirement to register for the Selective Service are not eligible to receive grants. However, an individual who has failed to register for the Selective Service shall not be denied a right, privilege, or benefit under this section if (i) the requirement to so register has terminated or become inapplicable to the individual and (ii) the individual shows by a preponderance of the evidence that the failure to register was not a knowing and willful failure to register. The Council shall be assisted in enforcing this provision by the eligible institutions whose students benefit from the Program.

**8 Va. Admin. Code § 40-71-10**
**Definitions**

The following words and terms when used in this chapter shall have the following meanings unless the context clearly indicates otherwise:

*"Academic year"* means the enrollment period that normally extends from late August to May or early June and that is normally comprised of two semesters 15 to 16 weeks in length or three quarters 10 to 11 weeks in length.

*"Accredited"* means approved to confer degrees pursuant to the provisions of Article 3 (§ 23.1-213 et seq.) of Chapter 2 of Title 23.1 of the Code of Virginia and requirements of the annual appropriation act, as the same are now constituted or hereafter amended. Unless otherwise provided by law, an institution must be accredited by a nationally recognized regional accrediting agency prior to participation in the program.

*"Award"* means a grant of Virginia Tuition Assistance Grant Program funds given during fall and spring terms at semester institutions and fall, winter, and spring terms at quarter institutions.

*"Census date"* means the time during a term when a count of enrolled students is made for reporting purposes. For all standard terms, the census date shall be the end of the program add/drop period. For nonstandard terms, the census date shall be determined by council on a program by program basis.

*"Cost of attendance"* means the sum of tuition, fees, room, board, books, supplies, and other education-related expenses, as determined by an eligible institution for purposes of calculating a student's financial need and awarding federal student aid funds.

*"Council"* or *"SCHEV"* means the State Council of Higher Education for Virginia or its designated staff.

*"Domiciliary resident"* means a student who is determined by the enrolling institution to be a domiciliary resident of Virginia under § 23.1-502 of the Code of Virginia and augmented by the Domicile Guidelines or provided the equivalent educational benefits of the same under § 23.1-505 or 23.1-505.1 of the Code of Virginia. In cases where there are disputes between students and the enrolling institutions, the council shall make the final determinations (see 8VAC40-71-40 E).

*"Eligible institution"* means private nonprofit institutions of collegiate education in the Commonwealth whose primary purpose is to provide collegiate, graduate, or professional education and not to provide religious training or theological education. Eligible institutions not admitted to this program before January 1, 2011, shall also:

1. Be formed, chartered, established, or incorporated within the Commonwealth;

2. Have their principal place of business within the Commonwealth;

3. Conduct their primary educational activity within the Commonwealth;

4. Be accredited by a nationally recognized regional accrediting agency; and

5. Comply with applicable reporting requirements as:

a. Found in the Code of Virginia or supporting administrative code for institutions operating in Virginia or participating in state financial aid programs; or

b. Identified by the council as necessary for the administration of the program.

*"Eligible program"* means a curriculum of courses at the undergraduate, graduate, or first professional level for those institutions eligible under the definition of eligible institution. For those institutions chartered under an act of Congress and admitted to this program prior to January 1, 2011, only a curriculum of courses offered at a campus located in the Commonwealth are eligible programs.

1. Undergraduate programs are those programs that lead to an associate's or baccalaureate degree and that require at least two academic years (minimum 60 semester hours or its equivalent in quarter hours) to complete or an undergraduate teacher certification program.

2. Graduate programs are those programs leading to a degree higher in level than the baccalaureate degree and that require at least one academic year (minimum 30 semester hours or its equivalent in quarter hours) to complete. Only graduate programs in a health-related professional program classified in the National Center for Education Statistics' Classification of Instructional Programs (CIP) Code 51-series programs are eligible graduate programs.

3. First-professional programs are those post-undergraduate programs leading to a degree in dentistry, medicine, veterinary medicine, or pharmacy. Only professional programs in a health-related professional program classified as CIP Code 51-series programs are eligible first-professional programs.

4. Programs that provide religious training or theological education, classified as CIP Code 39-series programs, are not eligible programs.

5. Students enrolled in a declared double-major that includes an ineligible degree program may receive an award only for those terms in which the student's enrollment includes an equal or greater number of courses required for an eligible major or concentration than the number of courses enrolled for an ineligible major or concentration (excludes general education or elective courses). Exceptions may be made by council based on circumstances beyond the control of the student.

*"First-professional student"* means a student enrolled and program placed in any of the following post-undergraduate programs: dentistry, medicine, veterinary medicine, or pharmacy.

*"Fiscal year"* means the period extending from July 1 to June 30.

*"Formed, chartered, established, or incorporated within the Commonwealth"* means the institution is, and continues to be, recognized as a domestic or in-state institution under the council's certification to operate in Virginia and under state law.

*"Full-time student"* means a student who is enrolled for at least 12 credit hours per semester or its equivalent in quarter hours at the undergraduate level or nine credit hours per semester or its equivalent in quarter hours at the graduate or first-professional level. The total hours counted do not include courses taken for audit, but may include required developmental, remedial, or prerequisite courses and other elective for-credit courses that normally are not counted toward a degree at the institution. For students enrolled in:

1. Nonstandard terms: the full-time enrollment requirement, as approved by council, will be proportionate based on the length of the terms, the number of contact hours, or other measures of comparability with the institution's normal academic year.

2. Concurrent undergraduate, graduate, or first-professional courses: the full-time enrollment requirement may be met by a combination of the total credit hours, providing that the combination totals at least the minimum credit hours for full-time status, as described above, for the student's institutionally recognized student level.

3. Programs leading to a doctoral degree: the full-time enrollment requirement may be met by enrollment in nine credit hours per semester or its equivalent in quarter hours or the minimum full-time enrollment as defined by the institution, whichever is less.

*"Graduate student"* means a student enrolled and program-placed in a master's or doctoral program.

*"Nonprofit institution"* means an educational institution operated by one or more nonprofit corporations, and said institution's earnings are applied solely to the support of said institution and its educational programs and activities.

*"Nonstandard degree program"* means a degree program where the terms of the program do not conform to the standard terms of the institution's academic year. Nonstandard programs must be approved by council before students enrolled in the programs can receive awards.

*"Participating eligible institution"* means an eligible institution that has been approved to participate in the program by council.

*"Principle place of business"* means the single state in which the natural persons who establish policy for the direction, control, and coordination of the operations of the institution as a whole primarily exercise that function considering the following factors:

1. The state in which the primary executive and administrative offices of the institution are located. The primary executive and administrative offices are those most often physically used in the performance of the executive and administrative functions of the institution;

2. The state in which the principal office of the chief executive officer of the institution is located. The principal office of the chief executive officer is the location that is most often physically occupied by the chief executive officer when in performance of official institution duties;

3. The state in which the board of trustees or similar governing person or persons of the institution conducts a majority of its meetings; and

4. The state from which the overall operations of the institution are directed in that the institution is not subject to control or directives from an office, agency, or board located within another state.

*"Program"* means the Virginia Tuition Assistance Grant Program.

*"Term"* means the fall semester or quarter, winter quarter, or the spring semester or quarter.

*"Undergraduate student"* means a student in a program leading to an associate's or baccalaureate degree or a student enrolled in an undergraduate teacher certification program.

*"VTAG"* means the Virginia Tuition Assistance Grant.

**8 Va. Admin. Code § 40-71-30**
**Disbursement of funds**

A. Advancement of funds. A percentage of an institution's estimated allocation of funds for a term will be forwarded to the institution at the beginning of the term. The allocation will be based primarily on the projected award for the term and each institution's prior academic year's enrollment unless the institution makes a convincing case by presenting new enrollment factors.

After the census date for each term, the institution will certify that recipients are enrolled as full-time students and are meeting other eligibility requirements established for the program. After enrollment is verified, additional funds, if needed, may be disbursed to the institution. Funds for recipients reported as not enrolled full time or not meeting other eligibility requirements shall not be disbursed to students, and funds for these students, if already received by the institution in its capacity as the student's fiscal agent, shall be returned to the council no later than the end of the fiscal year unless otherwise requested, in which case the deadline is within 30 days of the request.

B. Notification to students. The private institutions that participate in this program shall, during the spring semester previous to the commencement of a new academic year or as soon as a student is admitted for that academic year, whichever is later, notify their enrolled and newly admitted Virginia students about the availability of tuition assistance awards under the program. The information provided to students and their parents must include information about the eligibility requirements, the application procedures, and the fact that the amount of the award is an estimate and is not guaranteed. The number of students applying for participation and the funds appropriated for the program determine the amount of the award. Conditions for reduction of award amount and award eligibility are described in these regulations. The institutions shall certify to the council that such notification has been completed and shall indicate the method by which it was carried out.

Further, the institutions shall make students aware that the award is state funded. Evidence of such notification may include award letters or

other formal procedures used by the institution for student notification of financial aid awards.

C. Restriction on use of funds. An institution shall establish and maintain financial records that accurately reflect all program transactions as they occur. The institution shall identify each program transaction and separate those transactions from all other institutional financial activity. Program funds shall be deposited in a noninterest-bearing account established and maintained exclusively for that purpose. Funds shall be disbursed only to student accounts receivable or returned to the council. The institution shall not hold program funds in the account for more than 20 working days before transferring funds to student accounts.

Funds received by the institutions under the program shall be used only to pay awards to students. The funds are held in trust on behalf of the Commonwealth of Virginia by the institutions for the intended student beneficiaries and shall not be used for any other purpose.

**8 Va. Admin. Code § 40-71-40**
**Student eligibility**

A. Receipt of application.

1. Applications submitted in person, by facsimile, or by other electronic means, or postmarked by carrier mail by the applicable deadline (July 31, September 14, and December 1) of the academic year may be deemed as meeting the deadline.

2. If the deadline occurs on a weekend or nonbusiness day as recognized by the institution or carrier, the application will be deemed as meeting the respective deadline if the application is received by the institution by the first business day following the deadline or postmarked by carrier mail by the carrier's first business day following the deadline.

3. Students who submit an application to one institution but enroll into another may still be considered to have met the respective deadline if the initial institution can verify receipt of the application by the deadline.

B. Priority for award. Because funds may not be sufficient to award all eligible students, students are prioritized based on prior eligibility (returning students) and date of application (new students). Below are descriptions of the students in priority order for receiving an award. Priority students will receive a full award before students in a subsequent priority order.

1. Category 1 and 2 students receive priority for an award.

a. Category 1 students: returning students who received an award in the previous fiscal year, including:

(1) Students returning to their original institution;

(2) Students transferring from another participating eligible institution; and

(3) Students moving from one degree level to another within an institution or from another participating eligible institution.

b. Category 2 students: students submitting a completed program application by July 31 of the fiscal year who were:

(1) New and readmitted students who were not enrolled in the previous fiscal year; or

(2) Returning students who met the domicile requirements in the previous fiscal year but did not receive an award due to insufficient funding (Category 3 and 4 students) or because they were not enrolled full time or otherwise did not meet other award criteria.

2. Category 3 students will be considered for an award if funds are available after Category 1 and 2 students are fully funded. Category 3 students are those who submit a completed application after July 31 but no later than September 14, including:

a. New and readmitted students who were not enrolled in the previous fiscal year; or

b. Students enrolled but who did not apply for an award in the previous fiscal year.

3. Category 4 students will be considered for an award if funds are available after Category 1, 2, and 3 students are fully funded.

a. Category 4 students are those who submit a completed program application after September 14 but no later than December 1 of the fiscal year and include new and readmitted students who were not enrolled in the previous fiscal year.

b. Category 4 students receive spring term only awards.

4. Exceptions are made for students who break enrollment for military purposes. Students reentering their degree program within one year of completion of military responsibilities shall be granted priority, along with Category 1 students. This exception is for priority purposes only as the student still must meet all eligibility criteria.

C. Eligibility criteria. In order to be eligible to receive an award, the student must:

1. Be a domiciliary resident of Virginia, as defined by § 23.1-502 of the Code of Virginia, for at least one year prior to the date of entitlement (first day of classes for the program in which the student is enrolled) or eligible under § 23.1-505 of the Code of Virginia.

2. Enroll in the academic year for which the award is to be received as a full-time student in an eligible program at a participating eligible institution.

a. A student's enrollment status shall be determined at the census date. If a student falls below full time by dropping or withdrawing from individual courses or withdraws from the institution after the census date, he shall receive a prorated award based on the tuition refund policy in effect at the institution.

b. A graduating student enrolled less than full time for a term in his final academic year may be eligible to receive an award if:

(1) The student was enrolled full time and accepted for or received an award in the immediate preceding academic year;

(2) The course credits available in the current term needed to complete degree requirements total less than a full-time course load; and

(3) The maximum number of years of eligibility has not been exceeded.

c. Exceptions to the full-time requirement due to a documented disability or other medical reasons, as applicable under the federal

American's with Disabilities Act, will be considered on a case-by-case basis.

3. Have complied with federal selective service registration requirements unless the following apply:

a. The requirement to register has terminated or become inapplicable to the person; and

b. The person shows by preponderance of the evidence that failure to register was not a knowing and willful failure to register.

4. Complete and submit an application for an award by the published deadline.

5. Not participate in the Virginia Women's Institute for Leadership at Mary Baldwin College.

D. Limitations on awards. For administrative purposes, each academic year shall be comprised of six units of program eligibility; accordingly, a semester is equivalent to three units and a quarter is equivalent to two units.

1. If a student receives a partial payment for a semester or quarter, the student's total eligibility shall be reduced by one semester (three units) or quarter (two units).

2. Undergraduate students:

a. Students pursuing an associate's degree shall be limited to a maximum of two academic years (12 units), or its equivalent, of support.

b. Students pursuing degrees at the undergraduate level shall be limited to a combined life-time maximum of four academic years (24 units), or its equivalent, of support, inclusive of enrollment in any combination of associate's or baccalaureate degrees.

c. Students enrolled in teacher certification programs at the undergraduate level may receive awards if the student is enrolled full time and has not exhausted eligibility.

3. Post-undergraduate students:

a. Students pursuing degrees at the graduate level shall be limited to a combined life-time maximum of three academic years (18 units), or its equivalent, of support.

b. Students pursuing degrees at the first-professional level shall be limited to a life-time maximum of three academic years (18 units), or its equivalent, of support, except for students pursuing medical or pharmacy degrees who are limited to four academic years (24 units), or its equivalent, of support.

c. In no case should any combination of post-undergraduate programs exceed four years of support.

4. A student enrolled at multiple institutions may receive an award if:

a. The home institution is an eligible institution;

b. A formal consortium agreement is in place; and

c. The student's combined enrollment is full time.

If the consortium agreement includes a Virginia public institution, the award will be prorated based on the courses for the term not attempted at the Virginia public institution as a percentage of minimum full-time enrollment.

5. A student may receive an award under a study abroad program if:

a. The student is enrolled full time;

b. The student remains on record as an enrolled student in an otherwise eligible program at a participating eligible institution for the term in which the award is received;

c. The program funds are disbursed to the participating eligible institution; and

d. The overseas program is a formal agreement arranged by the participating eligible institution.

E. Appeals process.

1. The participating institution makes the student's initial eligibility determination. If the institution determines that the student does not meet the domicile requirements, the institution must notify the student in writing of the outcome and the availability of the appeals process.

2. Council shall make final decisions on domicile eligibility disputes between students and the enrolling institutions. The appeal process for resolving eligibility disputes shall consist of a review of the institution's

initial determination by a council staff member. Further student appeals are subject to a final review by a committee comprised of three council staff members. No person who serves at one level of the appeals process shall be eligible to serve at any other level of review. Timing for completion of the review is heavily dependent upon the response time to staff information requests for both the student and the institution, but typically council staff will respond within two weeks.

3. Student appeals must be filed in writing with the council within 30 days of the institution's written notification. If the outcome of the appeal upholds the institution's initial determination, the student may file a final appeal within 30 days of the council's written notification.

4. The appeals process is contained in this subsection and available to the institutions and students online or in print upon request.