No. 26-1437

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

CAMERON JOHNSON; LUKE THOMAS; and TRACE STEVENS,

*Plaintiffs-Appellants,*

v.

A. SCOTT FLEMING, IN HIS OFFICIAL CAPACITY AS THE DIRECTOR OF THE STATE COUNCIL OF HIGHER EDUCATION FOR VIRGINIA, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:25-cv-00407-RCY

## AMICI CURIAE BRIEF OF WEST VIRGINIA AND 19 OTHER STATES IN SUPPORT OF APPELLANTS AND REVERSAL

JOHN B. MCCUSKEY
*Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
hwilson@wvago.gov

MICHAEL R. WILLIAMS
*Solicitor General*

HOLLY J. WILSON
*Principal Deputy Solicitor General*
*Counsel of Record*

S. HALLIE HOVEY-MURRAY
*Assistant Solicitor General*

*Counsel for Amicus Curiae State of West Virginia*
[additional counsel listed after signature page]

**TABLE OF CONTENTS**

Table of Authorities ................................................................................. ii

Introduction ...........................................................................................1

Interests of Amici Curiae ........................................................................4

Argument ................................................................................................6

I.      *Locke* is distinguishable. ................................................................6

        A. The plaintiffs won't undoubtedly enter the ministry. ........................8

        B. Virginia lacks Washington's historic and substantial
            state interest. ........................................................................10

II.     Virginia's programs go further than *Locke* permits. ............................16

III.    Extending *Locke* here will harm the States ..............................................22

Conclusion ...............................................................................................25

Additional Counsel ................................................................................ 27

Certificate of Compliance .......................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Board of Education,*
347 U.S. 483 (1954)............................................................................15

*Carson v. Makin,*
596 U.S. 767 (2022)...............................................................2, 7, 8, 23

*Catholic Charities Bur., Inc. v. Wis. Labor & Indus. Rev.*
*Comm'n,*
605 U.S. 238 (2025)..................................................................17, 22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)............................................................................1, 10

*Clark v. Sweeney,*
607 U.S. 7 (2025)..................................................................................6

*Colo. Christian Univ. v. Weaver,*
534 F.3d 1245 (10th Cir. 2008)..........................................................3

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020).............................................2, 7, 12, 13, 15, 17

*Everson v. Bd. of Educ. of Ewing Twshp.,*
330 U.S. 1 (1947)................................................................................12

*Faith Ctr. Church Evangelistic Ministries v. Glover,*
462 F.3d 1194 (9th Cir. 2006)............................................................17

*Hall v. Fleming,*
No. 25-1574, 2026 WL 1314675 (4th Cir. May 13, 2026)....................2, 3, 6, 7

*Larson v. Valente,*
456 U.S. 228 (1982)............................................................................23

ii

*Locke v. Davey,*
    540 U.S. 712 (2004)....................................1, 2, 3, 4, 6, 7, 8,
                                                        9, 10, 11, 16, 17,
                                                        20, 21, 22, 23, 25

*Loffman v. Cal. Dep't of Educ.,*
    119 F.4th 1147 (9th Cir. 2024) ........................................1

*Miller v. Ayres,*
    191 S.E.2d 261 (1972)................................................15

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018)....................................................17

*Mitchell v. Helms,*
    530 U.S. 793 (2000)..................................................13

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    591 U.S. 732 (2020)..................................................23

*Perry v. Commonwealth,*
    44 Va. (3 Gratt.) 632 (1846) ........................................12

*Trinity Lutheran Church v. Comer,*
    582 U.S. 449 (2017)............................................2, 7, 8, 24

## Constitutional Provisions

VA. CONST. art. I, § 16 ..................................................11

VA. CONST. art. VIII, § 10 .............................................11, 15

VA. CONST. art. VIII, § 11 .............................................11, 15

VA. CONST. art. IX, § 141 (1902)........................................13

VA. CONST. art. IV, § 67 (1902).........................................13

VA. CONST. art. IX, § 141 (1956)........................................15

## Regulations

8 VA. ADMIN. CODE 40-71-10..............................................18

8 VA. ADMIN. CODE § 40-71-10.................................................................19, 20

**Other Authorities**

1 VA. CONST. CONVENTION (1901-1902), REPORT OF THE
     PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL
     CONVENTION (1906) ..............................................................................13, 14

APPLIED RSCH. IN THE APOSTOLATE, THE CLASS OF 2026:
     SURVEY OF ORDINANDS TO THE PRIESTHOOD (2026),
     https://perma.cc/P86G-9WED...............................................................................9

Christopher C. Lund, *The New Victims of the Old Anti-
     Catholicism*, 44 CONN. L. REV. 1001 (2012) ......................................................12

*Detail for CIP Code 38*, NAT'L CTR. FOR EDUC. STATS.,
     https://perma.cc/B3TC-5YSR (last visited June 2, 2026)....................5, 18, 21

*Detail for CIP Code 39*, NAT'L CTR. FOR EDUC. STATS.,
     https://perma.cc/7Z9U-VEX2 (last visited June 2, 2026)..........................5, 18

Douglas Laycock, *Theology Scholarships, the Pledge of
     Allegiance, and Religious Liberty: Avoiding the Extremes
     but Missing the Liberty*, 118 HARV. L. REV. 155 (2004) ...........................6, 13

Joseph P. Viteritti, *Blaine's Wake: School Choice, the First
     Amendment, and State Constitutional Law*, 21 HARV. J.L. &
     PUB. POL'Y 657 (1998) ...........................................................................................13

JOURNAL OF THE CONSTITUTIONAL CONVENTION TO REVISE AND
     AMEND SEC. 141 OF THE CONSTITUTION OF VIRGINIA (1965) .......................15

Michael W. McConnell, *Establishment and Disestablishment at
     the Founding*, 44 WM. & MARY L. REV. 2105 (2003)..............................11, 12

*Music (BA)*, BLUEFIELD UNIV., https://perma.cc/2ZUA-WSV8
     (last visited June 2, 2026)...................................................................................19

PHILIP JENKINS, THE NEW ANTI-CATHOLICISM: THE LAST
     ACCEPTABLE PREJUDICE (2003) ...........................................................................14

*Religious Studies*, HAMPTON UNIV., https://perma.cc/2LYP-FJUD (last visited June 2, 2026)...................................................................18

Richard D. Komer, *Trinity Lutheran and the Future of Educational Choice: Implications for State Blaine Amendments*, 44 MITCHELL HAMLINE L. REV. 551 (2018) ........................15

Robert F. Utter and Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution*, 15 HASTINGS CONST. L.Q. 451 (1988) ..............................................................................................13

Steven K. Green, *The Blaine Amendment Reconsidered*, 36 AM. J. LEGAL HIST. 38 (1992) ...............................................................14

THEOLOGICAL SCHS. COMM'N ON ACCREDITING, ENTERING STUDENT QUESTIONNAIRE Table 6 (2025), https://perma.cc/N8H3-A4YS .................................................................9

Thomas C. Berg, *Anti-Catholicism and Modern Church-State Relations,* 33 LOY. U. CHI. L.J. 121 (2001) ................................16

Toby J. Heytens, *School Choice and State Constitutions*, 86 VA. L. REV. 117, 138 (2000).................................................14

VA. DEP'T OF MIL. AFFS., COMMAND POLICY 22-023 VA. NATIONAL GUARD STATE TUITION ASSISTANCE PROGRAM (VANGSTAP) § 7(a)(6)(c) (2022), https://perma.cc/Y49X-XVTZ.....................................................................................20

VA. UNION UNIV., 2022-2024 UNDERGRADUATE AND GRADUATE ACADEMIC CATALOGUE (n.d.), https://perma.cc/M5YW-K5MS.................19

*Virginia National Guard Joint Force Headquarters Chaplain Support*, VA. NAT'L GUARD, https://perma.cc/2HC3-E2WX (last visited June 2, 2026)...................................................10

**INTRODUCTION**

Virginia refuses to provide scholarship funds for certain studies that it dubs too religious. That's wrong. "[A] statutory scheme that requires [someone] to forgo a sectarian education … in order to receive … education benefits otherwise available … imposes a burden on their free exercise rights." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1168 (9th Cir. 2024) (cleaned up). And "[t]o satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (cleaned up). As Appellants have well explained, Virginia can't meet that demanding test. So Appellants should be entitled to obtain scholarship funds for their preferred programs.

Faced with straightforward principles like these, Virginia mistakenly seeks shelter in *Locke v. Davey*, 540 U.S. 712 (2004), a case endorsing a dissimilar Washington scholarship program. The Court should refuse Virginia's invitation to extend that case. *Locke* rested on two pillars: a plaintiff who undisputedly sought to train for the ministry and a State with an animus-free historic and substantial interest in not funding the clergy. Those

1

pillars don't hold here. The plaintiffs are not pursuing degrees solely to lead a religious congregation. And Virginia lacks Washington's founding-era antiestablishment tradition. Its no-aid provisions trace not to principled conviction but to Blaine Amendment animus that *Locke* expressly left unresolved. Even setting those distinctions aside, Virginia's exclusions don't resemble Washington's—they are more arbitrary and more burdensome in ways *Locke* never contemplated.

To be sure, this Court recently said *Locke* remains good law. *Hall v. Fleming*, No. 25-1574, 2026 WL 1314675, at \*4 (4th Cir. May 13, 2026). But the Court there resolved a narrow question: whether the Supreme Court had abrogated *Locke* entirely. *Id.* at \*3-4 (addressing *Trinity Lutheran Church v. Comer*, 582 U.S. 449 (2017), *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020), and *Carson v. Makin*, 596 U.S. 767 (2022)). It confirmed that the Supreme Court has not overruled *Locke* entirely (yet). *Hall*, 2026 WL 1314675, at \*4. And because the plaintiff in *Hall* conceded her facts were "on all fours" with *Locke*, the Court didn't need to decide how far *Locke* extends. *Id.* at \*3 (cleaned up). But it does need to here.

In other words, unlike *Hall*, the question of how far *Locke* goes matters here—and it matters to amici States, too. Treating *Locke* as a broad exception

2

to otherwise straightforward free-exercise principles creates real problems for the States and those who choose religious programs. We administer our own scholarship programs. We serve religious students. We want to keep doing so—without making arbitrary, entangling judgments about which degrees are too religious to fund. Virginia's approach would invite that kind of arbitrary regime. Yet it would ultimately leave religious students worse off and States constitutionally exposed.

*Locke* is a "stain on our Free Exercise jurisprudence," and this Court should decline Virginia's invitation to extend it to the "novel setting" here. *Hall*, 2026 WL 1314675, at *7-8 (Richardson, J., concurring). After all, even on its own terms, *Locke* "does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1255 (10th Cir. 2008) (McConnell, J.). The Court should reaffirm these foundational First Amendment principles and reverse.

3

## INTERESTS OF AMICI CURIAE

West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, Ohio, South Carolina, South Dakota, Tennessee, Texas, and Utah are States that administer scholarship programs serving hundreds of thousands of students, religious and non-religious alike. West Virginia, for example, offers several state-sponsored scholarship programs, including its Promise Scholarship, the Higher Education Grant Program, and the National Guard Educational Encouragement Program. Each is open to religious students. Eligible institutions include those that prepare students for religious vocations. Other amici States administer similar programs.

Amici States have a direct stake in how this case is decided. We want to keep funding the education of religious students as much as the First Amendment and the States' constitutions allow. We believe that students who are interested in religious vocations deserve the same access to state scholarship programs as anyone else. And we have no interest in making the choice Virginia makes—excluding religious students and programs from otherwise available benefits to satisfy a state constitutional provision rooted in animus.

If the Court extends *Locke* to permit Virginia's exclusions, then the Court will allow States to make the very kind of entangling, arbitrary judgments about religious programs that the First Amendment is designed to prevent. And it will create a doctrinal conundrum in the process. Virginia's experience with its Virginia Tuition Assistance Grant program illustrates the problem: the State draws an arbitrary line between CIP Code 38 and CIP Code 39 programs—a distinction that turns on whether a degree "focuses on" religion versus "prepares individuals for" a religious vocation. That line is not only difficult to administer; it is the kind of government inquiry into religious character and purpose that the Supreme Court has repeatedly condemned. Things only get worse when it comes to the Virginia National Guard State Tuition Assistance Program, where a single decisionmaker appears to separate religious and non-religious programs on the fly. States should not be allowed to replicate these approaches.

Finally, the consequences for religious students are just as concrete. They will have to abandon religious degrees or switch or modify courses of studies they are called to pursue. And if they refuse, they'll have to pay the price—or worse, move. That outcome is a bad one for both students and States.

## ARGUMENT

**I.     *Locke* is distinguishable.**

*Locke v. Davey* "was an outlier when decided" and "it is even more of one today." *Hall*, 2026 WL 1314675, at *6 (Richardson, J., concurring). In a slew of recent Free Exercise cases, the Supreme Court has "eroded *Locke*'s foundation" substantially. *Id.* And fundamentally, a college "[s]cholarship for secular courses, if and only if the student does not major in theology, is like a fine on theology majors." Douglas Laycock, *Theology Scholarships, the Pledge of Allegiance, and Religious Liberty: Avoiding the Extremes but Missing the Liberty*, 118 HARV. L. REV. 155, 244 (2004). Today's Supreme Court doesn't take kindly to such government-directed antireligion—so it's hard to think *Locke* will continue for long. But this Court has noted how the Supreme Court hasn't *yet* expressly overruled *Locke*. *Hall*, 2026 WL 1314675, at *4.[*] So at this stage, *Locke* still has force.

---

[*] The plaintiff in *Hall* conceded that her case was governed by *Locke*. 2026 WL 1314675, at *3. So the Court held merely that *Locke* remains binding precedent, never considering whether *Locke* was distinguishable. *Id.* Nor could it have. *See Clark v. Sweeney*, 607 U.S. 7, 9-10 (2025) (per curiam) (explaining Courts are limited to examining issues that the parties present). The plaintiffs here make no similar concession.

But what matters more at this point is that *Locke* isn't nearly as broad as either Virginia or the district court conceived it to be. *Trinity Lutheran* first confined *Locke* to cases involving exclusions for religious *use*—not religious character alone—and to those where the State's choice "was in keeping with [its] antiestablishment interest." *Trinity Lutheran*, 582 U.S. at 464-65. *Espinoza* explained that *Locke* hinged on Washington's choice not to fund "the essentially religious endeavor of training a minister to lead a congregation," and the State's "historic and substantial state interest in not funding the training of clergy." *Espinoza*, 591 U.S. at 479-80 (cleaned up). And *Carson* is clearer still. It "cabined *Locke* to its facts." *Hall*, 2026 WL 1314675, at *6 (Richardson, J., concurring). The Supreme Court said it cleanly: "*Locke* cannot be read beyond its *narrow* focus on vocational religious degrees." *Carson*, 596 U.S. at 789 (emphasis added).

This case looks nothing like *Locke*. Here, no plaintiff is undisputedly going to enter the ministry; Virginia has no historic and substantial interest in not funding the clergy's education; and Virginia's constitutional no-aid provisions are of the kind *Locke* reserved judgment on.

7

## A. The plaintiffs won't undoubtedly enter the ministry.

*Locke*'s outcome turned on plaintiff Joshua Davey's unequivocal intent. Davey "had planned for many years to attend a Bible college and to prepare himself through that college training for a lifetime of ministry, specifically as a church pastor." *Locke*, 540 U.S. at 717 (cleaned up). Davey's intent was undisputed—and dispositive. As *Trinity Lutheran* later explained, "Davey was not denied a scholarship because of who he *was*; he was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry." *Trinity Lutheran*, 582 U.S. at 464. *Carson* confirmed that *Locke* itself "emphasized" the scholarship "was *intended* to be used to prepare for the ministry." *Carson*, 596 U.S. at 788 (emphasis added) (cleaned up). *Locke* was always about *intent,* not identity.

Cameron Johnson and Luke Thomas have made no such commitment. Johnson is pursuing a Pastoral Leadership degree. JA216. But he is also considering careers in real estate and nonprofit work, and he plans to add a business minor. JA215-216. Thomas is pursuing a Music and Worship degree while remaining open to other musical and entrepreneurial careers. JA220-222. Neither student chose his degree solely to prepare for ministry.

8

JA214-216, JA220-222. Both may end up there—but so might any number of students pursuing secular degrees.

Data bears that out. A survey of the 2026 class of ordinands to the Catholic priesthood showed that of those who attended undergraduate or graduate school, only 22% majored in "theology/philosophy." CENT. FOR APPLIED RSCH. IN THE APOSTOLATE, THE CLASS OF 2026: SURVEY OF ORDINANDS TO THE PRIESTHOOD 24 (2026), https://perma.cc/P86G-9WED. The remainder earned secular degrees, like business (18%), engineering (17%), and science and math (11%). *Id.* Another survey of incoming seminarians reports similar findings. Only 14% had undergraduate degrees in "Religious Studies." ASS'N OF THEOLOGICAL SCHS. COMM'N ON ACCREDITING, ENTERING STUDENT QUESTIONNAIRE Table 6 (2025), https://perma.cc/N8H3-A4YS. In contrast, 24.7% majored in "Social/behavioral sciences," 17.2% in "Technical studies," and 16.7% in "Humanities." *Id.* If most people who actually enter the ministry didn't major in theology, then the assumption that a theology-adjacent major means ministerial intent is empirically unfounded.

Trace Stevens falls outside *Locke*'s reach, too. Stevens hopes to become a Virginia National Guard Chaplain—and that role is categorically different

9

from the theological vocations *Locke* concerned. JA227-229. Guard Chaplains' mission is not to promote any denomination but to serve as "the Adjutant General's religious programs policy subject matter expert as it pertains to ensuring the free exercise of religion, religious accommodation, and religious support requests." *Virginia National Guard Joint Force Headquarters Chaplain Support*, VA. NAT'L GUARD, https://perma.cc/2HC3-E2WX (last visited June 2, 2026). The historic state interest *Locke* invoked—against funding "*church* leaders" who "lead … *congregation[s]*"—does not extend to a student perhaps preparing to protect the religious liberty of service members. *Locke*, 540 U.S. at 721-22 (emphasis added). And Stevens is also open to careers in law enforcement, the military, and aviation. JA227. So, his path, like Johnson's and Thomas's, is not fixed on ministry.

*Locke*'s holding was tethered to what Davey intended to do. None of the plaintiffs here has made that same proposal.

**B. Virginia lacks Washington's historic and substantial state interest.**

*Locke* also rested on Washington's animus-free "historic and substantial state interest" against using "taxpayer funds to support church leaders." *Locke*, 540 U.S. at 722. Virginia has no equivalent tradition. Washington's no-aid principle appeared in the Establishment Clause of its Bill of Rights. *Id.*

10

at 719 n.2. And it drew "a more stringent line" than the Federal Constitution, prohibiting state funding for "religious worship, exercise or instruction, or the support of any religious establishment." *Id.* at 719 n.2, 722, 725 (cleaned up).

Virginia's funding restrictions on religious education appear not in its Establishment Clause in its Bill of Rights, *see* VA. CONST. art. I, § 16, but in its Education article—Sections 10 and 11 in Article VIII. And those provisions are not the product of principled founding-era anti-establishment conviction, like Washington's was. *See Locke*, 540 U.S. at 723 (cataloguing state constitutional no-aid provisions adopted "to avoid an establishment of religion around the time of the founding"). Instead, Virginia's no-aid provisions are the product of Blaine Amendments adopted more than 100 years *after* the founding, rooted in anti-Catholic animus. That distinction is decisive. *Locke* expressly declined to resolve what happens when a State's no-aid provision has that pedigree.

But first, more broadly, Virginia's history cuts against the interest it now claims. Virginia maintained an established religion until the Revolution. Michael W. McConnell, *Establishment and Disestablishment at the Founding*, 44 WM. & MARY L. REV. 2105, 2119 (2003). And Virginia's disestablishment in the late 1700s was driven by evangelical religious revival,

11

not growing secularism or rationalism. *Id.* In 1776, Virginia enacted a Declaration of Rights that ended the persecution of Baptists and gave Virginians the right to free exercise. *Id.* at 2120. Yet the climax of the disestablishment movement came later still, in 1785 and 1786, when "the Virginia legislative body was about to renew Virginia's tax levy for the support of the established church." *Everson v. Bd. of Educ. of Ewing Twshp.*, 330 U.S. 1, 11-12 (1947). Madison penned his Memorial and Remonstrance against the law, the bill failed, and the Assembly enacted Thomas Jefferson's Virginia Bill for Religious Liberty shortly after. *Id.* That bill "separated religion … from government" and put "all religions on a footing of perfect equality; protecting all; imposing neither burdens nor civil incapacities upon any; conferring privileges upon none." *Perry v. Commonwealth*, 44 Va. (3 Gratt.) 632, 641 (1846) (cleaned up). Virginia's founding tradition, thus, was about religious equality—not about prohibiting neutral support for religious training for the clergy.

Virginia's no-aid provisions are marred by animus, too. Catholic immigration to the United States surged in the 1830s and 1840s—and so did anti-Catholic sentiment. *Espinoza*, 591 U.S. at 499 (Alito, J., concurring); Christopher C. Lund, *The New Victims of the Old Anti-Catholicism*, 44 CONN.

12

L. REV. 1001, 1003, 1005-06 (2012). The backlash came to a head in the 1870s. Congress nearly passed the "Blaine Amendment," which "would have amended the Constitution to bar any aid to sectarian institutions." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000). It was "born of bigotry," for "it was an open secret that 'sectarian' was code for 'Catholic.'" *Espinoza*, 591 U.S. at 482 (cleaned up); *see also* Laycock, *supra*, at 188. Indeed, the related Congressional debate centered on anti-Catholic rhetoric, targeting Catholic schools. Robert F. Utter and Edward J. Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution*, 15 HASTINGS CONST. L.Q. 451, 465-66 (1988).

States picked up the baton after Congress's Blaine Amendment failed—Virginia included. *See* Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 HARV. J.L. & PUB. POL'Y 657, 672 (1998). During the 1902 Constitutional Convention, Virginia enacted its own Blaine Amendments to bar funding to "any school … not owned or exclusively controlled by the State," VA. CONST. art. IX, § 141 (1902), and to "any church, or sectarian … institution," VA. CONST. art. IV, § 67 (1902). Records show, too, that the "Catholic question" remained squarely on the minds of delegates during the debates at the 1902 Constitutional Convention.

13

*E.g.* 1 VA. CONST. CONVENTION (1901-1902), REPORT OF THE PROCEEDINGS AND DEBATES OF THE CONSTITUTIONAL CONVENTION 805 (1906) (Charles Meredith inquiring "is not the whole milk in the cocoanut [sic] the Catholic question"); *id.* at 812 (Meredith making case that government shouldn't deny benefits to Catholics because they do charitable work).  Proponents of the measure used the term "public school" during the debates, but that changes nothing.  "When politicians spoke of private or sectarian schools during the debate over Blaine Amendments, they meant Catholic schools."  Toby J. Heytens, *School Choice and State Constitutions*, 86 VA. L. REV. 117, 138 (2000).  And "most lawmakers expressed a nineteenth century restricted view of religious liberty.  Reading from the Protestant Bible was considered nonsectarian."  Steven K. Green, *The Blaine Amendment Reconsidered*, 36 AM. J. LEGAL HIST. 38, 69 (1992).

Virginia's current no-aid provisions, Sections 10 and 11 of Article VIII, grew out of this history.  *See* PHILIP JENKINS, THE NEW ANTI-CATHOLICISM: THE LAST ACCEPTABLE PREJUDICE 20 (2003) ("[A] new anti-Catholicism that was more relevant" to then-current political issues reemerged—an animus that "coincided at many points with the older body of stereotypes.").  In 1956, Virginia revised its Constitution to permit state funding directed to

14

"nonsectarian" private schools. VA. CONST. art. IX, § 141 (1956). And bigotry in another form served as the impetus for that shift. Racial animus was at the forefront, as members of the Constitutional Convention sought to undermine integrated schools following *Brown v. Board of Education*, 347 U.S. 483 (1954). JOURNAL OF THE CONSTITUTIONAL CONVENTION TO REVISE AND AMEND SEC. 141 OF THE CONSTITUTION OF VIRGINIA 5-6, 41-42, 89 (1965) ("Now, we are here to amend Section 141, but we are here, really, … for the purpose of preventing enforced integration.").

That provision, Section 141, "was later readopted, as amended, as Section 10 of Article VIII of the Virginia Constitution of 1971." *Miller v. Ayres*, 191 S.E.2d 261, 269 (1972). And in 1971, Virginia adopted Section 11 to "mak[e] possible a loan program which would be free of the restrictions which might otherwise apply because of Section 10." *Id.*; *see also* Richard D. Komer, *Trinity Lutheran and the Future of Educational Choice: Implications for State Blaine Amendments*, 44 MITCHELL HAMLINE L. REV. 551, 564 n.87 (2018) (remarking that Virginia Constitution Article VIII, Section 11 revised Article VIII, Section 10).

Virginia's current "no-aid provisions belong to a more checkered tradition shared with the Blaine Amendment of the 1870s." *Espinoza*, 591 U.S.

15

at 482. They trace directly to anti-Catholic animus and were later expanded to serve racial segregation. *See* Thomas C. Berg, *Anti-Catholicism and Modern Church-State Relations,* 33 LOY. U. CHI. L.J. 121, 162 (2001) ("[D]istrust of Catholic power and Catholic education was" a major "factor in the strict[] 'no-aid' separationism of the 1960s and 1970s."). And without the clean constitutional pedigree *Locke* assumed, Virginia has not a historic and substantial state interest—but a historic and substantial problem.

## II.    Virginia's programs go further than *Locke* permits.

Even if *Locke* applied here—and for the reasons above, it does not— Virginia's scholarship exclusions would still fail *Locke*'s rubric. *Locke* tolerated Washington's choice because Washington "merely chose[] not to fund a distinct category of instruction" and imposed only a "minor burden" on students. *Locke,* 540 U.S. at 713, 724-25. Virginia's exclusions look different. It has drawn lines within religious education, delegated religious classification authority to state officials, and constructed an entirely arbitrary scheme. And the burdens on students loom large. *Locke* never sanctioned Virginia's kind of system.

Start with the exclusions. Washington had a single target: scholarship recipients like Joshua Davey could not use state funds to pursue a "degree in

16

theology." *Locke*, 540 U.S. at 716. And the parties agreed that those degrees were "'devotional in nature or designed to induce religious faith.'" *Id.* "The institution, rather than the State, determine[d] whether the student's major [was] devotional." *Id.* at 717.

In contrast, Virginia's exclusions are nonsensical. It funds some religious programs while excluding others, and its system for doing so isn't even consistent across scholarship programs. Too, the State—not the institutions—base eligibility determinations "solely [on] the religious character of the" major. *Espinoza*, 591 U.S. at 476. Yet "official differentiation on theological lines is fundamentally foreign to our constitutional order, for the law knows no heresy, and is committed to the support of no dogma." *Catholic Charities Bur., Inc. v. Wis. Labor & Indus. Rev. Comm'n*, 605 U.S. 238, 249 (2025) (cleaned up). And, as in the free-speech context, "the State must be able to articulate some sensible basis for distinguishing what may come in [to the scholarship program] from what must stay out." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018); *see also, e.g., Faith Ctr. Church Evangelistic Ministries v. Glover*, 462 F.3d 1194, 1217 (9th Cir. 2006) (Tallman, J., dissenting) (concluding that a program was unconstitutional where it drew an "arbitrary line in the sand, arguing that it

17

has the right to decide what constitutes a religious service while failing to set forth specific guidelines defining the term").

Consider VTAG. It defines ineligible "[p]rograms that provide religious training or theological education" as those the State Council of Higher Education classifies "as CIP Code 39-series programs." 8 VA. ADMIN. CODE 40-71-10. CIP Code 38-series programs *are* eligible. But CIP-38 and CIP-39 majors are virtually indistinguishable. CIP-38 programs "focus on logical inquiry, philosophical analysis, and the academic study of organized systems of belief and religious practices." *Detail for CIP Code 38*, NAT'L CTR. FOR EDUC. STATS., https://perma.cc/B3TC-5YSR (last visited June 2, 2026). CIP-39 programs "focus on the intramural study of theology and that prepare individuals for the professional practice of religious vocations." *Detail for CIP Code 39*, NAT'L CTR. FOR EDUC. STATS., https://perma.cc/7Z9U-VEX2 (last visited June 2, 2026).

Virginia's own approved programs expose VTAG's 38/39 distinction as fiction. Hampton University's Religious Studies major—an eligible CIP 38 program—is "designed to sharpen the skills of students already in ministry" and "to prepare students for advanced studies, especially in religious education and theology." *Religious Studies*, HAMPTON UNIV.,

18

https://perma.cc/2LYP-FJUD (last visited June 2, 2026). Virginia Union University's Religious Studies major—also eligible—"prepare[s] persons … to pursue religious vocations." VA. UNION UNIV., 2022-2024 UNDERGRADUATE AND GRADUATE ACADEMIC CATALOGUE 49 (n.d.), https://perma.cc/M5YW-K5MS. And Bluefield University's Music program—eligible—has a "Church Music" concentration that "prepares students for a professional vocational music ministry in the church." *Music (BA)*, BLUEFIELD UNIV., https://perma.cc/2ZUA-WSV8 (last visited June 2, 2026). VTAG funds all of these. Yet Virginia denies funding to Cameron Johnson's Pastoral Leadership degree and Luke Thomas's Music and Worship degree.

VTAG's dual-degree rule makes the arbitrariness clearer still. Virginia will fund a CIP Code 39 major if the student also pursues an eligible double major and takes at least as many courses in the eligible major per semester. 8 VA. ADMIN. CODE § 40-71-10. A student double-majoring in Pastoral Leadership and History can receive a full VTAG grant each semester, so long as he takes three History courses and no more than three Pastoral Leadership courses. *Id.* The Pastoral Leadership instruction is identical. The religious content is identical. Only the proportion changes. Virginia, thus, doesn't even do what it purports it must: exclude religious vocational instruction. And if a

19

student cannot meet the proportionality requirement for reasons "beyond [his] control," the State Council retains sole discretion to grant an exception anyway. *Id.* Nothing in the regulations defines what circumstances suffice. Notably, had Joshua Davey himself lived in Virginia, he likely would have been eligible for VTAG—he double-majored in "pastoral ministries and business management/administration," *Locke*, 540 U.S. at 717, and would have qualified under the double-major rule. Whatever can be said of Washington's exclusion, it was at least more narrowly tailored than Virginia's.

VANGSTAP is worse. VTAG eligibility is at least governed by published CIP Code regulations. VANGSTAP gives the Adjutant General unfettered discretion to determine which degrees constitute "religious training or theological education" on a case-by-case basis, without any published standards defining the terms. *See* VA. DEP'T OF MIL. AFFS., COMMAND POLICY 22-023 VA. NATIONAL GUARD STATE TUITION ASSISTANCE PROGRAM (VANGSTAP) § 7(a)(6)(c) (2022), https://perma.cc/Y49X-XVTZ. The result is not a principled exclusion of a distinct category of instruction. It is an ongoing, standardless government inquiry into the religious character of individual degree programs.

20

Take Trace Stevens. His religion degree (CIP Code 38) at Liberty University would be eligible for VTAG. JA53, JA58, JA153-154. Yet the Department of Military Affairs deemed it ineligible for VANGSTAP. JA53, JA58, JA152-154. When Stevens asked why, the Department told him that VTAG "is managed by another organization within the State government that [the Guard] has nothing to do with." JA153-154. That answer is a confession that no cohesive, principled system exists in Virginia.

Additionally, in *Locke*, the Supreme Court blessed Washington's exclusion because it put only a "minor burden" on students and required no entangling inquiry into religious purpose. *Locke*, 540 U.S. at 725. The same can't be said for VTAG's and VANGSTAP's exclusions. The burdens are significant.

The plaintiffs here illustrate how. Johnson and Thomas are denied VTAG funding for their entire course of study unless they pick up a secular double-major and restructure their course load around Virginia's proportionality rules. Stevens is denied VANGSTAP funding that a different state agency makes available to other students at the same institution for the same degree. And because eligibility determinations are case-by-case, without standards or published guidance, he may carry a special burden that other

21

similarly situated students do not. It's hard to tell, considering how the Adjutant General has total discretion over eligibility decisions.

So, Virginia's programs do not fall within *Locke*'s narrow exception.

## III.  Extending *Locke* here will harm the States.

If *Locke* shields Virginia's programs from the ordinary level of scrutiny, then it will blow a hole in Supreme Court precedent warning that States cannot become overly entangled with religion or provide denominational preferences. Chaos among State scholarship programs and confusion among students will ensue.

States will be left to decipher a new—paradoxical—doctrinal landscape. After all, *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), prohibits the very conduct *Locke*'s extension here would bless. States will be green lit to do what *Catholic Charities Bureau* forbids: give implicit denominational preference to religions "based on theological choices." *Id.* at 251. Really, Virginia already does that. It funds Hampton University's Religious Studies program, for instance— designed to prepare students "already in ministry"—while denying funds to Johnson's Pastoral Leadership degree. That distinction does not track any neutral criterion.

22

Thus, under a Virginia-style regime, States could deny funds to more stereotypically religious programs while granting funds to ones that are less so. And a State that conditions scholarship eligibility on whether a program is "for religious training or theological education" is conducting a risky entangling inquiry the Supreme Court has oft cautioned against. *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 761 (2020). Simply, Governments should not engage in inquiries that grade-out religiosity. *See id.* at 761; *see also Carson*, 596 U.S. at 787 (noting that "scrutinizing whether and how a religious school pursues its educational mission would also raise serious concerns about state entanglement with religion and denominational favoritism"). Any kind "of state inspection and evaluation of the religious content of a religious organization is fraught with … entanglement" concerns. *Larson v. Valente*, 456 U.S. 228, 255 (1982) (quotation omitted).

So, States cannot adopt a Virginia-style regime—kosher under an extended *Locke*—without running into other constitutional problems. And States have no easy path through that Supreme Court thicket. The doctrinal chaos will be real, it will be immediate, and it will fall squarely on the States that administer scholarship programs and the students who depend on them. And States that choose *not* to adopt Virginia-style exclusions will face a

23

different risk: Establishment Clause challenges from plaintiffs who will cite this Court's blessing of Virginia's approach as evidence that neutral, inclusive funding of religious programs is constitutionally suspect. Even if those challenges ultimately fail, they will impose real litigation costs and chill the very inclusivity the Free Exercise Clause demands.

Students will bear the consequences, too. Religious students applying for state scholarships will face eligibility rules that cannot be predicted, explained, or consistently applied. They will be forced to structure their education around what the government will fund—choosing the secular version of their desired major, doubling up on secular coursework to dilute the religious content, or abandoning their chosen program entirely. Those consequences are precisely the kind of choice between faith and public benefit that the Free Exercise Clause was designed to eliminate. *See Trinity Lutheran*, 582 U.S. at 462 ("[T]he Free Exercise Clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (cleaned up)). And when students' deepest convictions are on the line, States don't doubt these students will move to protect them.

Amici States have no interest in having a Virginia-style option available. We serve religious students. We want to keep doing so. And we want to do it

24

without exposing ourselves to a doctrinal headache or giving religious students a reason to run across borders.

The Court should decline Virginia's invitation to extend *Locke* into a regime that no state can administer without constitutional peril and no student can navigate without abandoning religious conviction.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

JOHN B. MCCUSKEY
 ATTORNEY GENERAL

/s/Holly J. Wilson
Michael R. Williams
 *Solicitor General*

Holly J. Wilson
 *Principal Deputy Solicitor*
 *General*
 *Counsel of Record*

S. Hallie Hovey-Murray
 *Assistant Solicitor General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov
hhovey-murray@wvago.gov

Dated: June 2, 2026

*Counsel for Amicus Curiae*
*State of West Virginia*

26

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

KRIS KOBACH
Attorney General
State of Kansas

STEPHEN J. COX
Attorney General
State of Alaska

LIZ MURRILL
Attorney General
State of Louisiana

TIM GRIFFIN
Attorney General
State of Arkansas

CATHERINE L. HANAWAY
Attorney General
State of Missouri

JAMES UTHMEIER
Attorney General
State of Florida

AUSTIN KNUDSEN
Attorney General
State of Montana

CHRIS CARR
Attorney General
State of Georgia

MICHAEL T. HILGERS
Attorney General
State of Nebraska

RAÚL LABRADOR
Attorney General
State of Idaho

DAVE YOST
Attorney General
State of Ohio

THEODORE E. ROKITA
Attorney General
State of Indiana

ALAN WILSON
Attorney General
State of South Carolina

BRENNA BIRD
Attorney General
State of Iowa

MARTY JACKLEY
Attorney General
State of South Dakota

27

28

JONATHAN SKRMETTI
Attorney General
State of Tennessee

DEREK BROWN
Attorney General
State of Utah

KEN PAXTON
Attorney General
State of Texas

28

## CERTIFICATE OF COMPLIANCE

1.      This amicus curiae brief complies with Fed. R. App. P.  29(a)(5) because it contains 4,809 words.

2.      This amicus curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/Holly J. Wilson
Holly J. Wilson

29