**CASE NO. 26-1437**

IN THE

# United States Court of Appeals
# For the Fourth Circuit

CAMERON JOHNSON, *et. al.*,

*Plaintiffs-Appellants,*

v.

A. SCOTT FLEMING, in his official capacity as the Director of the State Council of Higher Education for Virginia, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern District of Virginia (Case No. 3:25-cv-00407-RCY)

**Brief of *Amici Curiae* Association of Christian Schools International, Association for Biblical Higher Education, International Alliance for Christian Education, International Association of Baptist Colleges and Universities, and The Cardinal Newman Society in support of PLAINTIFFS-APPELLANTS and REVERSAL**

Joshua A. Hetzler
Michael B. Sylvester
FOUNDING FREEDOMS LAW CENTER
707 E. Franklin St.
Richmond, VA 23219
804-801-6707

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1 *amici curiae*, Association of Christian Schools International, Association for Biblical Higher Education, International Alliance for Christian Education, International Association of Baptist Colleges and Universities, and The Cardinal Newman Society, make the following disclosures:

1.      *Amici* are not publicly held corporations or other public entities.

2.      *Amici* do not have a parent corporation.

3.      No publicly held corporation or other public held entity owns 10% or more of the stock of *amici*.

4.      *Amici* are not trade associations.

5.      This case does not arise out of a bankruptcy proceeding.

6.      No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

DATED: June 2, 2026                    */s/ Michael B. Sylvester*
                                       Michael B. Sylvester
                                       Counsel for *Amici*

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICI CURIAE* ..........................................................1

INTRODUCTION ..............................................................................3

ARGUMENT ....................................................................................4

     I.     *LOCKE*'S FOUNDATIONS ARE QUADRUPLE ERODED. ...........................5

         a.  *Locke* rested on key foundations...............................5

         b.  *Locke*'s key foundations have been eroded.............................11

     II.    ERODED FOUNDATIONS CONSISTENTLY CONNOTE NARROWNESS. ...................................................16

     III.   THE COURT HAS NARROWED *LOCKE*. ...............................................19

         a.  *Trinity Lutheran*, *Espinoza*, and *Carson* narrowed *Locke*. ........19

         b.  *Hall v. Fleming* had no occasion to discuss *Locke*'s narrowness and is inapposite here. ............................24

     IV.   AS NARROWED, *LOCKE* DOES NOT REMOVE VIRGINIA'S GRANT PROGRAMS FROM ORDINARY RELIGIOUS EQUALITY PRINCIPLES. ...................................................26

CONCLUSION ..................................................................................28

CERTIFICATE OF COMPLIANCE..................................................29

CERTIFICATE OF SERVICE ..........................................................30

ii

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Ansley v. Warren*,
861 F.3d 512 (4th Cir. 2017) ........................................................................18

*Arizona Christian School Tuition Organization v. Winn*,
563 U.S. 125 (2011) ........................................................................................18

*Board of Education of Westside Community Schools v. Mergens*,
496 U.S. 226 (1990) ........................................................................................10

*Bowen v. Kendrick*,
487 U.S. 589 (1988) ........................................................................................10

*Carson v. Makin*,
596 U.S. 767 (2022) ..................................................................................19, 23

*Cent. Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006) ..........................................................................................3

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993) ....................................................................................8, 27

*Cohens v. Virginia*,
19 U.S. 264 (1821) ............................................................................................3

*Committee for Public Education and Religious Liberty v. Nyquist*,
413 U.S. 756 (1973) ..........................................................................................9

*Corporation of the Presiding Bishop of the Church of Jesus Christ
of Latter-day Saints v. Amos*,
483 U.S. 327 (1987) ........................................................................................10

*County of Allegheny v. American Civil Liberties Union*,
492 U.S. 573 (1989) ........................................................................................10

*Doe v. Mast*,
　　173 F.4th 524 (4th Cir. 2026) ........................................................15

*Edwards v. Aguillard*,
　　482 U.S. 578 (1987) ........................................................................10

*Employment Division v. Smith*,
　　494 U.S. 872 (1990) ........................................................................27

*Espinoza v. Montana Department of Revenue*,
　　591 U.S. 464 (2020) ................................................................ *passim*

*Estate of Thornton v. Caldor, Inc.*,
　　472 U.S. 703 (1985) ........................................................................10

*Flast v. Cohen*,
　　392 U.S. 83 (1968) ....................................................................16–19

*Hall v. Fleming*,
　　No. 25-1574, __F.4th__, 2026 U.S. App. LEXIS 13779,
　　(4th Cir. May 13, 2026) .......................................................13, 24, 25

*Hein v. Freedom from Religion Found., Inc.*,
　　551 U.S. 587 (2007) ....................................................................17–18

*Hernandez v. Commissioner*,
　　490 U.S. 680 (1989) ........................................................................10

*Indep. Inst. v. FEC*,
　　816 F.3d 113 (D.C. Cir. 2016) ........................................................19

*Jimmy Swaggart Ministries v. California Board of Equalization*,
　　493 U.S. 378 (1990) ........................................................................10

*Johnson v. Fleming*,
　　No. 3:25CV407, 2026 U.S. Dist. LEXIS 71085
　　(E.D. Va. Mar. 31, 2026)...........................................................4, 26

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) ................................................................*passim*

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982) ................................................................9

*Larson v. Valente*,
    456 U.S. 228 (1982) ................................................................9

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ................................................................*passim*

*Locke v. Davey*,
    540 U.S. 712 (2004) ................................................................*passim*

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025) ................................................................15

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ................................................................17

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    584 U.S. 617 (2018) ................................................................15, 28

*Mueller v. Allen*,
    463 U.S. 388 (1983) ................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................14

*NLRB v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979) ................................................................9

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ................................................................14–15

*Santa Fe Independent School District v. Doe,*
    530 U.S. 290 (2000) ...............................................................................10

*School District of the City of Grand Rapids v. Ball,*
    473 U.S. 373 (1985) ...............................................................................10

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ...........................................................................*passim*

*U.S. v. Richardson,*
    418 U.S. 166 (1974) ...............................................................................17

*Valley Forge Christian Coll. v. Ams. United for Separation of*
*Church & State, Inc.,*
    454 U.S. 464 (1982) ...............................................................................17

*Widmar v. Vincent,*
    454 U.S. 263 (1981) .................................................................................9

*Witters v. Washington Department of Services for the Blind,*
    474 U.S. 481 (1986) ...............................................................................10

## Other Authorities

Richard M. Re, *Narrowing Precedent in the Supreme Court,*
    114 COLUM. L. REV. 1861 (2014) ..............................................................19

Peter J. Smith, *Establishment Clause Mythology,*
    75 Case W. Res. 573 (2024) ....................................................................24

Steven D. Smith, *Jurisdictional Diversity, Tradition, and*
    *the Religion Clauses,* 100 CHI.-KENT L. REV. 729 (2025) .....................23–24

## INTEREST OF *AMICI CURIAE*[1]

The Association of Christian Schools International (ACSI) is a nonprofit association providing support services to 24,000 Christian schools in over 100 countries.  ACSI serves 2,300 Christian preschools, elementary and secondary schools, and over 50 post-secondary institutions in the United States.  Member-schools educate some 5.5 million children around the world.  ACSI accredits Protestant pre-K – 12 schools, provides professional development and teacher certification, and offers member-schools high-quality curricula, student testing and a wide range of student activities.  ACSI members advance the common good by providing quality education and spiritual formation to their students.  Its calling relies upon a vibrant Christian faith that embraces every aspect of life.  This gives ACSI an interest in ensuring expansive religious liberty with strong protection from government attempts to restrict it.

---

[1] Counsel for all parties consented to the filing of this brief.  No counsel for a party authored this brief in whole or in part, and no person other than *amici* and their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

The Association for Biblical Higher Education (ABHE) is an association of more than 170 institutions of biblical higher education, which enroll more than 90,000 students. ABHE institutions offer undergraduate and graduate educational opportunities through traditional residential, extension, and distance learning models. Its member schools have diverse histories and affiliations, but they are all centered on promoting a Christian education and biblical worldview in their students.

The mission of the International Alliance for Christian Education (IACE) is to unify, synergize, and strengthen collective conviction around biblical orthodoxy and orthopraxy, cultural witness, scholarship, professional excellence, and resourcing of Christian education at all levels. Functioning as a network and umbrella organization, IACE seeks to provide enablement, connections, and collaborative opportunities for the various aspects of Christian education.

The mission of the International Association of Baptist Colleges and Universities is to provide and maintain an organization through which educational institutions currently or historically cooperating with Baptists may work together in promoting the interests of Christian higher education.

2

The Cardinal Newman Society, through The Newman Guide, promotes and defends faithful Catholic education by recognizing schools, colleges, and graduate programs that meet high standards of fidelity to Catholic teaching and formation of students in the light of the Catholic faith, without compromise to Catholic beliefs or morals. The Society's Newman Guide Network brings together leaders of recognized institutions and programs for collaboration and defense of their religious freedom.

## INTRODUCTION

Chief Justice John Marshall well said, "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. 264, 399 (1821). This principle is well known. *See, e.g.*, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) (quoting this principle). And its caution toward careful contextualization is only more salient when a decision's foundations no longer remain.

The foundations for *Locke v. Davey*, 540 U.S. 712 (2004), have been quadruple eroded. First, its reliance on a purported "tension" prompting "play in the joints" between the Religion Clauses has since been disavowed by the Supreme Court. Second, its teaching that a state's distinct

3

"antiestablishment interests" can constitute a sufficient interest that overrides Free Exercise concerns is no longer true. Third, its view that some government-approved religious discrimination can be cast off as "mild" has lost purchase before the Court. And fourth, the shadow of *Lemon v. Kurtzman*, which undeniably affected the outcome in *Locke*, has since been removed by *Lemon*'s modern overturning.

Unsurprisingly then, the Court now views *Locke*'s application as narrow—the natural posture that emerges when the correctness of a decision is in doubt. Today, *Locke* narrowly applies only to the specific context of the bona fide training of clergy. Plaintiffs here were not bona fide trainees for ministry roles. They were ordinary students, pursuing their chosen degree, unsure about their future career field—much like anyone else. *Locke*, therefore, is inapposite. And the Court's religious equality precedents control instead. Because of this, the judgment of the District Court should be reversed.

## ARGUMENT

The District Court below found that *Locke* governed this case and required dismissal of the bulk of its claims. *Johnson v. Fleming*, No. 3:25CV407, 2026 U.S. Dist. LEXIS 71085, at *25 (E.D. Va. Mar. 31, 2026).

4

In doing so, however, it erred by not correctly considering *Locke*'s weakened foundations and consequent narrowness.

The following four points are detailed below. *Locke*'s foundations have been thoroughly eroded. Consequently, it is to be read narrowly. This narrow reading of *Locke* is precisely what the Court has directed. Therefore, taken in its appropriately narrow context, *Locke* is inapplicable to this case and the Court's ordinary religious freedom jurisprudence applies instead.

### I. *LOCKE*'S FOUNDATIONS ARE QUADRUPLE ERODED.

#### a. *Locke* rested on key foundations.

Significant to the Court's decision in *Locke v. Davey* are four unique qualities. In reaching its decision, the Court focused on a belief that (1) there is "tension" between the Religion Clauses, (2) a state's own antiestablishment interests can justify restrictions on Free Exercise, and (3) the perceived "mild[ness]" of a religious burden can diminish the requisite constitutional protection. 540 U.S. at 718, 720, 722. Also, *Locke* was decided at a time when (4) the Establishment Clause was viewed as significantly restrictive under the test prescribed in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), a reality that meaningfully affected *Locke*'s outcome. However, each of these four foundations for *Locke* have since been jettisoned

5

by the Court. In this context, undoubtedly—just as the Court has already explicitly stated—*Locke* is to be read narrowly.

For background, *Locke*, 540 U.S. 712, tested a Washington state scholarship program that broadly benefited many students, but excluded those who pursued a theology degree. *Id.* at 716–17. The Court upheld this program as not violating the Free Exercise Clause. However, the context was key. The scholarship applicant who was denied this benefit because he sought a degree in pastoral ministries, had "planned for many years to attend a Bible college and to prepare [himself] through that college training for a lifetime of ministry, specifically as a church pastor." *Id.* at 717. Indeed, his "religious beliefs [were] the only reason for [him] to seek a college degree." *Id.* at 721. As best as the Court was aware, his state-funded scholarship would directly pay for his entry into religious ministry.

Said simply, *Locke* was all about a bona fide ministry trainee. It was this context that primarily animated the holding in *Locke*, leading it to rest on its unique foundations discussed above—Religion Clause "tension," separate state antiestablishment interests, mere "mild" religious burdens, and *Lemon*-type reasoning.

6

The Court explained, "[t]raining someone to lead a congregation is an essentially religious endeavor," and few areas more readily raise a state's own "antiestablishment interests." *Id.* at 721–22. "Historically," it continued, society has balked against "procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." *Id.* at 722.

In that context, the Court recited that "there is room for play in the joints" between the Free Exercise and Establishment Clauses, which are "frequently in tension." *Id.* at 719. Under this doctrinal teaching, "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* The Court held, "[t]his case involves that 'play in the joints.'"

*Locke* presented no true Establishment Clause problem. The Court expressly determined this, explaining that the link between government funds and religious training, would be "broken by the independent and private choice of [scholarship] recipients." *Id.* at 719. "As such," it held, "there is no doubt that the State could, consistent with the Federal Constitution, permit [scholarship recipients] to pursue a degree in devotional theology." *Id.* Rather, the issue before the Court was whether a

7

state's own antiestablishment interest sufficed to allow it to create a generally-available benefit while excluding genuine ministry students from that program. *Id.*

The Court's prior holding in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), would seem to answer this question in the negative. A state preventing its generally-available benefit from aiding ministry students would be impermissible religious discrimination. *Lukumi* held that, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* Put simply, laws which are not neutral to religion are presumptively unconstitutional.

But in *Locke*, the Court avoided *Lukumi*. While acknowledging that the scholarship program at issue there was not entirely neutral toward religion—stating that the religious-studies exception could be referred to as "disfavor of religion," *id.* at 720—the Court waved off this detail as being disfavor "of a far milder kind," *id.*, and thus meriting a special exception to the ordinary principles espoused in *Lukumi*.

8

Anomalous?  Yes.  But *Locke* was decided at a time when *Lemon v. Kurtzman*, 403 U.S. 602 (1971), held dominant sway, terminating numerous religious freedom claims.

*Lemon* was contextually similar to the factual background of *Locke* and this case too.  *Lemon* considered whether two states' programs that provided state aid to church-related schools violated the First Amendment.  *Id.* at 606–07.  In its groundbreaking decision, *Lemon* held that the Establishment Clause required government programs to satisfy a three-pronged test— (1) secular purpose, (2) non-advancement nor inhibition of religion, and (3) in-excessive entanglement between government and religion.  *Id.* at 612–13.  Finding that the states' programs that it evaluated failed this test, *Lemon* held that the Establishment Clause invalidated them.  *Id.* at 606.

Since its issuance, *Lemon* comprehensively dominated its space.  It was followed in no less than a staggering seventeen subsequent decisions from the Supreme Court leading up to *Locke*, if not more.[2]

---

[2] *Lemon* was followed in these seventeen Supreme Court cases leading up to *Locke*:  *Comm. for Public Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756 (1973); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979); *Widmar v. Vincent*, 454 U.S. 263 (1981); *Larson v. Valente*, 456 U.S. 228 (1982); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982); *Mueller v. Allen*, 463 U.S. 388 (1983);

9

*Lemon* did more than just affect the environment in which Religion Clause matters like *Locke* were evaluated. More directly, its concepts are reflected in *Locke*. *Lemon* taught against laws that "advance . . . religion" or cause "excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13. These teachings are notably similar to *Locke*'s teaching about "tension" and "play in the joints" between the religion clauses, *Locke*, 540 U.S. *at* 718–19, and its idea that even without concern of violating the Establishment Clause, states can have "antiestablishment interests" that justify discrimination against religion, *id.* at 722.

*Locke* certainly was anomalous. It departed from ordinary teachings that non-neutrality toward religion prompted strict scrutiny. However, because it was moored into the four pivotal foundations discussed above, its holding initially was given significant weight. That since has changed.

---

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985); *School District of the City of Grand Rapids v. Ball*, 473 U.S. 373 (1985); *Witters v. Washington Dep't of Services for the Blind*, 474 U.S. 481 (1986); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987); *Edwards v. Aguillard*, 482 U.S. 578 (1987); *Bowen v. Kendrick*, 487 U.S. 589 (1988); *Hernandez v. Commissioner*, 490 U.S. 680 (1989); *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989); *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226 (1990); *Jimmy Swaggart Ministries v. California Board of Equalization*, 493 U.S. 378 (1990); and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000).

### b. *Locke*'s key foundations have been eroded.

Two decades after *Locke*'s issuance, its four pivotal foundations now have all been abandoned. First, the idea of their being "tension" between the Religion Clauses requiring "play in the joints" no longer applies. This is the result of the Court's decision in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), a case with relevant similarities to *Locke*.

In *Kennedy*, during downtime after public school football games, school coaches were permitted to enjoy free time before returning to specific coaching duties. During those moments, the plaintiff Coach Kennedy—a public school employee—would pray on the football field, and some players would join him. The School District believed that these prayers created religious establishment concerns, and eventually it terminated the Coach's employment, prompting religious liberty litigation that reached the Supreme Court. *Id.*

Under that backdrop, the Court could have taken an approach like that illustrated in *Locke*. It could have declared that, while the Establishment Clause did not foreclose the Coach's prayers, the Free Exercise Clause did not compel tolerance of them either, and because the school district sought

11

to vindicate "antiestablishment interests" this sufficed to overcome the Coach's free exercise concerns.

An outcome like this was contemplated, as hinted at in Justice Sotomayor's *Kennedy* dissent. There, she cited *Locke* to illustrate a perceived tension between the Free Exercise and Establishment Clauses that needed balancing and that should have been balanced against the Coach's Free Exercise claim. *See id.* at 568 (Sotomayor, J., dissenting) ("The Court, however, has long recognized that these two [Religion] Clauses, while expressing complementary values, often exert conflicting pressures.") (cleaned up).

The majority did not adopt that position, however. Instead, determining that there was no pure Establishment Clause violation, the majority decision penned these doctrinally significant words:

> In the end, the [School] District's case hinges on the need to generate conflict between an individual's rights under the Free Exercise [Clause] . . . and its own Establishment Clause duties— and then develop some explanation why one of these Clauses in the First Amendment should trump the other two [the Free Exercise and Free Speech Clauses]. But the project falters badly. Not only does the [School] District fail to offer a sound reason to prefer one constitutional guarantee over another. It cannot even show that they are at odds. In truth, **there is no conflict between the constitutional commands before us.** There is only the "mere shadow" of a conflict, a false choice premised on a

misconstruction of the Establishment Clause.  And **in no world may a government entity's concerns about phantom constitutional violations justify actual violations** of an individual's First Amendment rights.

*Id.* at 542–43 (emphasis added) (internal citations omitted).

This holding in *Kennedy* abandoned the ideas of "play in the joints" or "tension" between the Free Exercise and the Establishment Clauses.  Thus, upon recognizing the absence of a pure Establishment Clause violation, the Court simply followed ordinary Free Exercise jurisprudence which prohibited religious censorship.  Religion Clause tension, no more.[3]

Second, just two years earlier, the Supreme Court had ended the teaching set out in *Locke*, 540 U.S. 722, that a state's own "antiestablishment

---

[3] This point is made in Judge Richardson's concurrence in *Hall v. Fleming*, No. 25-1574, 2026 U.S. App. LEXIS 13779, *16 n.3 (4th Cir. May 13, 2026) (Richardson, J., concurring):

[T]he Supreme Court has rejected the notion of "play in the joints" between the Free Exercise and Establishment Clauses—a notion on which the *Locke* majority heavily relied. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 533 [] (2022) ("A natural reading [of the First Amendment] would seem to suggest the [religion] Clauses have 'complementary' purposes, not warring ones."); *Espinoza*, 591 U.S. at 484–85 ("[A state's] interest in separating church and State 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of the infringement of free exercise." (quoting *Trinity Lutheran*, 582 U.S. at 466) (cleaned up)).

13

interests"—distinct from what the U.S. Constitution requires—could justify a softened approach toward addressing potential Free Exercise violations. In *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), the Supreme Court explained that "[a state's] interest in separating church and State 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of the infringement of free exercise." *Id.* at 485.

Third, the Supreme Court clearly no longer retains the anomalous idea that perceptions of mere "mild" religious discrimination receive watered-down protection under the Free Exercise Clause. *Locke* suggested this watering-down, saying that the religious disfavor at issue in the scholarship program it evaluated was "of a far milder kind," not meriting general Free Exercise protection. *Locke*, 540 U.S. at 720.

The Supreme Court now, however, consistently acknowledges the significance of any First Amendment violation, severe or mild. For example, when evaluating the appropriateness of issuing a preliminary injunction—relief that is consistently characterized as "extraordinary," *see, e.g., Nken v. Holder*, 556 U. S. 418, 428 (2009)—the Supreme Court recently reaffirmed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of*

14

*Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see also Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (same). And the Fourth Circuit likewise has recently reiterated this point. *Doe v. Mast*, 173 F.4th 524, 533 (4th Cir. 2026) (same). Indeed, the Court has now pronounced, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 638 (2018).

Today, the mildness of a religious-freedom deprivation that was relied upon in *Locke* has lost its salience to the Court. The Court's pronouncements against "subtle departures from neutrality" on matters of religion and the "unquestionable" irreparable injury that occurs from even minimal periods of First Amendment deprivations makes this plain.

Fourth and finally, the *Lemon*-type reasoning in *Locke* now has lost its force. Particularly, *Lemon* taught against laws that "advance . . . religion" or cause "excessive government entanglement with religion." *Lemon*, 403 U.S. at 612–13. This matched similarly to *Locke*'s teaching about "tension" and "play in the joints" between the Religion Clauses, *Locke*, 540 U.S. *at* 718–19, and its idea that even without concern of violating the Establishment Clause, states can have "antiestablishment interests" that justify discrimination against religion, *id.* at 722.

15

However, despite its temporary dominance, *Lemon* eventually fell out of favor.  In 2022, *Lemon*'s demise was sure.  The Court declared in *Kennedy*, that *Lemon* indeed was "abandoned" by the Court.  *Id.* at 523; id at 535 (cleaned up) ("In place of *Lemon* . . . , this Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings.").

*Locke* was anomalous.  And today, as has been set out above, each of the four foundations key to its decision no longer apply.  This has seriously amended how the Supreme Court applies *Locke* now.

## II.    ERODED FOUNDATIONS CONSISTENTLY CONNOTE NARROWNESS.

When the foundations of an anomalous legal decision have been severely eroded, it is common for the Supreme Court to project to the circuit courts the need to construe that decision narrowly.  This was well illustrated in the Establishment Clause context through the narrowing of the Article III standing holding in *Flast v. Cohen*, 392 U.S. 83 (1968).

In an Establishment Clause dispute, *Flast* addressed whether ordinary standing principles applied when plaintiffs challenge government expenditures that allegedly violate the Constitution.    The Court there broadly pronounced that "a taxpayer will have standing consistent

16

with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power." *Id.* at 105–06.

This broad pronouncement greatly differed from ordinary standing principles set out in cases like *Massachusetts v. Mellon*, 262 U.S. 447 (1923), which flatly forbade federal taxpayer standing. *Flast* was anomalous. However, soon after *Flast*'s issuance, the Supreme Court began signaling that its atypical holding should be taken narrowly.

First, the Court promptly explained, generally, that *Flast*'s application was narrow, *U.S. v. Richardson*, 418 U.S. 166, 173 (1974), with some justices indicated that *Flast* was limited to the Establishment Clause context. *Id.* at 180 (J. Powell concurring) ("[I]t is now settled that federal taxpayer standing exists in Establishment Clause cases."); id. at 197 (Douglas, J., dissenting) ("We held in *Flast* [], that a taxpayer had 'standing'" for an Establishment Clause challenge). Further, the Court later found no taxpayer standing even when Establishment Clause violations had been alleged. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 488–90 (1982). Later, a plurality of the Court again drew on *Flast*'s

17

narrowness, saying taxpayer standing could not apply to Establishment Clause challenges of Executive action that used generally appropriated funds; it only applied specifically to Congressional appropriations which specifically were alleged in a fashion that allegedly violated the Establishment Clause. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587 (2007) (plurality opinion). Yet once more, *Flast* was read narrowly as applying only to tax expenditures as opposed to tax credits in *Arizona Christian School Tuition Organization v. Winn*, 563 U.S. 125 (2011). Through this decisional history, the Court had greatly restricted *Flast*'s initial scope.

What became of *Flast*'s initial sweeping pronouncement was the Court's repeated proclamations to the circuit courts that *Flast* indeed was to be read narrowly, within its specific context. Now, the Fourth Circuit recognizes this and also reads *Flast* narrowly. *Ansley v. Warren*, 861 F.3d 512, 516 (4th Cir. 2017) ("In light of the Supreme Court's admonitions on the narrow scope of taxpayer standing, we affirm the judgment of the district court that plaintiffs lack standing to press this claim."); *id.* at 519 ("The Court issued a steady drumbeat of decisions emphasizing the narrow contours of the taxpayer exception."). *Flast*, being anomalous, was swiftly eroded and declared narrow, a view circuit courts were then to follow.

18

*Flast*'s narrowing is emblematic of circumstances that are not uncommon. "The nature of our system of legal precedent is that later cases often distinguish prior cases based on sometimes slight differences." *Indep. Inst. v. FEC*, 816 F.3d 113, 117 (D.C. Cir. 2016). Narrowing frequently occurs, and circuit courts are to heed such narrowing when it occurs. *See generally* Richard M. Re, *Narrowing Precedent in the Supreme Court*, 114 Colum. L. Rev. 1861 (2014).

## III.    THE COURT HAS NARROWED *LOCKE*.

That *Locke*'s application now is narrow cannot be denied. The Court made this plain in its decisions in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017) and *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020); and it stated this explicitly in *Carson v. Makin*, 596 U.S. 767 (2022). Numerous other authorities and scholars recognize this too.

### a.    *Trinity Lutheran, Espinoza,* and *Carson* narrowed *Locke.*

After its issuance, *Locke* was never again viewed as broadly applicable by the Court. *Locke* was first meaningfully evaluated for salience in *Trinity Lutheran*, 582 U.S. 449 (2017). But it was not favorably applied.

In *Trinity Lutheran*, generally-available, government-funded rubber surfaces for playgrounds were denied to a church-operated preschool. That

19

school functioned as "a ministry of Trinity Lutheran church" and had as part of its mission allowing children "to grow spiritually." *Id.* at 455. After this denial, the school brought a Free Exercise challenge. The district court assessed that challenge under *Locke*, which it found barred the school's claim. *Id.* at 456. However, the Supreme Court reversed that decision. Looking carefully at *Locke*'s specific facts, the Court observed that the plaintiff in *Locke* was denied a scholarship because he proposed to "use the funds to prepare for the ministry," *id.* at 465, which the Court held was different from excluding someone simply because they are religious, *id.* The latter was to be scrutinized more rigorously.

Ruling in this fashion, *Trinity Lutheran* read *Locke* narrowly. It could have declared that the state's "antiestablishment interests" were implicated because the state's provision of government-funded playground surfaces inevitably advanced the ability of a religious ministry to continue its work. If it ruled in this fashion, *Locke* would seem to apply. But it instead demonstrated this was the wrong approach. *Locke* did not reach that far.

That *Trinity Lutheran* had read *Locke* narrowly was clear to the Court when it issued its decision. Justices Thomas and Gorsuch, concurring in *Trinity Lutheran*, observed this narrowing. They stated that they joined the

20

majority opinion "because the Court today appropriately construes *Locke* **narrowly**, . . . and because no party has asked us to reconsider it." *Trinity Lutheran*, 582 U.S. at 468 (Thomas and Gorsuch, J., concurring) (emphasis added). Justice Sotomayor similarly observed that *Trinity Lutheran* reshaped the prescribed view of *Locke*, dissenting and saying that the Court had "**recast**[] *Locke* as a case about a restriction that prohibited the would-be minister from 'us[ing] the funds to prepare for the ministry.'" *Id.* at 492 (emphasis added). After *Trinity Lutheran*, *Locke* was newly focused on those specifically who were entering into ministry.

Next, *Espinoza*, 591 U.S. 464, took this same narrowing tack. Montana's school tuition scholarship program which generally benefited private school students, denied benefits for plaintiff students who intended to attend a Christian school. *Id.* at 470. Overtly religious, this private institution instructed its students in Christian values, the same as would be taught at home. *Id.* at 472–71.

With this backdrop, the Court could have applied *Locke* and held that providing scholarships where children are instructed in Christian values would conflict with the state's antiestablishment interest. But again, it stepped around *Locke*. It explained that *Locke* was about "the 'essentially

21

religious endeavor' of training a minister 'to lead a congregation'" —

receiving "funds to prepare for the ministry." *Id.* at 479–80. But because

overt state-supported clergy concerns were not so clearly implicated in

Montana's school tuition program, the Free Exercise Clause prevented

Montana's religious school exception. *Id.* at 483.

Justice Breyer's dissent detected *Espinoza*'s narrowing of *Locke*. After

referencing *Locke*, the dissent exclaimed:

> The majority barely acknowledges the play-in-the-joints doctrine
> here. It holds that the Free Exercise Clause forbids a State to
> draw any distinction between secular and religious uses of
> government aid to private schools that is not required by the
> Establishment Clause.

*Id.* at 520 (Breyer, J., dissenting). Justice Breyer thought this was incorrect.

He wrote:

> The majority finds that the school-playground case, *Trinity
> Lutheran*, and not the religious-studies case, *Locke*, controls here.
> I disagree. In my view, the program at issue here is strikingly
> similar to the program upheld in *Locke* and importantly different
> from the program we found unconstitutional in *Trinity Lutheran*.

> *Id.* at 524 (Breyer, J., dissenting). Yet, this similarity between *Espinoza*

and *Locke* did not control the final outcome. It was clear, once again, that the

scope of *Locke* had been narrowed.

22

But what the majorities in *Trinity Lutheran* and *Espinoza* did simply through their analysis, *Carson*, 596 U.S. 767 (2022), did explicitly. The context for *Carson* was that the state of Maine excluded religious schools from a tuition assistance program, which the Supreme Court held violated the Free Exercise Clause. *Id.* The Court repeated that *Locke* did not apply because it pertained to the use of scholarship funds for the "'essentially religious endeavor' of pursuing a degree designed to 'train[] a minister to lead a congregation.'" *Id.* at 788. *Locke*, it repeated, pertained to funds "intended to be used 'to prepare for the ministry.'" *Id.* This was, it said, *Locke*'s "narrow focus." *Id.* at 789. Once again, anomalous *Locke* could not be used to justify restrictions on religious free exercise.

The principal dissent in *Carson* stressed the teachings espoused in *Locke* and expressed disappointment that *Locke* was not being applied. *Id.* at 790, 792, 801–802. Yet, those teachings did not win the day. *Locke* had been profoundly narrowed. Going forward, its application pertained only to the bona fide training of clergy. *Id.* at 788.

Unsurprisingly, many scholars likewise have observed *Locke*'s modern narrowness. *See, e.g.*, Steven D. Smith, *Jurisdictional Diversity, Tradition, and the Religion Clauses*, 100 Chi.-Kent L. Rev. 729, 749 (2025) ("[T]he more recent

23

decisions, while not explicitly overruling Locke [v. Davey], have distinguished and severely limited it."); Peter J. Smith, *Establishment Clause Mythology*, 75 Case W. Res. 573, 632 (2024) ("The Court also effectively confined Locke to its facts.").

Indeed, *Locke*'s modern narrowness is apparent from its subsequent disuse. After its issuance in 2004, *Locke* has never since been cited by a majority of the Supreme Court to foreclose a Free Exercise Clause claim. The Court could have applied *Locke* in *Kennedy*, *Trinity Lutheran*, *Espinoza*, or *Carson*. But it did not, signaling to circuit courts *Locke*'s limited role—the bona fide training of clergy.

### b. *Hall v. Fleming* had no occasion to discuss *Locke*'s narrowness and is inapposite here.

The Fourth Circuit's recent decision in *Hall v. Fleming*, 2026 U.S. App. LEXIS 13779 (4th Cir. May 13, 2025), does not control this case. This is so since this Court there had no occasion to consider *Locke*'s narrowed function as repeatedly demonstrated by the Supreme Court. The facts in *Hall*, as stated by all parties involved, were directly analogous to *Locke*.

In *Hall*, a plaintiff challenged Virginia's Tuition Assistance Grant program after she was denied from pursuing a religious degree using those

24

funds, but the context was significant.  As the Fourth Circuit explained, the plaintiff sought government funds specifically to prepare her for religious ministry.  *Id.* at *3.  She said she "heard God's call to ministry" and because of that calling, she "changed her major to 'Youth Ministries.'"  *Id.*  There could be no doubt regarding her intended direction.  She had become a bona fide ministry trainee.  Faced with this similarity, the plaintiff in *Hall* "conceded that "her situation aligns with the one faced by the undergraduate student pursuing a religious vocation major in *Locke*."  *Id.* at *4.  In this context, this Court had no need to discuss *Locke*'s narrowing.  It would make no difference because *Hall* and *Locke* concededly were analogous.

Observing that "[t]he funding in *Locke* was intended to be used '**to prepare for the ministry**'" and that *Locke* pointed to "'historic and substantial state interest' against using 'taxpayer funds to **support church leaders**," the Fourth Circuit held that *Locke* barred the Free Exercise claim in *Hall*.  *Id.* at *11 (emphasis added).  The two cases were directly analogous.

But the case presented here is of an entirely different shade.  As discussed in the next section, the plaintiffs here did not implicate the concern

25

of taxpayer funds being used to support church leaders because the plaintiffs were not necessarily preparing to enter into ministry.

### IV. AS NARROWED, *LOCKE* DOES NOT REMOVE VIRGINIA'S GRANT PROGRAMS FROM ORDINARY RELIGIOUS EQUALITY PRINCIPLES.

As discussed above, *Locke* was anomalous. It did not sweepingly undo the Court's ordinary religious equality precedents. *Locke* pertained to the bona fide training of clergy, and nothing beyond that. Because the plaintiffs' claims do not fit that narrow scope, their claims are beyond *Locke*'s reach.

Here, the plaintiffs simply seek collegiate education in their chosen degree program. Their study programs were religious in nature—pastoral leadership (plaintiff Johnson), music and worship (plaintiff Thomas), and religion, general track (plaintiff Stevens)—but they were not studying for the purpose of assuming the role of clergy. *Johnson*, 2026 U.S. Dist. LEXIS 71085, at *7–*8, *11–*12

Neither knew whether he would pursue a vocational or secular career. *Id.* Johnson was unsure if he was going to enter a "vocational calling" or a "secular career or workplace." *Id.* at *7. Thomas did not know if he would enter "the ministry field" or careers other than those strictly in vocational

26

ministry." *Id.* at *7. And Stevens was unsettled as to whether his occupation would be "in ministry," "the Army," or "other career interests." *Id.* at *12.

This makes all the difference. The plaintiffs here are not bona fide ministry trainees. As such, *Locke* has no application to this case. Ordinary Free Exercise principles apply instead.

*Employment Division v. Smith*, 494 U.S. 872, 879 (1990), set out a well-known rule: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" But as this rule states, this space of regulatory freedom evaporates in the absence of religious neutrality.

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993), made this clear. It explained, "[a]t a minimum, the protections of the Free Exercise pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Id.* It plainly expressed that a law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." In that case, the law is "invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 534.

27

*Masterpiece Cakeshop*, 584 U.S. 617, 638 (2018), stated this principle even more plainly: "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Id. Trinity Lutheran* made this same point: "The Free Exercise Clause protects religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." 582 U.S. at 458. The District Court did not apply these principles, so its judgment should be reversed.

## CONCLUSION

*Locke* narrowly applies only to the bona fide training of clergy. Because that is not the posture of the plaintiffs here, the Court's religious equality precedents apply to this case instead—not *Locke*. This Court should reverse the judgment below.

Dated: June 2, 2026                    Respectfully Submitted,

By: */s/ Michael B. Sylvester*
Joshua A. Hetzler
Michael B. Sylvester
FOUNDING FREEDOMS LAW CENTER
707 E. Franklin St.
Richmond, VA 23219
804-801-6707

28

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 5,608 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced type face using 14-point Book Antiqua.

*/s/ Michael B. Sylvester*
Michael B. Sylvester
June 2, 2026

29

# CERTIFICATE OF SERVICE

I certify that on June 2, 2026, I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Michael B. Sylvester*
Michael B. Sylvester
June 2, 2026
