No. 26-1437

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

CAMERON JOHNSON, *et al.*,

*Plaintiffs-Appellants,*

v.

A. SCOTT FLEMING, *et al.*,

*Defendants-Appellees.*

On appeal from the United States District Court
for the Eastern District of Virginia at Richmond
No. 3:25-cv-00407, Hon. Roderick C. Young

## BRIEF OF *AMICI CURIAE* RETIRED U.S. ARMY CHIEFS OF CHAPLAINS IN SUPPORT OF PLAINTIFFS-APPELLANTS

Eric S. Baxter
Daniel H. Blomberg
William J. Haun
  *Counsel of Record*
Michael J. O'Brien
Phillip J. Allevato*
The Becket Fund
  for Religious Liberty
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketfund.org

*\*Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Counsel for *Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1437__       Caption: __Johnson v. Fleming__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Retired U.S. Army Chiefs of Chaplains Douglas L. Carver and Thomas J. Solhjem__
(name of party/amicus)

_____

who is _____amici_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ William J. Haun        Date: 06/02/2026

Counsel for: The Becket Fund for Religious Liberty

- 2 -
ii

**Print to PDF for Filing**

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF AUTHORITIES...................................................................... v

INTEREST OF THE *AMICI* ................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT............................2

ARGUMENT.............................................................................................5

I. The chaplaincy is inherently religious and
constitutionally required. ...................................................................5

A. The chaplaincy is inherently religious. ...........................................5

1. Chaplains facilitate servicemembers'
free exercise of religion.............................................................. 6

2. Chaplains must be endorsed by an
ecclesiastical body....................................................................... 8

3. Chaplains must have specific
religious education...................................................................... 10

B. The chaplaincy is constitutionally required..................................13

1. The chaplaincy is deeply rooted in history. .............................. 13

2. The Founding era deemed the chaplaincy
crucial to American servicemembers. ....................................... 15

3. The constitutional mandate to maintain
the chaplaincy continues to this day.........................................18

iii

II. Virginia's ban on tuition assistance for chaplaincy-related degrees violates the Religion Clauses. ............................................... 20

    A. The Virginia Defendants concede that the chaplaincy has a "different" history than *Locke v. Davey*. ............................... 21

    B. Grafting *Locke* onto the chaplaincy raises additional Religion Clause problems .............................................................. 26

CONCLUSION ..................................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................................... 31

CERTIFICATE OF SERVICE ................................................................ 32

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Billard v. Charlotte Catholic High Sch.*,
101 F.4th 316 (4th Cir. 2024) ...................................................................28

*Carson v. Makin*,
596 U.S. 767 (2022) ............................................................................24, 29

*Catholic Charities Bureau, Inc. v.
Wis. Lab. & Indus. Rev. Comm'n*,
605 U.S. 238 (2025) ...................................................................................27

*Colo. Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) .................................................................28

*Corp. of Presiding Bishop v. Amos*,
483 U.S. 327 (1987) ...................................................................................6

*Espinoza v. Montana Dep't of Rev.*,
591 U.S. 464 (2020) ...........................................................................*passim*

*Firewalker-Fields v. Lee*,
58 F.4th 104 (4th Cir. 2023) ......................................................................21

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) ...................................................................................27

*Hall v. Fleming*,
No. 25-1574, 2026 WL 1314675
(4th Cir. May 13, 2026) .......................................................................24, 29

*Katcoff v. Marsh*,
755 F.2d 223 (2d Cir. 1985) .................................................................*passim*

*Kennedy v. Bremerton*,
597 U.S. 507 (2022) ...................................................................................19

*Locke v. Davey*,
540 U.S. 712 (2004) ..............................................24, 26, 28, 29

*Markel v. Union of Orthodox Jewish
Congregations of Am.*,
124 F.4th 796 (9th Cir. 2024) ..........................................28

*McDaniel v. Paty*,
435 U.S. 618 (1978)......................................................22, 27

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020)..........................................................8

*Rayburn v. Gen. Conf. of Seventh-day Adventists*,
772 F.2d 1164 (4th Cir. 1985)..........................................28

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) ...............................................5-6, 18, 23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)........................................................29

*Wallace v. Jaffree*,
472 U.S. 38 (1985).........................................................25

*Walz v. Tax Comm'n*,
397 U.S. 664 (1970).......................................................20

*Zorach v. Clauson*,
343 U.S. 306 (1952)....................................................12, 30

**Statutes**

10 U.S.C. § 521 *et seq.* .....................................................2

10 U.S.C. § 7217..........................................................7, 23

10 U.S.C. § 9217...............................................................7

An Act for Organizing the General Staff, and Making
Further Provisions for the Army of the United States,
ch. 69, 3 Stat. 297 (1816) ................................................18

An Act in Addition to the Act Entitled "An Act to Raise an
    Additional Military Force," and for Other Purposes
    ch. 16, 2 Stat. 796 (1813) ...................................................................... 18

An Act Regulating the Staff of the Army,
    ch. 61, 3 Stat. 426 (1818) ...................................................................... 18

National Defense Authorization Act for Fiscal Year 2013,
    Pub. L. No. 112-239, § 533 (2013) ......................................................... 7

Va. Code Ann. § 23.1-610 ............................................................................. 26

Va. Code Ann. § 44-83 ............................................................................. 3, 22

**Constitutions**

U.S. Const. amend. I........................................................................... *passim*

Va. Const. art. VIII, § 11 ..................................................................... 22-23

**Other Authorities**

1983 Code of Canon Law 900 ................................................................... 8-9

1983 Code of Canon Law 965 ..................................................................... 9

1983 Code of Canon Law 1003 ................................................................... 9

*56A Chaplain*, Army National Guard ............................................. *passim*

*About the Virginia National Guard*, Virginia National Guard ................ 2

*ANSWER THE CALL…become a National Guard Chaplain!*,
    New York National Guard ................................................................. 11

*Become a Chaplain*, Chaplaincy Ministries ........................................... 10

Thomas C. Berg & Douglas Laycock, Espinoza,
    *Government Funding, and Religious Choice*,
    35 J.L. & Religion 361 (2020) ............................................................. 24

John Brinsfield, *Points of Light: Continental Army Chaplains and Civil Relations,* 1 Mil. Chaplaincy Rev. (2024) ............................................... 15, 16, 17

*Chaplain Basic Officer Leadership Course,* Army National Guard .................................................................... 12

*Chaplaincy Studies, Graduate Certificate,* Georgia State University.................................................................. 12

Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023) ...................... 25

Cong. Globe, 25th Cong., 1st Sess. 134 (1838) ........................................ 18

*Federal Tuition Assistance*, Army National Guard ............................... 11

4 Robert K. Gushwa, *The United States Army Chaplaincy: The Best and Worst of Times, 1920-1945* (1977)................................ 19

Alexandra Hegji, Cong. Rsch. Serv. R43159, Eligibility for Participation in Title IV Student Financial Aid Programs (2024) ......................................................................... 12

*Military Chaplain*, SBC Chaplaincy...................................................... 10

*Office of the Chaplain*, Va. Mil. Inst.................................................... 19

1 Anson Phelps Stokes, *Church and State in the United States* (1950) ................................................................ 16

Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause,* 169 U. Pa. L. Rev. 111 (2020) ........................................................... 25

*Student Loan Repayment*, Pennsylvania National Guard ..................... 11

*Support the Battle for Wellbeing,* Massachusetts Army National Guard ............................................. 11

1 Parker C. Thompson, *From Its European Antecedents to 1791: The United States Army Chaplaincy* (1978) .............................................................. 13, 15

U.S. Army Chaplain Corps, *Celebrating 250 Years of Sacred Service: U.S. Army Chaplain Corps 1775-2025* ............................. 6, 18

U.S. Army Chaplain Corps, *Chaplain Center and School* ...................... 19

U.S. Dep't of Army, Army Reg. 165-1, *Army Chaplain Corps Activities* (Feb. 5, 2024) .............................................................. *passim*

U.S. Dep't of Army, Army Reg. 600-20, *Army Command Policy* (July 24, 2020) ......................................................... 9

U.S. Dep't of Def., Dir. 1304.19 (June 11, 2004) .................................... 6-7

U.S. Dep't of Def., Instr. 1300.17, *Religious Liberty in the Military Services* (Sep. 1, 2020) ........................................................ 6, 19

U.S. Dep't of Def., Instr. 1304.28 (May 12, 2021) ................................... 10

U.S. Dep't of War, Army Reg. 60-5, *Chaplains* (Feb. 15, 1924) ................................................................. 19

*Virginia National Guard Joint Force Headquarters Chaplain Support*, Virginia National Guard ...................................................... 3

Eugene Franklin Williams, *Soldiers of God – The Chaplains of the Revolutionary War* (1975) ............... 13-14, 16, 17

## INTEREST OF THE *AMICI*

Chaplains Douglas L. Carver and Thomas J. Solhjem retired at the rank of Major General after they served as the United States Army's 22nd and 25th Chief of Chaplains, respectively. As the Chief of Chaplains, they were responsible to "provide[] leadership to the [U.S. Army Chaplain Corps] and exercise[] technical supervision over chaplains, religious affairs specialists, directors of religious education … religious activities, and religious support operations throughout the Army." U.S. Dep't of Army, Army Reg. (AR) 165-1, *Army Chaplain Corps Activities* § 1-10 (Feb. 5, 2024), https://perma.cc/QH8Q-QG6B. Together, Chaplains Carver and Solhjem have over 90 years of combined military experience and served in numerous key chaplaincy leadership roles and major commands. These include, just to name a few, roles as Director of the Chaplain Center and School and as Command Chaplain for the U.S. Special Operations Command. They have both served in multiple combat tours and understand the importance of chaplaincy and religion to soldier and family readiness.

Chaplain Carver holds a Master of Divinity from Southern Baptist Theological Seminary, a Master of Science in Strategic Studies from the U.S. Army War College, and a Doctor of Ministry from Gordon-Conwell Theological Seminary. Chaplain Solhjem holds a Master of Divinity from Bethel Theological Seminary and a Master of Science in Strategic Studies from the U.S. Army War College.

1

*Amici* have significant interest and expertise in the constitutional mandate for a military chaplaincy. Virginia's restriction on tuition assistance for prospective chaplains conflicts with that mandate.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Virginia National Guard ("VNG") has a dual federal-state mission. The VNG provides a "combat reserve" for the United States Army and Air Force and answers "the call of the Governor to defend the commonwealth."[2] This "history and tradition of Citizen-Soldier service" traces back to "the founding of Jamestown in 1607."[3]

Crucial to the VNG's longstanding mission is the chaplaincy. That is because the First Amendment's Religion Clauses, drawing upon a long historical tradition, make it a "duty" for the government "to satisfy [soldiers'] Free Exercise rights." *Katcoff v. Marsh*, 755 F.2d 223, 228 (2d Cir. 1985). This duty was insisted upon by the nation's most prominent Founding-era Virginian and the leader of the Continental Army: George Washington, who consistently advocated for a professional military chaplaincy with commensurate pay and provisions. Building on that Washingtonian tradition, the VNG chaplaincy "provide[s] the highest

---

[1] All parties have consented to the filing of this *amicus* brief. No parties other than *amici* and their counsel contributed any money for its creation and submission.

[2] *See About the Virginia National Guard*, Virginia National Guard, https://perma.cc/2N9H-CJQ7.

[3] *Id.*

2

levels of religious support throughout the full-spectrum of military operations."[4] When the VNG is "called into state active duty," Virginia—not the United States—pays VNG chaplains.[5]

As particularly relevant here, those chaplains are *required* to hold a master's degree, at least 36 semester hours of which "must be in Theology."[6] And, based on requirements imposed by their sponsoring faith groups, most chaplains fulfill this educational requirement by obtaining theology degrees. The VNG may also "pay for a particular religious 'required' course" when its servicemembers pursue "another type of degree." JA.110.

Yet despite maintaining the chaplaincy, paying chaplains, requiring chaplains' theological education in overlapping ways, and subsidizing religious courses, the VNG excludes servicemembers—including chaplain candidates—from its tuition-assistance program if the degree they seek is deemed "religious training or theological education." JA.120 (all-caps removed). Excluding religious participants from generally available public benefits is religious discrimination. The First Amendment's Religion Clauses do not allow it.

---

[4] *See Virginia National Guard Joint Force Headquarters Chaplain Support,* Virginia National Guard, https://perma.cc/RTK7-5JHD.

[5] *See* Va. Code Ann. § 44-83; *see also* 10 U.S.C. §§ 521-28.

[6] *56A Chaplain,* Army National Guard, https://perma.cc/DNE5-VGUP.

3

For this blatant discrimination against chaplaincy-related degrees to pass muster under the First Amendment, the Virginia Defendants must show that it is rooted in a historic and substantial tradition. They cannot. As the Virginia Defendants concede, the Constitution's treatment of chaplains has a far "different history" and much different government "interest" than any that could justify state restrictions on clergy educational support. Rather, there is a long history and tradition of *providing* financial support to chaplain candidates, not denying it.

The Virginia Defendants' invocation of *Locke v. Davey* does them no good, and for much the same reasons. There, the Supreme Court upheld Washington state's restriction on scholarships for devotional theology degrees, based on a "historic" interest against "procuring taxpayer funds to support church leaders." But the Supreme Court has twice held since that *Locke*'s "focus" is "narrow." That focus says nothing about the military chaplaincy. The district court thus erred in becoming the first to extend *Locke* to that context while ignoring the longstanding history and tradition of supporting chaplains' religious education. That unprecedented error—which produces church-state entanglement as well as religious discrimination—raises more Religion Clause problems than *Locke* can solve.

While Virginia is not required to subsidize postsecondary education, it is constitutionally required to maintain and fund the chaplaincy. Virginia thus cannot exclude servicemembers seeking chaplaincy-related degrees

from an otherwise available tuition program. That kind of discrimination is odious to our Constitution. The Court should thus hold that VNG's tuition-assistance exclusion falls outside *Locke* and is constitutionally prohibited.

## ARGUMENT

### I. The chaplaincy is inherently religious and constitutionally required.

The First Amendment's Religion Clauses make it "readily apparent" that the government is "obligate[d] … to make religion available to soldiers." *Katcoff*, 755 F.2d at 234. This constitutional "duty to satisfy [soldiers'] Free Exercise rights" is deeply rooted in the nation's "historical background." *Id.* at 228, 232. An "unambiguous and unbroken history of more than 200 years" confirms that government furnishing of an inherently religious chaplaincy—through pay, facilities, and education— is vital to the military's functioning. *Id.* at 232. At least some level of government support is constitutionally required. Tuition assistance to that end thus cannot be a constitutional problem.

#### A. The chaplaincy is inherently religious.

In military service, "the Government regulates the temporal and geographic environment of individuals to a point that, unless it permits voluntary religious services to be conducted with the use of government facilities, military personnel would be unable to engage in the practice of their faiths." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 226

5

n.10 (1963). So unlike other contexts where the government can secure religious liberty only by "*lifting a regulation* that burdens the exercise of religion," *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 338 (1987) (emphasis added), securing religious liberty in the military requires the government to "furnish" what is necessary "to assist a chaplain in performing his duties," *Katcoff*, 755 F.2d at 225. The chaplaincy is thus inherently designed to support servicemembers' efforts "to observe the tenets of their religion." U.S. Dep't of Def., Instr. (DoDI) 1300.17, *Religious Liberty in the Military Services*, § 1.2 (Sep. 1, 2020), https://perma.cc/5X84-AC58.

> **1. Chaplains facilitate servicemembers' free exercise of religion.**

"[The Chaplain Corps] itself is a product of the nation's commitment to religious freedom and its recognition that religion plays an integral role in the lives of many of its Soldiers." AR 165-1 § 1-6(b). As of 2024, there were "more than 3,000 chaplains" and "more than 500 chaplain candidates" in the Army alone (including the Army National Guard and Army Reserve). *See* U.S. Army, *Celebrating 250 Years of Sacred Service: U.S. Army Chaplain Corps 1775-2025* at 7, https://perma.cc/J3RB-98K7. Every chaplain holds a "dual role"—at once a "professional military religious leader," providing for soldiers' free exercise of religion, and a "professional military religious staff advisor," advising the command on moral, ethical, and religious matters. AR 165-1 § 2-4(b); *see also* U.S.

Dep't of Def., Dir. (DoDD) 1304.19 § 4.1 (June 11, 2004), https://perma.cc/XC3H-72UJ (Appointment of Chaplains for the Military Departments). Chaplains serve the "religious needs" of personnel by providing "comprehensive religious support." AR 165-1 §§ 3-3 (2)(b), 1-7(b). They must hold regular "religious" worship services and "religious" burial services for faithful soldiers who die while serving. 10 U.S.C. §§ 7217, 9217. They also provide such "essential elements of religion" as "religious rites, sacraments and ordinances, holy days and observances, … and religious education." AR 165-1 § 2-4(a). At all times, "[c]haplains serve in the U.S. Military as representatives of their distinctive religious group" and as commissioned officers. *See id.* § 6-3(a).

To sustain the chaplaincy's role in meeting the "increased needs for religion" that soldiers experience while in harm's way, Congress has consistently appropriated funds to enable the chaplaincy's "services, facilities, and supplies." *Katcoff*, 755 F.2d at 227, 229; *see also* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 533, 126 Stat. 1632, 1727 (2013) (providing protections for "conscience, moral principles, [and] religious beliefs" of servicemembers and enhanced protections for chaplains). Indeed, without a government-furnished chaplaincy, the Religion Clauses would be violated twice over: the government would "deprive the soldier of his right under the Establishment Clause not to have religion inhibited" and "his right under

7

the Free Exercise Clause to practice his freely chosen religion." *Katcoff*, 755 F.2d at 234.

### 2. Chaplains must be endorsed by an ecclesiastical body.

To help ensure they can meet the religious needs of servicemembers, the military mandates that chaplains meet religious qualification requirements that can only be fulfilled in partnership with religious institutions. That is because "the Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (cleaned up). To uphold the Religion Clauses and meet the "duty to satisfy [servicemembers'] Free Exercise rights," *Katcoff*, 755 F.2d at 228, the military works in partnership with religious institutions to obtain chaplains who are "religious professional[s]," AR 165-1, § 3-1(a).

This is why the military requires that chaplain candidates obtain an ecclesiastical "endorsement," an "official formal statement by a recognized authority of a [religious organization] attesting to the credentials of an individual as a qualified religious ministry professional." AR 165-1, § 3-1(a) (citations omitted); *see also 56A Chaplain*, Army National Guard, https://perma.cc/DNE5-VGUP. ("Requirements" include "[o]btain[ing] a federally-recognized ecclesiastical endorsement from your faith group").

8

The endorsement requirement ensures chaplains can meet soldiers' religious needs. For instance, Catholic soldiers can receive certain sacraments only from a "validly ordained priest." *See* 1983 Code of Canon Law 900 § 1 (Eucharist); Canon 965 (penance); Canon 1003 § 1 (anointing of the sick). To ensure those soldiers can exercise their religion, the Army relies on the Catholic Church to identify—or "endorse"—validly ordained priests to become Army chaplains. *See* AR 165-1 §§ 6-3(a)-(b), 8-2(a). This requirement lasts throughout a chaplain's career. If a chaplain loses his or her "ecclesiastical endorsement," he or she "cannot continue to function as a chaplain" and "must immediately cease from all religious support." AR 165-1 §§ 6-3(b), 8-9(a).

Further, to furnish the Free Exercise rights of a religiously diverse population, the military requires chaplains to provide for the "nurture and practice of religious beliefs, traditions, and customs in a pluralistic environment"—including for those who do not share their beliefs. AR 165-1 § 3-2(a); *see also id.* § 1-7(b)-(c) (elaborating the multifaceted elements of chaplains' "comprehensive religious support" across military matters regardless of rank or religion). For example, a Catholic chaplain is trained to support Jewish soldiers' needs by helping provide access to kosher diets. *Cf. id.* § 1-7(c) (chaplains advise "on all matters pertaining to the free exercise of religion" and assist "in providing for the accommodation of religious practices"); *see also* U.S. Dep't of Army, Army Reg. (AR) 600-20, *Army Command Policy* § 5-6(c)(3)(d)(2) (July 24, 2020)

9

(noting dietary-accommodation policy). "[W]ithout compromising their religious tradition or ecclesiastical endorsement requirements," chaplains "ensure the most comprehensive religious support opportunities possible within the unique military environment." AR 165-1 § 1-7(b).

### 3. Chaplains must have specific religious education.

As "religious professional[s]" in the unique military environment, chaplains must meet certain "educational qualifications." AR 165-1, § 3-1(a). And the military often helps pay for those qualifications.

A chaplain applicant "must" possess "a post-baccalaureate graduate degree in the field of theological or related studies from a qualifying education institution." DoDI 1304.28 § 3.2(d)(1) (May 12, 2021) https://perma.cc/72ZY-RUMW; *accord* AR 165-1, § 6-3(c)(3) ("professional experience requirements" "fulfill[ed]" with "completion of the qualifying graduate degree"). For chaplain service in the Army National Guard, this entails an "accredited Master's degree" with at least "36 semester hours … in theology." *See 56A Chaplain*, Army National Guard, https://perma.cc/DNE5-VGUP.

Similarly, many religious endorsing bodies also require advanced religious education as a condition of endorsement. The North American Mission Board of the Southern Baptist Convention, for instance, requires a Master of Divinity. *Military Chaplain*, SBC Chaplaincy at 1

10

https://perma.cc/C2LZ-J269. So too for the Assemblies of God. *See Become a Chaplain*, Chaplaincy Ministries, https://perma.cc/7U6P-JLEV.

Because theological education is crucial to the military meeting its constitutional mandate, government tuition assistance for chaplain candidates is commonplace. For instance, the Army has a "Chaplain Candidate Program" that provides "tuition assistance" to "religious ministry students who want to get a head start on a career in Army Chaplaincy while still in school." *56A Chaplain*, Army National Guard, https://perma.cc/DNE5-VGUP. This program is specifically focused on "theological and religious studies graduate students." AR 165-1, § 7-1(a). The Army National Guard also gives federal tuition assistance to chaplain candidates after they have received a master's degree. *Federal Tuition Assistance*, Army National Guard, https://perma.cc/GZ8P-VDKU ("chaplain certification … may be eligible after receiving a master's degree"). Similar programs exist in many states—including those, like Virginia, that are part of the original thirteen—like Georgia, Massachusetts, New York, and Pennsylvania.[7] Ensuring the religious

---

[7]   The New York National Guard provides "[t]uition assistance," as well as funding for educational programs, for chaplain candidates. *ANSWER THE CALL…become a National Guard Chaplain!*, New York National Guard, https://perma.cc/FJD9-9F7L. The Pennsylvania National Guard offers a "Chaplain Loan Repayment Program" for the express purpose of "maintaining adequate numbers of qualified chaplains within the N[ational] G[uard]." *Student Loan Repayment*, Pennsylvania National Guard, https://perma.cc/L7RY-FZ8J. It also offers "tuition assistance"

11

education of future chaplains is exactly what one would expect from a government under a constitutional mandate to furnish soldiers' free exercise rights. It "respects the religious nature of our [soldiers] and accommodates the public service to their spiritual needs." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).

Indeed, the Army not only requires and financially assists with chaplain candidates' graduate-level education in theology—it also directly provides several forms of religious training. AR 165-1, § 9-3(b). One form is the "Chaplain Basic Officer Leader Course," a three-month course teaching candidates "how to perform religious duties in a military environment." *56A Chaplain*, Army National Guard, https://perma.cc/DNE5-VGUP. This course includes education in "ethics," "pluralism," and performing "memorials, ceremonies, and funerals." *Chaplain Basic Officer Leader Course*, Army National Guard, https://perma.cc/UK5T-RESX. There is also a "Post-Chaplain Basic

---

that may be used at any Title IV-eligible school—which includes private, religious institutions. Alexandra Hegji, Cong. Rsch. Serv., R43159, Eligibility for Participation in Title IV Student Financial Aid Programs (2024). The Massachusetts Army National Guard gives chaplains up to $80,000 in loan repayment assistance and explicitly gives federal tuition assistance to chaplains. *Support the Battle for Wellbeing*, Massachusetts Army National Guard, https://perma.cc/QSJ7-J5QF. And Georgia funds and supports chaplaincy through programs like Georgia State University's partnership with the Association of Professional Chaplains. *See Chaplaincy Studies, Graduate Certificate*, Georgia State University, https://perma.cc/HQ3X-4JJN.

Officer Leadership Course" that provides "reinforcement training" to (among other things) "increase individual pastoral skills and to improve supervisory and coaching capabilities." AR 165-1, § 9-4(a). Such training ensures that chaplains "contribute[] to Soldiers' religious freedom, moral development, and spiritual well-being." *Id.* § 1-6(b).

**B. The chaplaincy is constitutionally required.**

Our law recognizes that none of these practices came out of thin air. Neither the Religion Clauses "nor [the] statutes creating and maintaining … the [military] chaplaincy may be interpreted as if they existed in a sterile vacuum." *Katcoff*, 755 F.2d at 232. Rather, as all three federal branches of government have concluded, the Religion Clauses *require* a government-furnished chaplaincy. The nation's "historical background" confirms as much. *Id.*

**1. The chaplaincy is deeply rooted in history.**

The chaplaincy's "tradition of a specially appointed clergyman accompanying soldiers into battle" has "spiritual roots" that reach "deep in[to] the pages of the Old Testament." 1 Parker C. Thompson, *From Its European Antecedents to 1791: The United States Army Chaplaincy* xi (1978), https://perma.cc/7K9R-NHBE. That ancient tradition developed further with the growth of Christendom. The word "chaplain" originates in the story of Martin of Tours, a Christian saint and soldier, who cut his cloak or "capella" in two to share with a beggar he found in the wintry cold. That same night, Martin had a vision of Christ wearing the cloak,

13

which hastened his conversion, leading him ultimately to become the Bishop of Tours. The priest appointed to preserve Martin's cloak was known as a "'chappellanus,' which became … 'chaplain' or 'keeper of the cloak' in English." Eugene Franklin Williams, *Soldiers of God – The Chaplains of the Revolutionary War* 11-12 (1975), https://archive.org/details/isbn_0806201967/.

The chaplaincy's religious roots have had a profound effect on it becoming "a vital factor in the military." Williams, *Soldiers*, 16. Through a "long chain of evolutionary steps"—from soldiers taking up military service as personal penance, to the creation of military orders that took monastic vows, to warriors required to "furnish[] succor to the sick and needy"—Western civilization came to see the chaplain as "provid[ing] the necessary spiritual ministrations" not just to a nation's military but to individual soldiers in their varied tasks. *Id.* This development created the "dual role" chaplains play today. That is, "[c]haplains were assigned to the army to serve God, but this purpose became so fully identified with serving men that the two were seldom differentiated." *Id.* at 14-15.

This understanding of the chaplaincy—a religious calling to God fulfilled through ministry to individual soldiers—carried into America. *See Katcoff*, 755 F.2d at 237 ("[T]he morale of our soldiers, their willingness to serve, and the efficiency of the Army as an instrument for our national defense rests in substantial part on the military chaplaincy[.]"). The person chiefly responsible for carrying that dual

14

understanding forth in America was himself a prominent Virginian: George Washington.

### 2. The Founding era deemed the chaplaincy crucial to American servicemembers.

George Washington's "respect for religion and confidence in its salutary influence among soldiers … led him to support the efforts of chaplains throughout his entire lifetime." Williams, *Soldiers*, 36. He was instrumental in persuading the Continental Congress to "perpetuate[]" the chaplaincy, informed by Virginia practices "that began during Revolutionary days." *Katcoff*, 755 F.2d at 225. Those practices would build on the historical, religious understanding of chaplains as—in Washington's words—"point[s] of light" for individual service members. John Brinsfield, *Points of Light: Continental Army Chaplains and Civil Relations*, 1 Mil. Chaplaincy Rev. at 9 (2024), https://perma.cc/S567-RHLT (quoting Washington). Further still, the chaplaincy Washington envisioned would be one with substantial government support.

During the French and Indian War, then-Colonel Washington "constantly importuned" the Governor of Virginia and Virginia legislative leaders—through at least a half-dozen letters between 1756 and 1758—to finance a chaplain for the Virginia regiment. *See* Thompson, *Antecedents*, 57-58. Washington insisted that the lack of a paid chaplaincy position among Virginia's officers was "a hardship"—and "reflect[ed] dishonor upon the regiment." *Id.* (cleaned up). Heeding

15

Washington's wisdom, in 1758 Virginia not only "open[ed] the regimental chaplaincies" but did so for "religious bodies" besides Anglicans—the established religion of Virginia—as well. *See* 1 Anson Phelps Stokes, *Church and State in the United States* 268 (1950), https://perma.cc/YV2Z-J3BC.

"Virginia's system of appointing chaplains was far superior to that of the other southern colonies." Williams, *Soldiers*, 81. At the time of the Revolution, Virginia's chaplaincy appointment system became a model for "North Carolina, South Carolina, and Georgia." *Id.* The model also went national. During the same summer that Virginia made provision for Anglican and Baptist preachers to join its regiments as chaplains, the Continental Army established a military chaplaincy with paid positions (on July 29, 1775). Stokes, *Church and State*, 268-71.

As General of the Continental Army, Washington ensured that "each regiment" would "procure chaplains accordingly"—with a "deep interest in having chaplains chosen who would as far as possible hold religious views sympathetic to those of the men he served." *Id.* at 271. Because the Continental Congress could not "tax citizens directly," fulfilling Washington's commitment depended upon states raising money to support the chaplaincy. *See* Brinsfield, *Points of Light*, 1 Mil. Chaplaincy Rev. at 15. Yet due to Washington's insistence that financial support was necessary to attract "men of abilities," by the Revolution's end, the pay of

16

chaplains had "advanced from that of a captain to that of a colonel." Williams, *Soldiers*, 82, 94.

At least 218 chaplains served in the Continental Army and militia during the Revolution—encompassing a range of Christian backgrounds and education. *See* Brinsfield, *Points of Light*, 1 Mil. Chaplaincy Rev. at 16-17. Out of those 218, 125 are known to have had college education, including from Harvard, Yale, Princeton, the future University of Pennsylvania, William & Mary, Cambridge, and Oxford. *Id.* These well-educated chaplains "br[ought] religion to the men" through worship services, prayers, communion services, funerals, visiting the sick and wounded, writing letters for soldiers to their family, and providing soldiers' "counsel and comfort." Williams, *Soldiers*, 84-86. Chaplains became "endeared … to the hearts of the men who comprised their military parishes." *Id.* at 86.

It is thus no surprise that "[u]pon the adoption of the Constitution and before the December 1791 ratification of the First Amendment Congress authorized the appointment of a commissioned Army chaplain." *Katcoff*, 755 F.2d at 225. Fittingly, the first U.S. Army chaplain appointed by George Washington was Reverend John Hurt, a Virginian who previously was chaplain for the 6th Virginia Regiment.

17

### 3. The constitutional mandate to maintain the chaplaincy continues to this day.

The tradition of supporting the chaplaincy not only pre-dates the First Amendment, it continues unabated to this day.

Over the two-and-a-half centuries following ratification, Congress enhanced the chaplaincy's provisions, religious diversity, and financial support. *See generally* U.S. Army, *250 Years of Sacred Service* at 9-10; *see also* An Act Regulating the Staff of the Army, ch. 61, § 2, 3 Stat. 426 (1818) (regulating chaplains serving at West Point); Cong. Globe, 25th Cong., 1st Sess. 134 (1838) (appropriating chaplains for the Army and specifying their duties).[8] "[A]s early as 1850," Congress expressly said that its "its failure to provide a chaplaincy would deprive soldiers of their Free Exercise rights." *Katcoff*, 755 F.2d at 234-35. As such, the ranks of chaplains and their religious diversity quickly expanded in the early republic and continued to expand well into the 21st century. *See* U.S. Army, *250 Years of Sacred Service* at 9-10 (recognizing the addition of Catholic and Jewish chaplains in the 1800s, and that "the Army

---

[8]  Justice Brennan in *Schempp* suggested that James Madison may have been a skeptic of the military chaplaincy's constitutionality. *See* 374 U.S. at 296 n.71 (Brennan, J., concurring). But as President, Madison signed into law two pieces of legislation that provided military chaplains "pay and emoluments" akin to an infantry major. *See* An Act in Addition to the Act Entitled "An Act to Raise an Additional Military Force," and for Other Purposes, ch. 16, § 16, 2 Stat. 796 (1813); An Act for Organizing the General Staff, and Making Further Provisions for the Army of the United States, ch. 69, § 2, 3 Stat. 297 (1816).

commissioned its first woman Chaplain in 1974, its first Muslim Chaplain in 1993, its first Buddhist Chaplain in 2008, and its first Hindu Chaplain in 2011.").

After World War I, the Army chaplaincy was established as its own corps. U.S. Dep't of War, Army Reg. (AR) 60-5, *Chaplains* (Feb. 15, 1924). And in 1925 chaplains began being appointed to the National Guard. 4 Robert K. Gushwa, *The United States Army Chaplaincy: The Best and Worst of Times, 1920-1945* 13-14 (1977). Virginia would also continue its leading role in this tradition. In 1839, the Commonwealth established the Virginia Military Institute, which houses a Chaplain's Office and names Cadet Chaplains. *Office of the Chaplain*, Va. Mil. Inst., https://perma.cc/8DE6-6MBA. And Virginia's Fort Monroe would go on to host the first session of the U.S. Army Chaplain School, formed in 1918 "out of a need to adequately train chaplains to staff the large fighting force that the United States had prepared for service in World War I." *See* U.S. Army Chaplain Corps, *Chaplain Center and School*, https://perma.cc/QZN7-TYK2.

To this day, government support for the chaplaincy remains crucial to protect servicemembers' right "to observe the tenets of their religion[s]." DoDI 1300.17, § 1.2. This "uninterrupted practice" shows that the Religion Clauses' "complementary purposes" are furthered by tuition assistance for chaplaincy-related degrees. *See Kennedy v. Bremerton*, 597 U.S. 507, 533, 536 (2022) (cleaned up) (discussing proper historical

19

analysis of the Religion Clauses); *see also Katcoff*, 755 F.2d at 232 ("In interpreting the Bill of Rights such 'an unbroken practice … is not something to be lightly cast aside.'" (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 678 (1970))).

## II. Virginia's ban on tuition assistance for chaplaincy-related degrees violates the Religion Clauses.

Despite Virginia's role in this longstanding tradition of chaplaincy educational support, the Virginia Defendants deny tuition assistance for chaplaincy-related degrees. This denial is based on what they call "a fundamental principle of religious liberty[:]" "maintaining Virginians' religious freedom from being compelled to fund others' religious vocational education." Br. in Supp. of Mot. to Dismiss at 3, *Johnson v. Fleming*, No. 3:25-cv-407 (E.D. Va. June 23, 2025) ("Br.ISO.MTD."). This is a rehash of Montana's losing argument from *Espinoza v. Montana Department of Revenue*: that the state's "no-aid provision protects the religious liberty of taxpayers." 591 U.S. 464, 485 (2020) (holding that the State's view that "the infringement advances religious liberty" "cannot be justified."). The Virginia Defendants drape that losing argument here in *Locke v. Davey*. But *Locke* is a fig leaf. It does not even address the chaplaincy, let alone resolve the threats that the Virginia Defendants' logic poses to the chaplaincy's legal foundations. The Court should hold that the chaplaincy falls outside *Locke*.

20

## A. The Virginia Defendants concede that the chaplaincy has a "different" history than *Locke v. Davey.*

For the Virginia Defendants to restrict tuition assistance to chaplaincy-related degrees, they must show a "historic and substantial tradition" that supports doing so. *Espinoza*, 591 U.S. at 480 (cleaned up); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.6 (4th Cir. 2023) ("Identify the relevant tradition, then determine whether the challenged practice is in or out."). But here, the Virginia Defendants have conceded that the "history and interest" restricting financial support for clerical training addressed in *Locke* is "different" from chaplaincy-related funding. IPA.Opp.25; *see also* JA.273 n.5 ("the Constitution's treatment of chaplains is a different matter"). That should end the matter.

No tradition exists to explain why the Virginia Defendants will eagerly fund any qualifying student's Religion degree at Eastern Mennonite University under its general tuition-assistance program, JA.8, 87, but require the VNG to deny funding for eligible students seeking, in their judgment, a Religion degree of that same "nature," JA.6, 8. Nor is the lack of tradition a surprise. Out of a "duty to satisfy [soldiers'] Free Exercise rights," *Katcoff*, 755 F.2d at 228, the government can: require chaplains to have "ecclesiastical endorsements" and graduate-level theological training, *supra* 8-10; fund and staff "[i]nstitutional training[s] for chaplains," AR 165-1, § 9-3(b); and (at least at the federal level) provide tuition assistance both to graduate theology students seeking to

21

become chaplains and to those who have received the required master's degree, *supra* 10-12. What is more, chaplains are "members of the National Guard," so Virginia "shall" pay them "when called into state active duty." Va. Code Ann. § 44-83.

Accordingly, it makes no sense for Virginia to insist that it has a historic interest against providing tuition assistance to the same individuals it pays to lead worship, prayer, and religious teaching, and whom it requires to have (and sometimes pays to have) the religious education necessary to perform those religious tasks. Enduring traditions have historical justification when "the American experience provide[s] … persuasive support" for their underlying rationales. *McDaniel v. Paty*, 435 U.S. 618, 628-29 (1978) ("Tennessee has failed to demonstrate that its views of clergy participation in the political process have not lost whatever validity they may once have enjoyed."). But here "the American experience provides no persuasive support" for Virginia's discrimination. *See id.*

Unable to cite any tradition justifying this discrimination, Virginia posits a "fundamental principle of religious liberty" to not "fund others' religious vocational education." Br.ISO.MTD.3. Virginia began applying this "fundamental principle" to postsecondary student loans in 1971 and to grants in 1975, after it amended its constitution to authorize postsecondary educational loans and grants "whose primary purpose … is not to provide religious training or theological education." Va. Const. art.

22

VIII, § 11; IPA.Opp.3-4. Setting aside whether the "history and interest" of these amendments deserve any constitutional credit at all,[9] the Virginia Defendants admit that these amendments have a "different" "history and interest" than financing the chaplaincy. *See* IPA.Opp.25. As such, these 1970s amendments "cannot create," retroactively, "an early American tradition" of restricting financial assistance to chaplaincy education. *Cf. Espinoza*, 591 U.S. at 482 (an "early American tradition" isn't begun in the late nineteenth-century enactments; "such evidence may reinforce an early practice but cannot create one").

If there is a "fundamental" at issue, it is the fundamental threat to the chaplaincy itself posed by Virginia's "principle" of not "fund[ing] others' religious vocational education." Br.ISO.MTD.3. The entire logic of the chaplaincy's constitutional mandate is that, unlike other contexts, "the use of government facilities" and resources is necessary to ensure military personnel are able "to engage in the practice of their faiths." *Schempp*, 374 U.S. at 226 n.10. This is why both case law and federal statute speak of the government "furnish[ing]" what chaplains need "in performing [their] duties." *Katcoff*, 755 F.2d at 225; *see also* 10 U.S.C. § 7217(b) ("Each commanding officer shall furnish facilities, including

---

[9]    *See* Appellants.Br.12 (tracing the amendments' language to Virginia's "Blaine-Amendment-inspired practice of excluding religious people from public benefits"); *Espinoza*, 591 U.S. at 482 (Blaine Amendments "hardly … a tradition that should inform our understanding of the Free Exercise Clause").

23

necessary transportation, to any chaplain assigned to his command, to assist the chaplain in performing his duties."). But if a "fundamental principle of religious liberty" prohibits "fund[ing] others' religious vocational education" for the chaplaincy, Br.ISO.MTD.3, then why should the government fund any chaplaincy education, training, or "furnish" anything at all? And even if Virginia's "fundamental principle" could avoid undermining the chaplaincy itself, it certainly would still result in fewer and less-trained chaplains. That's a strange—and unconstitutional—way to support religious freedom.

Striving to root their "fundamental principle" in case law, the Virginia Defendants invoke *Locke v. Davey*, 540 U.S. 712 (2004). But *Locke* "cannot be read beyond its narrow focus." *Carson v. Makin*, 596 U.S. 767, 789 (2022); *see also Espinoza*, 591 U.S. at 480 (*Locke*'s was a "narrow restriction"); *Hall v. Fleming*, No. 25-1574, 2026 WL 1314675, at *6 (4th Cir. May 13, 2026) (Richardson, J., concurring) (*Carson* "cabined *Locke* to its facts."). *Locke*'s narrow focus is irrelevant to the chaplaincy.

*Locke* justified Washington State's "devotional theology" scholarship restriction with reference to Founding-era "popular uprisings against procuring taxpayer funds to support church leaders." 540 U.S. at 721-722. But that history "was focused on earmarked taxes for the religious functions of churches, and principally for the support of the clergy." Thomas C. Berg & Douglas Laycock, Espinoza*, Government Funding, and Religious Choice*, 35 J.L. & Religion 361, 369 (2020). In other words,

24

that history was aimed at eliminating "coerced tithes"—"exceptional attempts to finance [a preferred] religion" as opposed to "ordinary taxation to support a public good" through a religious beneficiary. Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. Pa. L. Rev. 111, 133 (2020). "[T]he same was not true of funding for things like education, even if beneficiaries used some of the funds for religion." *Id.* at 183. Indeed, "Virginia … frequently and uncontroversially provided state support to schools and colleges that educated aspiring clergy." Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 71 (2023).

Prohibitions on government-coerced tithes have nothing to do with George Washington's, Virginia's, and the Continental Congress's practice of paying and providing military chaplains, which ensured that soldiers could freely exercise their religion. *Supra* 15-20. As *Locke*'s own author recognized, the historical tradition for military chaplains is different. *See Wallace v. Jaffree*, 472 U.S. 38, 105 (1985) (Rehnquist, J., dissenting) ("No principle of constitutional law is violated ... when chaplains are designated for the army and navy."). Nor do the Virginia Defendants dispute it. *Supra* 21. There is no basis to transpose *Locke*'s historical analysis onto the military chaplaincy's distinct historical tradition.

25

**B. Grafting *Locke* onto the chaplaincy raises additional Religion Clause problems.**

Despite the inapposite historical lineage, the district court here became the first to extend *Locke*'s reasoning to the chaplaincy. The court held that the "mandatory authority embodied by *Locke*" dominates the "current legal landscape governing" religious claims for tuition assistance from the VNG and "renders them unlikely to succeed," which was "fatal to any effort by Plaintiffs to secure preliminary relief." JA.20. This was error. Applying *Locke* to the chaplaincy creates new Religion Clause problems that provide further grounds for reversal.

In *Locke*, it was "[t]he [educational] institution, rather than the State, [that] determine[d] whether [an otherwise eligible] student's major [was] devotional," and it was "the institution" that had to certify "that the student [was] not pursuing a degree in devotional theology." 540 U.S. at 717. Here, in sharp contrast, *the state itself* decides whether a given degree program primarily "provide[s] religious training or theological education" and is thus ineligible. Va. Code Ann. § 23.1-610(A); JA.6. Further, the state entity charged with separating the wheat from the tares—the Virginia Department of Military Affairs—has "not adopted regulations or publicly available guidance explaining which degrees are for religious training or theological education." JA.6. And unlike Virginia's general tuition assistance program, "the Department's decisions do not depend on" the uniform coding system employed by

26

universities and the federal Department of Education for classifying different fields of study. IPA.Opp.10; JA.4, 8. This unusual state-gauged-religiosity arrangement is, as the district court noted, a "factual departure from *Locke.*" JA.18. That distinction creates substantive constitutional problems.

For instance, if the Virginia Department of Military Affairs has discretion to decide how "religious" or "theological" a degree is, then that's exactly the kind of individual discretionary scheme that undermines general applicability and triggers strict scrutiny. *Cf. Fulton v. City of Philadelphia,* 593 U.S. 522, 537 (2021). It is also an impermissible "religious classification" system that imposes "unique disabilit[ies] upon those who exhibit a defined level of intensity of involvement in protected religious activity." *Cf. McDaniel,* 435 U.S. at 631-32 (Brennan, J., concurring). And in discriminating "along theological lines" "by differentiating between [religion-related degree programs] based on theological choices," Virginia runs afoul of the Establishment Clause's requirement of religious neutrality. *Cf. Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n,* 605 U.S. 238, 248, 250, 252 (2025).

Finally, and perhaps most obviously, there's no way to administer that scheme without unlawful entanglement. That is, the Virginia Defendants' religious exclusion lets the Virginia Department of Military Affairs "discern the boundary between religious faith and academic" study and make "intrusive governmental judgments regarding matters

27

of religious belief and practice." *Cf. Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1256, 1262 (10th Cir. 2008) (McConnell, J.) (collecting cases); *accord Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024) (acknowledging "the First Amendment's command to avoid 'intrusive inquiry into religious belief'"); *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1170-71 (4th Cir. 1985) ("[p]ervasive monitoring by public authorities … infringes precisely those Establishment clause values at the root of the prohibition of excessive entanglement"). Indeed, "'religious doctrine' can always be—and often is—intertwined with 'secular' things," so when government "delineate[s] between 'religious' and 'secular'" in matters like this, "excessive entanglement is unavoidable" not only from "the government *reaching* conclusions about a religion and its ministers" but also "the very process of inquiry." *Markel v. Union of Orthodox Jewish Congregations of Am.*, 124 F.4th 796, 809-10 (9th Cir. 2024).

The result of these religious classifications is categorical religious discrimination. Whereas *Locke* thought that Washington State's program went "a long way toward including religion in its benefits" by excluding only devotional theology (a "milder kind" of "disfavor of religion"), 540 U.S. at 720, 724, Virginia's rule disqualifies *any* "theological degree[]" from any tuition assistance. JA.99 (Command Policy 22-023). This means that the VNG bars funds even for religion-related majors that are non-devotional—an "inconsistency" the district court acknowledged, JA.8,

28

and one that again sweeps well beyond *Locke*, where "only a '*vocational religious*' degree was excluded," *Hall*, 2026 WL 1314675, at *4 (quoting *Carson*, 596 U.S. at 788) (emphasis modified). This sweep makes no sense, as "the study of theology does not necessarily implicate religious devotion or faith." *Locke*, 540 U.S. at 734 (Thomas, J., dissenting). The result? The VNG concedes it may "pay for a particular religious 'required' course" when a Guard member pursues "another type of degree," JA.110, like paying for a Guard member to take theology courses needed for an anthropology degree. But the VNG won't give a cent toward a Guard member taking the same theology courses for a theology degree. Neither *Locke* nor the Religion Clauses can justify such standardless discrimination.

"Our federal system prizes state experimentation," but not "state experimentation in the suppression of ... the free exercise of religion." *Espinoza*, 591 U.S. at 485 (cleaned up). Virginia is free to not provide tuition assistance to any postsecondary education. But having chosen to provide such aid, Virginia cannot now exclude tuition assistance for chaplaincy-related degrees. That kind of religious-based exclusion is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017). And it is inconsistent with Virginia's "duty to satisfy [soldiers'] Free Exercise rights." *Katcoff*, 755 F.2d at 228.

By stark contrast, a state "follows the best of our traditions" when it assists the next generation of chaplain candidates with their religious

29

education. *Zorach*, 343 U.S. at 314. This tradition upholds a constitutional mandate to ensure military chaplains are always able to "Nurture the Living, Care for the Wounded and Honor the Fallen." AR 165-1 § 1-6(a). Virginia should remember her Washington.

## CONCLUSION

The district court should be reversed and a preliminary injunction should follow.

Respectfully submitted,

/s/ *William J. Haun*
Eric S. Baxter
Daniel H. Blomberg
William J. Haun
   *Counsel of Record*
Michael J. O'Brien
Phillip J. Allevato*
The Becket Fund
   for Religious Liberty
1919 Pennsylvania Ave. NW,
   Suite 400
Washington, DC 20006
(202) 955-0095
whaun@becketfund.org

*Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.*

Counsel for *Amici Curiae*

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,471 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

/s/ *William J. Haun*
William J. Haun
Counsel for *Amici Curiae*

31

## CERTIFICATE OF SERVICE

I certify that on June 2, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *William J. Haun*
William J. Haun
Counsel for *Amici Curiae*