No. 26-1437

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

CAMERON JOHNSON, ET AL.,

*Plaintiffs-Appellants,*

v.

A. SCOTT FLEMING, in his official capacity as the Director of the State Council of Higher Education for Virginia, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia

### RESPONSE BRIEF OF DEFENDANTS-APPELLEES

JAY JONES
  *Attorney General*

GRETCHEN E. NYGAARD
  *Deputy Attorney General*

JACQUELINE C. HEDBLOM
  *Senior Assistant Attorney
  General/Trial Section Chief*

CALVIN C. BROWN
  *Senior Assistant Attorney
  General/Civil Unit Manager*

July 10, 2026

ROBERT S. CLAIBORNE, JR.
CHRISTOPHER P. BERNHARDT
  *Assistant Attorneys General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 482-2275 – Telephone
(804) 371-2087 – Facsimile
rclaibornejr@oag.state.va.us
cbernhardt@oag.state.va.us

*Counsel for Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT .......................................................... 3

ISSUES PRESENTED .................................................................... 3

STATEMENT ........................................................................... 4

A. Virginia has a historic and substantial interest in the
   denial of funding for religious vocational training programs. ........... 4

B. The Council's TAG Program. ......................................................... 9

C. The Department's STAG Program. ................................................... 11

D. The Challengers' religious vocational training programs
   are ineligible for TAG and STAG Program grants. ........................... 13

E. The procedural history. ........................................................... 15

STANDARDS OF REVIEW ............................................................... 16

SUMMARY OF ARGUMENT ............................................................... 18

ARGUMENT ........................................................................... 19

I. The Challengers lose on the merits. ............................................... 20

   A. *Davey* and *Hall* are controlling precedents. .............................. 20

   B. The Challengers' claims fail under *Davey* and *Hall* ....................... 30

      1. Washington's scholarship program is not materially
         distinguishable from the TAG or STAG Programs. ......................... 30

      2. It is inapposite whether the university or the
         Commonwealth determine the program's
         classification. ........................................................ 37

i

3.  *Davey* and *Hall* upheld restrictions on funding religious vocational training programs, and open-mindedness to career options does not materially distinguish the Challengers. ...................................40

4.  The history of the "Blaine Amendment" and of the desegregation of public schools is irrelevant here. ...................44

5.  The Challengers' "new arguments" do not materially distinguish them from Davey or Hall.........................................49

    a.  The Challengers' discrimination argument is misplaced..................................................................................50

    b.  The Challengers' neutrality/general-applicability argument is misplaced. ..........................................................51

    c.  The Challengers' denominational-preference argument is misplaced. ..........................................................56

    d.  The Challengers' excessive-entanglement argument is misplaced. ..........................................................58

    e.  The Challengers' strict-scrutiny argument is misplaced..................................................................................61

II. The Challengers are not irreparably harmed without the preliminary injunction....................................................................62

III. The balance of the equities and the public interest disfavor the requested preliminary injunction. .................................63

CONCLUSION ........................................................................................64

CERTIFICATE OF COMPLIANCE......................................................65

CERTIFICATE OF SERVICE..............................................................66

ii

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*2311 Racing LLC v. NASCAR, LLC,*
    139 F.4th 404 (4th Cir. 2025) ..................................................... 16, 62

*Ariz. Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011) ......................................................................... 6

*Avila v. Bondi,*
    170 F.4th 1128 (8th Cir. 2026) .......................................................... 38

*Balogh v. Virginia,*
    120 F.4th 127 (4th Cir. 2024) ............................................................ 17

*Brown v. Board of Education of Topeka,*
    344 U.S. 1 (1952) .............................................................................. 48

*Capital Associated Indus. v. Stein,*
    922 F.3d 198 (4th Cir. 2019) .............................................................. 8

*Carson ex rel. O.C. v. Makin,*
    596 U.S. 767 (2022) ............................................. 25, 26, 27, 28, 42, 50

*Catholic Charities Bureau, Inc. v. Wis. Labor & Industry*
    *Review Comm'n,* 605 U.S. 238 (2025) ................................ 2, 56, 57, 58

*City of Martinsville v. Express Scripts, Inc.,*
    128 F.4th 265 (4th Cir. 2025) ............................................................ 38

*City Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) .................................................................... 52, 53

*Colo. Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ............................................. 58, 59, 60

Order Denying Mot. for Prelim. Inj. (Mar. 17, 2000),
    *in Davey v. Locke,* No. C00-61R (W.D. Wash.) .................................. 62

iii

*Doe by Doe v. South Carolina,*
    No. 25-1787, 2025 WL 2375386 (4th Cir. Aug. 15, 2025) .29, 49, 50, 61

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ...................................................... 2, 25, 26, 27, 50

*Gibbons v. Gibbs,*
    99 F.4th 211 (4th Cir. 2024) ........................................... 28, 49, 50, 61

*Falwell v. City of Lynchburg,*
    198 F. Supp. 2d 765 (W.D. Va. 2002) ............................................. 5, 48

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ...................................................................... 53

*Hall v. Fleming,*
    175 F.4th 510 (2026) ............................................................... *passim*

*Hall v. Fleming,*
    No. 3:25-cv-00186, 2025 WL 2021022 (E.D. Va. May 9,
    2025) ........................................................................................ 26

*Hammock v. Watts,*
    146 F.4th 349 (4th Cir. 2025) ........................................................ 17

*Hart v. Massanari,*
    266 F.3d 1155 (9th Cir. 2001) ................................................... 21, 30

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ...................................................................... 53

*Kisor v. Wilkie,*
    588 U.S. 558 (2019) ...................................................................... 21

*Locke v. Davey,*
    540 U.S. 712 (2004) ................................................................ *passim*

*Mansion v. United States,*
    945 F.2d 1115 (9th Cir. 1991) ........................................................ 38

*Maryland v. King,*
    567 U.S. 1301 (2012) .................................................................... 62

iv

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014) ............................................................... 21

*Miller v. Ayres*,
213 Va. 251 (1972) ................................................................ 46

*Nanendla v. WakeMed*,
24 F.4th 299 (4th Cir. 2022) ................................................ 17

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) ............................................................ 62

*Nichols v. Bumgarner*,
173 F.4th 511 (4th Cir. 2026) .............................................. 17

*Neitzke v. Williams*,
490 U.S. 319 (1989) .............................................................. 17

*Pavek v. Simon*,
967 F.3d 905 (8th Cir. 2020) ............................................... 63

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) ......................... 28, 29, 50, 61

*Pierce v. N.C. State Bd. of Elections*,
97 F.4th 194 (4th Cir. 2024) ............................................... 17

*Retail Energy Advancement League v. Brown*,
175 F.4th 551 (4th Cir. 2026) .............................................. 63

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .............................................................. 16

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) .............................................................. 43

*Sun Microsystems, Inc. v. Microsoft Corp.*,
333 F.3d 517 (4th Cir. 2003) ......................................... 16, 62

*Taylor v. Freeman*,
34 F.3d 266 (4th Cir. 1994) ........................................... 16, 62

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   582 U.S. 449 (2017) .......................................................... 25, 26, 27, 50

*Turner v. Thomas,*
   930 F.3d 640 (4th Cir. 2019) ........................................................ 17

*Va. Coll. Bldg. Auth. v. Lynn,*
   260 Va. 608 (2000) ........................... 8, 31, 34, 35, 36, 37, 40, 51, 55, 60

*Vlaming v. W. Point Sch. Bd.,*
   302 Va. 504 (2023) ............................................................................ 1

*Winter v. NRDC, Inc.,*
   555 U.S. 7 (2008) ........................................................ 16, 20, 62, 63

## Constitutional Provisions                  Page(s)

U.S. Const. amend. I ................................................................. *passim*

U.S. Const. amend. XIV, § 1 ..................................... 15, 18, 21, 22, 24, 29

Va. Const. art. I, § 16 ........................................................ 7, 45, 47, 55

Va. Const. art. IV, § 16 ................................................................ 46, 50

Va. Const. art. VIII, § 10 ............................................................. 46, 50

Va. Const. art. VIII, § 11 ............................................................ *passim*

Va. Const. art. I, § 16 (1902) ............................................................. 47

Va. Const. art. IV, § 58 (1902) .......................................................... 47

Va. Const. art. III, § 11 (1830) ..................................................... 7, 45

Wash. Const. art. I, § 11 ........................................................ 21, 31, 38

## Statutes                                                   Page(s)

28 U.S.C. § 1292(a)(1) ....................................................................... 3

28 U.S.C. § 1331 ............................................................................... 3

28 U.S.C. § 1343 ........................................................................3

Colo. Rev. Stat. § 23-3.3-101(3)(d)..........................................59

Colo. Rev. Stat. § 23-3.5-102(3)(b)...........................................59

Colo. Rev. Stat. § 23-3.5-105 ....................................................59

Colo. Rev. Stat. § 23-3.7-104 ....................................................59

Colo. Rev. Stat. § 23-3.7-102(3)(f) ...........................................59

Colo. Rev. Stat. § 23-18-102(9) .................................................59

An Act for Establishing Religious Freedom, ch. 34 (Oct. 17, 1785), *reprinted in* 12 William Waller Hening, STATUTES AT LARGE 84 (1823) ..............................................................6

An Act for Exempting the Different Societies of Dissenters from Contributing to the Support and Maintenance of the Church as by Law Established, and Its Ministers, and for Other Purposes Therein Mentioned, ch. 2 (Oct. 7, 1776), *reprinted in* 9 William Waller Hening, STATUTES AT LARGE 164 (1821) .................................................................5

An Act to Repeal So Much of the Act for the Support of the Clergy, and for the Regular Collecting and Paying of Parish Levies, as Relates to the Payment of the Salaries Heretofore Given to the Clergy of the Church of England, ch. 36 (Oct. 4, 1779), *reprinted in* 10 William Waller Hening, STATUTES AT LARGE 197 (1822) ............................................5

1972 Va. Acts, ch. 18 ...............................................................44

1974 Va. Acts, ch. 624 ..............................................................7

1974 Va. Acts, ch. 687 ..............................................................7

1996 Va. Acts, ch. 931 .............................................................44

1996 Va. Acts, ch. 981 .............................................................44

Va. Code § 23.1-610 ........................................................................ 12

Va. Code § 23.1-610(A) ........................................7, 12, 31, 34, 36, 39, 40

Va. Code § 23.1-610(B) ................................................................... 12

Va. Code § 23.1-628(A) ............................................. 9, 25, 31, 36, 39

Va. Code § 23.1-629 ......................................................................... 9

Va. Code § 23.1-631(A) .................................................................... 9

Va. Code § 23.1-631(C) ................................................... 31, 36, 39

Va. Code § 57-1 ............................................................................... 6

Wash. Rev. Code § 28B.10.814 (1997) ............................... 31, 38

**Regulations**                                                          **Page(s)**

8 Va. Admin. Code § 40-71-10, et seq. .......................................... 9

8 Va. Admin. Code § 40-71-10 ............................10, 11, 25, 31, 37, 39, 54

8 Va. Admin. Code § 40-71-20 .......................................................... 9

8 Va. Admin. Code § 40-71-20(3)(a) .............................................. 9

8 Va. Admin. Code § 40-71-20(3)(b) .............................................. 9

8 Va. Admin. Code § 40-71-30(A) ........................................... 9, 10, 11

8 Va. Admin. Code § 40-71-30(C) ............................................. 9, 10

8 Va. Admin. Code § 40-71-40 ......................................................... 9

8 Va. Admin. Code § 40-71-40(C)(2)(c) ....................................... 54

8 Va. Admin. Code § 40-71-60(B)(1) ...................................... 9, 10, 11

8 Va. Admin. Code § 40-71-60(B)(2) ...................................... 9, 10, 11

**Rules**                                                               **Page(s)**

Fed. R. Civ. P. 12(b)(6) ........................................................ 17, 20, 25, 29

**Other Sources**                                                      **Page(s)**

Amici Religious Liberty Scholars Br. 12, *in Catholic
    Charities Bureau v. Wis. Labor & Industry Review
    Comm'n*, No. 24-154 (U.S.), *available at*
    https://tinyurl.com/yjeu6xy8...........................................................57

*Bachelor of Science in Religion – General*, LIBERTY.EDU
    (archived May 14, 2025), *available at*
    https://tinyurl.com/3btbkw8m ......................................................... 36

*CIP: The Classification of Instructional Programs*,
    NCES.ED.GOV (last accessed July 10, 2026), *available at*
    https://tinyurl.com/bddmfyez...............................................................9

COMMAND POLICY 22-023 VIRGINIA NATIONAL GUARD STATE
    TUITION ASSISTANCE PROGRAM (Sept. 15, 2022), *available
    at* https://tinyurl.com/mu4chyyu .................................... 12, 32, 35, 55

1 A.E. Dick Howard, COMMENTARIES ON THE CONSTITUTION
    OF VIRGINIA (1974) .........................................................................6

2 A.E. Dick Howard, COMMENTARIES ON THE CONSTITUTION
    OF VIRGINIA (1974) ............................................................ 7, 44, 48

Davey's Br., *in Locke v. Davey*, No. 20-1315 (U.S.), *available
    at* 2003 U.S. S. Ct. Briefs LEXIS 757...........................................23, 32

*Detail for CIP Code 38*, NCES.ED.GOV (last accessed July 10,
    2026), *available at* https://tinyurl.com/shhp8scm........................ 10, 33

*Detail for CIP Code 39*, NCES.ED.GOV (last accessed July 10,
    2026), *available at* https://tinyurl.com/bde7fkx7 ........................ 10, 33

Nat'l Ctr. for Educ. Stats., FREQUENTLY ASKED QUESTIONS
    FOR CIP WEBSITE & CIP WIZARD (Aug. 2020), *available at*
    https://tinyurl.com/bde676s9 ....................................................... 11, 33

Letter from Thomas Jefferson to the Danbury Baptist Ass'n (Jan. 1, 1802), *reprinted in* 36 THE PAPERS OF THOMAS JEFFERSON 258 (Barbara B. Oberg ed., 2009) ..................................... 47

LIBERTY UNIVERSITY ACADEMIC PROGRAMS (last updated June 18, 2025), *available at* https://tinyurl.com/v8tb7bxa ....... 11, 13, 14, 37

*Master of Divinity (M.Div.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/369hbaea ..................................................... 13, 40

*Music & Worship (B.S.) – Resident*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/5a6ku7t9 ........................................................... 13

*Pastoral Leadership Major (B.S.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/5ahu56cf ............................................................ 13

Pew Research Ctr., *People in Virginia*, RELIGIOUS LANDSCAPE STUDY (last accessed July 10, 2026), *available at* https://tinyurl.com/59s8v64f .................................................................. 1

*Religion Major (B.S.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/ywudpvc8 .......... 14, 40

Charles B. Sanford, THE RELIGIOUS LIFE OF THOMAS JEFFERSON (1995) ............................................................................... 6

REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION (1969) ..... 7, 47, 48

*State Tuition Assistance Program*, VA. NAT'L GUARD (last accessed July 10, 2026), *available at* https://tinyurl.com/4n2jh833 ........................................................... 12

4 UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE (1897) ................. 47

Hon. Stephen R. McCullough, VIRGINIA CONSTITUTIONAL LAW (LexisNexis 2025) ................................................................................ 4

Wash.'s Br., *in Locke v. Davey*, No. 20-1315 (U.S.), *available at* 2003 U.S. S. Ct. Briefs LEXIS 613 ................................................. 14

## INTRODUCTION

The Commonwealth of Virginia has an unrivaled and unbroken tradition in the protection of religious freedom, *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 528 (2023), dating back to the time of Thomas Jefferson and James Madison. In realization of that founding ideal, the Commonwealth today is a welcoming home to Protestants, Catholics, Jews, Muslims, Buddhists, and Hindus, as well as people of other faiths and religious non-adherents. Pew Research Ctr., *People in Virginia,* RELIGIOUS LANDSCAPE STUDY (last accessed July 10, 2026), *available at* https://tinyurl.com/59s8v64f.

Regardless of the dictates of those Virginians' conscience, Plaintiffs-Appellants Cameron Johnson, Luke Thomas, and Trace Stevens ("Challengers") want all Virginia taxpayers to fund state scholarships supporting their religious vocational training programs at Liberty University. And although the Challengers are confronted with controlling adverse precedent from the Supreme Court, *Locke v. Davey*, 540 U.S. 712 (2004), and from a panel of this Court, *Hall v. Fleming*, 175 F.4th 510 (2026), they persist in asserting that the Constitution requires Virginia to compel its taxpayers to fund their religious

vocational training programs. The Challengers say that Virginia's limitation against such funding is "born of bigotry." Op. Br. 46, 56 (quoting *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020)). The Challengers say that the district court "blessed . . . discrimination" in holding that Virginia did not violate the Constitution. Op. Br. 3. And, presumably, the Challengers think the same of the panel that decided *Hall* and of the district court that it affirmed. The Challengers are wrong in all of this. And the Amici Curiae who choose to associate themselves with it do not help the Challengers' cause, either.

The Challengers' case is foreclosed and not well-founded. They attempt to gut *Davey* of its holdings and ratio decidendi and attempt to retread points that the challenger argued, and lost, there. They unjustifiably treat *Davey* as ab-"normal" within our constitutional jurisprudence, Op. Br. 3, and attempt to will themselves out of it and into the inapposite precedent of *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, Op. Br. 29 (citing 605 U.S. 238 (2025)). They say that they are not bound by this Court's decision in *Hall* because they choose a different tactic from that challenger's there. And they repeatedly mischaracterize matters of Virginia law. They disregard

2

pertinent constitutional and statutory text and relevant precedent from the Supreme Court of Virginia. They strain to miscast the birthplace of religious liberty in America—Virginia—as bigoted against religion, saying that it has a "Blaine Amendment" without evidence of any anti-Catholic or anti-religious sentiment behind Virginia's constitutional and statutory provisions here at issue. They say that Virginia discriminates among religious denominations without identifying any denomination that Virginia treats better than their own. These are not winning arguments. The Challengers do not identify a basis for reversing the district court.

This Court should affirm both the district court's denial of the preliminary injunction and its order of dismissal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the Challengers' constitutional claims under 28 U.S.C. §§ 1331 and 1343. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.      Can the Challengers avoid the binding and controlling effect of the precedents of the Supreme Court and of this Court?

3

2. Do Johnson and Stevens state a claim upon which relief can be granted?

3. Are the Challengers likely to succeed on the merits of their claims?

4. Are the Challengers likely to suffer irreparable harm in the absence of a preliminary injunction?

5. Does the balance of the equities tip in favor of the Challengers or the Defendants-Appellees?

6. Is the requested preliminary injunction in the public interest?

## STATEMENT

**A. Virginia has a historic and substantial interest in the denial of funding for religious vocational training program.**

There is a "historic and substantial state interest" in "the denial of funding for vocational religious instruction." *Davey*, 540 U.S. at 725.

That interest traces to "the founding of our country," *id.* at 722, and Virginia's experience features prominently in it. That includes Virginia's disestablishment of the Church of England, breaking from colonial laws whereunder taxpayers were compelled to fund the salaries of the Church's ministers regardless of their own religious beliefs. Hon. Stephen R. McCullough, VIRGINIA CONSTITUTIONAL LAW § 6.04

4

(LexisNexis 2025); *e.g.*, An Act for Exempting the Different Societies of Dissenters from Contributing to the Support and Maintenance of the Church as by Law Established, and Its Ministers, and for Other Purposes Therein Mentioned, ch. 2 (Oct. 7, 1776), *reprinted in* 9 William Waller Hening, STATUTES AT LARGE 164 (1821); An Act to Repeal So Much of the Act for the Support of the Clergy, and for the Regular Collecting and Paying of Parish Levies, as Relates to the Payment of the Salaries Heretofore Given to the Clergy of the Church of England, ch. 36 (Oct. 4, 1779), *reprinted in* 10 William Waller Hening, STATUTES AT LARGE 197 (1822). And it includes "popular uprisings," in years following the Revolution, "against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." *Davey*, 540 U.S. at 722.

"Perhaps the most famous example of public backlash" against such compelled taxpayer support occurred in Virginia. *Id.* at 722 n.6. That was when the General Assembly rejected "A Bill for Establishing a Provision for Teachers of the Christian Religion" and, instead, enacted the famed Statute for Religious Freedom. *Id.*; *Falwell v. City of Lynchburg*, 198 F. Supp. 2d 765, 786 & n.21 (W.D. Va. 2002) (referring to "Thomas

Jefferson's Statute of Virginia for Religious Freedom" as the "achievement by which he 'wished to be most remembered'" (quoting Charles B. Sanford, THE RELIGIOUS LIFE OF THOMAS JEFFERSON 172 (1995))). The defeated Bill would have "lev[ied] a general assessment for the support of teachers of religion," 1 A.E. Dick Howard, COMMENTARIES ON THE CONSTITUTION OF VIRGINIA 291–92 (1974); *Davey,* 540 U.S. at 722 n.6, with funds going "to Christian societies of [the taxpayers'] choosing" or, "[i]f a taxpayer made no such choice, . . . to 'seminaries of learning,' at least some of which 'undoubtedly would have been religious in character,'" *Ariz. Christian Sch. Tuition Org. v. Winn,* 563 U.S. 125, 140 (2011) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 869 n.1 (1995) (Souter, J., dissenting)). "[T]he proposed bill threatened compulsory religious contributions." *Winn,* 563 U.S. at 140. But with the Bill's rejection, and the enactment of the Statute for Religious Freedom in 1786, Virginia law has since made clear that "no man shall be compelled to . . . support any religious worship, place or ministry whatsoever." Va. Code § 57-1; An Act for Establishing Religious Freedom, ch. 34 (Oct. 17, 1785), *reprinted in* 12 William Waller Hening, STATUTES AT LARGE 84, 86 (1823). This prohibition has been in the

6

Virginia Constitution since 1830. Va. Const. art. I, § 16; Va. Const. art. III, § 11 (1830).

That principle has carried forward as Virginia began providing loans, and then grants, to students attending nonprofit collegiate or graduate programs in the twentieth century. REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION 100–01 (1969). Article VIII, § 11 was added in 1971, and amended in 1975, 1974 Va. Acts, chs. 624 & 687, to allow State support for "students attending nonprofit institutions of higher education in the Commonwealth whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education." 2 A.E. Dick Howard, COMMENTARIES ON THE CONSTITUTION OF VIRGINIA 957–58 (1974); REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION, *supra*, at 273. That constitutional condition is also incorporated in the statutory eligibility criteria for the grant programs at issue in this case—the State Council of Higher Education in Virginia's ("Council") Tuition Assistance Grant ("TAG") Program, Va. Code § 23.1-631(C), and the Virginia Department of Military Affairs' ("Department") State Tuition Assistance Grant ("STAG") Program, *id.* § 23.1-610(A).

The Supreme Court of Virginia interpreted and applied the Article VIII, § 11 condition in *Virginia College Building Authority v. Lynn*, 260 Va. 608 (2000). It interpreted the respective prohibitions on funding for:

- "'theological education'" as "applicable to a seminary or other institution whose purpose is to prepare students for vocations associated with ordination, such as rabbi, minister or priest;" and

- "'religious training'" as "applicable to institutions or departments within institutions whose purpose is preparation of students for religious vocations other than those associated with ordination," such as "missionary or director of religious education."

*Id.* at 624; *see also Capital Associated Indus. v. Stein*, 922 F.3d 198, 211 (4th Cir. 2019) ("To construe state law, [federal courts] look to decisions of the state's highest court . . . ."). The Court held that programs within Regent University's School of Divinity—"which ha[d] a specific purpose of theological education"—were ineligible for state funding. *Lynn*, 260 Va. at 617, 640. And it rejected the view, *id.* at 640, that "the focus of [the] inquiry should" have been on the "institution as a whole" rather than "a dissection . . . into its constituent schools and their departments and programs," *id.* at 651 (Koontz, J., concurring in pt. & dissenting in pt.).

## B.    The Council's TAG Program.

The TAG Program provides grants to "Virginia students who are obligated to pay tuition as full-time undergraduate, graduate, or professional students at an" eligible "nonprofit private institution of higher education." Va. Code §§ 23.1-628(A), -631(A). The Council administers the program, *id.* § 23.1-629, and has adopted regulations for that purpose, 8 Va. Admin. Code § 40-71-10, et seq.

Institutions apply to the Council to qualify, 8 Va. Admin. Code § 40-71-20, and their applications must include lists of their eligible programs along with their respective Classification of Instructional Program ("CIP") Codes,[1] *id.* § 40-71-20(3)(a), (b). Qualifying institutions hold the funds in trust, *id.* § 40-71-30(A), (C), the students apply to their institutions for grant awards, *id.* § 40-71-40, and the institutions make eligibility and award determinations, *id.* § 40-71-60(B)(1), (2), disburse

---

[1] CIP Codes were developed by the U.S. Department of Education's National Center for Education Statistics and provide "a taxonomic scheme that supports the accurate tracking and reporting of fields of study and program completions activity." *CIP: The Classification of Instructional Programs*, NCES.ED.GOV (last accessed July 10, 2026), *available at* https://tinyurl.com/bddmfyez.

grants to students' accounts, *id.* § 40-71-30(C), and certify to the Council that the recipients are eligible, *id.* § 40-71-30(A), 40-71-60(B)(1), (2).

For purposes of implementing the applicable constitutional and statutory restrictions against grants for religious training or theological education, the Council considers programs "classified [in the] CIP Code 39-series" to be "not eligible." *Id.* § 40-71-10. CIP Code 39 is titled, "Theology and Religious Vocations." *Detail for CIP Code 39*, NCES.ED.GOV (last accessed July 10, 2026), *available at* https://tinyurl.com/bde7fkx7. Within the classification system, CIP Code 39-series programs are understood as those that "prepare individuals for the professional practice of religious vocations." *Id.*

These are, notably, different from CIP Code 38-series programs. Appearing under the title, "Philosophy and Religious Studies," CIP Code 38-series programs "focus on logical inquiry, philosophical analysis, and the academic study of organized systems of belief and religious practices." *Detail for CIP Code 38*, NCES.ED.GOV (last accessed July 10, 2026), *available at* https://tinyurl.com/shhp8scm. While the CIP Code 38-series programs "focus on the study of religion," the CIP Code 39-series programs differ in that they "are intended for individuals that are

10

preparing for religious vocations." Nat'l Ctr. for Educ. Stats., FREQUENTLY ASKED QUESTIONS FOR CIP WEBSITE & CIP WIZARD 6 (Aug. 2020), *available at* https://tinyurl.com/bde676s9.

The applicant institution assigns the CIP Codes to its programs, *see, e.g.*, LIBERTY UNIVERSITY ACADEMIC PROGRAMS 9 (last updated June 18, 2025), *available at* https://tinyurl.com/v8tb7bxa, and certifies to the Council that grant recipients are in eligible programs, 8 Va. Admin. Code §§ 40-71-30(A), 40-71-60(B)(1), (2).

Council regulations also address the circumstances of a student doubling in an eligible major alongside an ineligible one. The student may still receive the grant if his classes in the ineligible major do not exceed those in the eligible major for the semester. 8 Va. Admin. Code § 40-71-10. The Council may also make exceptions "based on circumstances beyond the control of the student," *id.*, such as limitations on course offerings in the given semester.

## C.    The Department's STAG Program.

The STAG Program allows grants to members of the Virginia National Guard who are "enrolled in any course or program at any public institution of higher education or accredited nonprofit private institution

11

of higher education whose primary purpose is to provide collegiate or graduate education" and satisfy other eligibility criteria. Va. Code § 23.1-610(A). The Department administers the program, *id.* § 23.1-610, and the Adjutant General has issued a command policy to "implement[]" it and provide "procedural guidance," COMMAND POLICY 22-023 VIRGINIA NATIONAL GUARD STATE TUITION ASSISTANCE PROGRAM ¶ 2 (Sept. 15, 2022) [hereafter COMMAND POLICY], *available at* https://tinyurl.com/mu4chyyu.

Servicemembers submit their applications to the Department, which makes eligibility and award determinations. Va. Code § 23.1-610(B); COMMAND POLICY, *supra*, ¶ 9(a)(1), (c); *State Tuition Assistance Program*, VA. NAT'L GUARD (last accessed July 10, 2026), *available at* https://tinyurl.com/4n2jh833. As part of this application process, the servicemember must sign a promissory note stating that he "understand[s] and agree[s] to" terms including that grant awards "cannot be used to fund degrees in religious training or theological education." JA120. The command policy references "seminary school" as an example of an ineligible "theological degree[]." COMMAND POLICY, *supra*, ¶ 7(a)(6)(c).

12

**D.    The Challengers' religious vocational training programs are ineligible for TAG and STAG Program grants.**

The Challengers' desired programs in religious training or theological education are ineligible for grants through the TAG and STAG Programs, respectively.

Johnson is majoring in Pastoral Leadership. JA216. Liberty offers this program through its school of divinity, *Pastoral Leadership Major (B.S.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/5ahu56cf, and classifies it in the CIP Code 39-series, LIBERTY UNIVERSITY ACADEMIC PROGRAMS, *supra*, at 11. It is ineligible for a grant through the TAG Program. JA216.

Thomas wants to major in Music and Worship, JA339–340, which Liberty classifies as a CIP Code 39-series program, LIBERTY UNIVERSITY ACADEMIC PROGRAMS, *supra*, at 10; *see also Music & Worship (B.S.) – Resident*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/5a6ku7t9. It is ineligible for a TAG Program grant. JA221.

Stevens is a member of the Virginia Army National Guard and wishes to pursue a Master of Divinity degree at Liberty. JA337. Liberty offers this program through its school of divinity, *Master of Divinity*

*(M.Div.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/369hbaea, and it is an ineligible program in religious training or theological education under the STAG Program, JA337. While the Department's decisions do not depend on CIP Code classifications, Liberty classifies the Master of Divinity in the CIP Code-39 series. LIBERTY UNIVERSITY ACADEMIC PROGRAMS, *supra*, at 11.

Stevens earlier obtained a Bachelor of Science in Religion, JA336, which is also offered through Liberty's school of divinity, *Religion Major (B.S.)*, CATALOG.LIBERTY.EDU (last accessed July 10, 2026), *available at* https://tinyurl.com/ywudpvc8. Although Liberty classifies this major as a CIP Code-38 series program, LIBERTY UNIVERSITY ACADEMIC PROGRAMS, *supra*, at 9, the Department found it to be ineligible based on publicly-available information from Liberty's website (including that it is offered through Liberty's school of divinity) and Stevens's decision to strike through the "religious training or theological education" condition in his promissory note, JA150–152, JA156.

The Challengers are interested in using their religious training or theological education for religious vocations, but they also say that they are open to secular career options. JA44–45, JA047, JA51, JA53.

14

## E.    The procedural history.

The Challengers filed this litigation, contending that their ineligibility for the respective TAG and STAG Programs violated:

- the Free Exercise Clause (Count I);

- the Free Exercise and Establishment Clauses in combination (Count II); and

- the Equal Protection Clause (Count III).

JA62–68. They moved for a preliminary injunction, which the district court denied. JA19–20, JA158–160. The district court also dismissed Johnson's and Thomas's claims against the Council defendants, as foreclosed by *Davey*. JA9–17. While the district court found Stevens's claims against the Department defendants "unlikely to succeed" under the preliminary injunction standard, JA20, and "suspect[ed] that" *Davey* "dooms" them, JA9, it let them to go forward, JA17–18. The district court wanted to rule with the benefit of "additional information" on the Department's implementation of the STAG Program. JA18.

The Challengers noticed their appeal and moved the district court for an injunction pending appeal. JA30–31, JA342–344. The district court denied the injunction. JA31. The Challengers then moved for an

15

injunction pending appeal in this Court, Dkt. No. 14, which was also denied, Dkt. No. 23.

## STANDARDS OF REVIEW

"This Court reviews the denial of a preliminary injunction under an abuse of discretion standard." *Retail Energy Advancement League v. Brown*, 175 F.4th 551, 559 (4th Cir. 2026). The preliminary injunction should issue only if the movant clearly establishes that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) the "injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The movant's showing must "'be indisputably clear'" where, as here, a "'disfavored'" mandatory preliminary injunction is sought to "alter, rather than preserve, the status quo." *2311 Racing LLC v. NASCAR, LLC*, 139 F.4th 404, 408 (4th Cir. 2025) (quoting *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 524–25 (4th Cir. 2003), and *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)). While the district court's embedded "legal conclusions" are reviewed "de novo," its "factual findings" are reviewed "for clear error." *Retail Energy*

16

*Advancement League*, 175 F.4th at 559 (quoting *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024)).

This Court "review[s] a district court's dismissal under Rule 12(b)(6) de novo and view[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded allegations." *Nichols v. Bumgarner*, 173 F.4th 511, 519–20 (4th Cir. 2026) (quoting *Hammock v. Watts*, 146 F.4th 349, 360 (4th Cir. 2025)). But this Court will "not accept" the complaint's "legal conclusions couched as facts" or its "unwarranted inferences, unreasonable conclusions, or arguments." *Balogh v. Virginia*, 120 F.4th 127, 134 (4th Cir. 2024) (quoting *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019)); *Nanendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022). Dismissal is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), including when it raises a "question of law" that "is correctly resolved against the plaintiff," *Neitzke v. Williams*, 490 U.S. 319, 328 (1989), *superseded by statute on other grounds*.

17

## SUMMARY OF ARGUMENT

Johnson and Thomas fail to state a claim against the Council defendants, and none of the Challengers are likely to succeed on the merits of their claims.

*Davey* and *Hall* dictate the outcome in this appeal. Under those precedents, it is compatible with the Constitution's Free Exercise, Establishment, and Equal Protection Clauses to deny State grant funding for a college or university student's religious vocational training program. As those are decisions of the Supreme Court and of a panel of this Court, they are binding in this case absent an intervening decision to the contrary from the Supreme Court or this Court sitting en banc. There is no such intervening decision. And the Challengers and Amici's attempts to argue around *Davey* and *Hall* are unavailing.

The Challengers and Amici fail to materially distinguish the TAG and STAG Programs from the scholarship program upheld in *Davey*. And *Hall* directly held that the TAG Program is constitutional. Their arguments that religious vocational training programs should be treated as eligible, like secularly-focused programs in the study of religion, were also argued by Davey and lost in the Supreme Court. There is nothing

18

arbitrary in the way TAG and STAG Program eligibility determinations are made—under governing Supreme Court of Virginia precedent, constitutional and statutory provisions, and regulations and guidance. It is inapposite whether the agency or the institution is the one making the eligibility determination under those standards. It does not matter that the Challengers may later decide against going into a religious vocation. "Blaine Amendment" history is inapposite here, as it was in *Davey*. And raising "new" arguments does not allow the Challengers to bypass *Davey* and *Hall*. The Challengers' claims fail.

Further, the other factors for awarding a preliminary injunction are not satisfied.

This Court should affirm.

## ARGUMENT

The arguments of the Challengers and of their Amici are not well-founded. This Court should affirm the district court's denial of the preliminary injunction and its dismissal of Johnson's and Thomas's claims.

## I.    The Challengers lose on the merits.

Dismissal of Johnson's and Thomas's claims should be affirmed because the complaint "fail[s] to state a claim upon which relief can be granted" to them, Fed. R. Civ. P. 12(b)(6), and denial of the preliminary injunction should similarly be affirmed because none of the Challengers are "likely to succeed on the merits" of their claims, *Winter*, 555 U.S. at 20. Affirmance is required under the Supreme Court's decision in *Davey* and this Court's decision in *Hall*, which the Challengers cannot avoid.

### A.    *Davey* and *Hall* are controlling precedents.

The Challengers and Amici are wrong in asserting that *Davey* "conflicts with intervening Supreme Court precedent," Op. Br. 31; Amici ACLJ & Davey Br. 5–8; Amici Ass'ns Br. 11–16, 19–24, and wrong in asserting that this case is materially distinguishable from *Davey* and *Hall*, Op. Br. 30–42; Amici States Br. 6–24; Amici ACLJ & Davey Br. 21–22; Amici Ass'ns Br. 24–28; Amici Chaplains Br. 20–29. As this Court recently observed,

- *Davey* is the "seminal Supreme Court case on the relationship between" the Constitution and "state educational scholarship programs like" Virginia's;

- "the Supreme Court has yet to either overrule or abandon its decision in" *Davey*; and

20

- *Davey* "is directly analogous to" the case of a Liberty University student's ineligibility for a State grant funding her religious vocational training program.

*Hall*, 175 F.4th at 513, 514, 516. This "caselaw on point *is* the law" and "cannot be considered and cast aside" as the Challengers and Amici wish. *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001); *Kisor v. Wilkie*, 588 U.S. 558, 586 (2019) ("Adherence to precedent is 'a foundation stone of the rule of law.'" (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014))).

### 1. *Davey* upheld Washington State's denial of scholarship funding for a Northwest University student's religious vocational training program.

In *Davey*, the Supreme Court held that Washington State did not violate the Free Exercise, Establishment, or Equal Protection Clauses in declining to provide scholarship funding for a student's religious vocational training program at Northwest University.

Washington's Constitution prohibited the use of "public money" for "religious . . . instruction," Wash. Const. art. I, § 11, and the scholarship program's statute incorporated this "prohibition on providing funds to students to pursue degrees that are 'devotional in nature or designed to induce religious faith,'" *Davey*, 540 U.S. at 716 (citation omitted); Wash.

21

Rev. Code § 28B.10.814 (1997) ("No aid shall be awarded to any student who is pursuing a degree in theology."). Davey was pursuing a double major in pastoral ministries and business management and administration, hoping to receive "college training for a lifetime of ministry, specifically as a church pastor." *Davey*, 540 U.S. at 717 (citation omitted). His pastoral studies major qualified as a "devotional theology degree," making him ineligible for the State scholarship. *Id.* He sued State officials, contending that his ineligibility violated the Free Exercise, Establishment, and Equal Protection Clauses. *Id.* at 718.

First, the Supreme Court rejected Davey's Free Exercise challenge. It observed that "[t]he State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden" on scholarship applicants. *Id.* at 725. States have "historic and substantial" "antiestablishment interests" against funding "training for religious professions," which is "not fungible" with "training for secular professions." *Id.* at 721–22, 725. And supporting that historic and substantial interest, the Court specifically referenced Virginia's experience in the 1780s, which led to its prohibition against compulsory support for ministries. *Id.* at 722 n.6. The State's differential

22

treatment of "religious education for the ministry" and "education for other callings" was "not evidence of hostility toward religion." *Id.* at 721. Washington was "merely cho[osing] not to fund a distinct category of instruction" and "d[id] not require students to choose between their religious beliefs and receiving a government benefit." *Id.* at 720–21. Scholarships could still be used at "pervasively religious schools," and students awarded scholarships could still "take devotional theology courses" outside of the major. *Id.* at 724–25. Withholding taxpayer support for religious vocational training programs served a "substantial" State interest and was constitutional. *Id.* at 725.

Second, the Court rejected Davey's Establishment Clause arguments. *Id.* at 725 n.10. He argued that Washington violated the Establishment Clause by "discriminat[ing]" against "religious instruction" and "entangl[ing]" itself in religious matters. Davey's Br. *72–75, *in Locke v. Davey*, No. 20-1315 (U.S.), *available at* 2003 U.S. S. Ct. Briefs LEXIS 757. But "the State ha[d] not impermissibly done so." *Davey*, 540 U.S. at 725 n.10. There was no discrimination or entanglement in the differential treatment of religious vocational

training relative to secular vocational training, those being nonfungible for purposes of constitutional comparison. *Id.* at 721.

And third, the Court rejected Davey's Equal Protection argument. *Id.* at 720 n.3. The Court "appl[ied] rational-basis scrutiny" and held that Washington's "program passes such review" consistent with the reasons why the program did not violate the Free Exercise or Establishment Clauses. *Id.*[2]

*Davey*, thus, held that a State does not violate the Free Exercise, Establishment, or Equal Protection Clause when it declines to compel its taxpayers' funding of religious vocational training programs.

### 2. *Hall* upheld the Council's denial of a TAG Program grant for a Liberty University student's religious vocational training program.

In *Hall*, this Court held that the Council's Director did not violate the Free Exercise Clause in denying a TAG Program grant for a student's religious vocational training program at Liberty University.

---

[2] The Challengers appear to have abandoned their Equal Protection claim, which their brief does not even seem to mention. *But cf.* Op. Br. add. 1 (addendum including the text of U.S. Const. amend. XIV, § 1). In any event, that claim fails for the same reasons that the claims based on the Free Exercise and Establishment Clauses fail. *Davey*, 540 U.S. at 720 n.3.

24

The TAG Program grants were subject to the same Virginia constitutional, statutory, and regulatory limitations on funding programs in "religious training or theological training" at issue here. 175 F.4th at 512 (quoting Va. Code § 23.1-628 and 8 Va. Admin. Code § 40-71-10). That included the Council's incorporation of the CIP Codes to determine ineligible majors. *Id.* Hall began at Liberty University, majoring in "Music Education: Choral," and was eligible for the TAG Program grant. *Id.* But she changed her major to "Youth Ministries" and, then, to "Music & Worship." *Id.* These were both ineligible CIP Code 39-series majors deemed to be "[p]rograms that provide religious training or theological education." *Id.* (alteration in original) (quoting 8 Va. Admin. Code § 40-71-10). So Hall did not receive the TAG Program grant. *Id.*

Hall sued the Council's Director, contending that her ineligibility violated the Free Exercise Clause, but the district court granted the Director's Rule 12(b)(6) motion to dismiss. *Id.* The Director argued that *Davey* "controlled and thus foreclosed Hall's claim." *Id.* While "Hall conceded that 'her situation aligns with'" Davey's, she "contended that the Supreme Court in *Trinity Lutheran Church of Columbia, Inc. v. Comer, Espinoza v. Montana Department of Revenue*, and *Carson ex rel.*

25

*O.C. v. Makin*, 'effectively abrogated and overruled'" *Davey*. *Id.* at 512–13 (quoting No. 3:25-cv-00186, 2025 WL 2021022, at *3 (E.D. Va. May 9, 2025), and citing 582 U.S. 449 (2017), 591 U.S. 464 (2020), and 596 U.S. 767 (2022)). The district court "found that Hall's claim was directly analogous to" Davey's and that—rather than "abrogat[ing] and overrul[ing]" *Davey*—*Trinity Lutheran*, *Espinoza*, and *Carson* "instead reaffirm [its] holding and support its application to" Hall's case. *Id.* at 513 (quoting 2025 WL 2021022, at *3).

This Court affirmed the dismissal on appeal. It recognized *Davey* as the "seminal Supreme Court case on the relationship between the Free Exercise Clause . . . and state educational scholarship programs like" the Council's TAG Program. *Id.* Though conceded by Hall, this Court confirmed that *Davey* was "directly analogous" to her case:

- both students "chose to pursue a major in a religious vocation at a private religious college;"

- "[b]oth state statutes allow students to take religious courses if the funding does not go toward an ineligible major[;]"

- both students' "choice of majors rendered them ineligible for a tuition grant;" and

- both students "sued, contending that their respective state laws barring tuition assistance for students pursuing

26

religious vocational majors violated the Free Exercise Clause."

*Id.* at 514. Both claims failed. *Id.*

This Court also disagreed with Hall's argument that "*Trinity Lutheran*, *Espinoza*, and *Carson* abrogated [*Davey*] . . . 'into oblivion.'" *Id.* (citation omitted). Those cases were materially distinct in that the State laws there challenged "disqualif[ied] a religious organization or school from a generally available benefit, solely because of their religious character." *Id.* That was not the case in *Davey*, where "only a vocational religious *degree* was excluded" as supported by "the historic and substantial state interest . . . against using taxpayer funds to support church leaders." *Id.* at 515–16 (quoting *Carson*, 596 U.S. at 788). And rather than undermining it, the constitutionality of a State's refusal to compel its taxpayers' funding of religious vocational training programs was "reaffirmed" in *Trinity Lutheran*, *Espinoza*, and *Carson*. *Id.* at 515.

*Hall* is a binding precedent of this Court upholding Virginia's denial of taxpayer funding for religious vocational training programs.

27

### 3. *Davey* and *Hall* control on the constitutionality of a State's denial of grant funding for a university student's religious vocational training program.

The Challengers and Amici fail to treat *Davey* and *Hall* as the controlling precedents that they are, and their attempts to avoid them are not well-founded.

*Davey*'s "focus on vocational religious degrees" is clearly relevant here, *Carson*, 596 U.S. at 789, and its treatment of a State's decision to decline compelling taxpayer funding of such degrees has been "reaffirmed" multiple times by the Supreme Court, *Hall*, 175 F.4th at 515. *Davey* is a Supreme Court precedent that "constrain[s]" this Court, that this Court cannot "disregard," and that this Court "must simply apply." *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). This Court is also "bound by prior panel decisions" such as *Hall*. *Id.* It "must apply [*Hall*'s] commands as a mechanical mandate." *Id.* "That rule does not disappear just because a future litigant identifies a fact, theory, or line of argument the previous panel could have but did not consider." *Gibbons v. Gibbs*, 99 F.4th 211, 213 (4th Cir. 2024). "[A] future court lacks the authority to say a previous court was wrong about how it resolved the actual legal issue before it." *Id.*

28

Rather than acknowledging the governing principles of vertical and horizontal stare decisis, the Challengers and Amici invite this Court to "adopt their proposed rule" which this Court could not do "without saying [*Hall*] wrongly affirmed the [12(b)(6) dismissal] in that case" or that *Davey* was wrongly decided. *Id.* That is something that this Court "lacks the authority to" do. *Id.*; *Payne*, 998 F.3d at 654. The Challengers' and Amici's "host of subtle factual distinctions and new arguments" (which suffer from significant problems on their own) all "ignore [*Davey*'s and *Hall*'s] holding[s], straining for a reason not to be bound by what [those cases] said." *Doe by Doe v. South Carolina*, No. 25-1787, 2025 WL 2375386, at *9 (4th Cir. Aug. 15, 2025). Their unduly dim view of the precedential significance of *Davey* and *Hall* lacks support.

*Davey* and *Hall* are the authoritative precedents on the constitutionality of a State's decision to deny taxpayer-funded grants for university students' religious vocational training programs. The Challengers and Amici identify no precedent of the Supreme Court or of this Court where any such grant or scholarship program was held to be in violation of the Free Exercise, Establishment, or Equal Protection

29

Clauses. They cannot because there are none. *Davey* and *Hall are* "the law" here. *Hart*, 266 F.3d at 1170.

## B.   The Challengers' claims fail under *Davey* and *Hall.*

The Challengers' case fails because it is not materially distinguishable from *Davey* or *Hall*. The Challengers' and Amici's various arguments to the contrary are not well-founded. *Davey* and *Hall*, Op. Br. 30–42; Amici States Br. 6–24; Amici ACLJ & Davey Br. 21–22; Amici Ass'ns Br. 24–28; Amici Chaplains Br. 20–29. Moreover, they misconstrue *Davey*, misconstrue *Hall*, and misconstrue Virginia law in an unavailing attempt to shoehorn their case into precedents that do not fit it.

### 1.   Washington's scholarship program is not materially distinguishable from the TAG or STAG Programs.

The Challengers and Amici try and fail to distinguish *Davey* on the assertion that Washington's scholarship program "operate[d] differently in material ways" from Virginia's. Op. Br. 32; Amici States Br. 16–23; Amici ACLJ & Davey Br. 21–22. Here, they misread *Davey* and misread Virginia law.

30

First, the programs do not operate in materially different ways. *Hall*, 175 F.4th at 512. Davey's pastoral ministries major made him ineligible for Washington's scholarship under that State's constitutional and statutory restrictions against the funding of religious vocational training programs. *Davey*, 540 U.S. at 716; Wash. Const. art. I, § 11; Wash. Rev. Code § 28B.10.814 (1997). Similarly, the Challengers' Pastoral Leadership, Music and Worship, Religion (offered through the school of divinity), and Master of Divinity programs are ineligible under Virginia's similar constitutional and statutory restrictions against funding religious vocational training programs. Va. Const. art. VIII, § 11; Va. Code §§ 23.1-610(A), -628(A), -631(C). Nothing is materially different in this.

Second, Virginia does not simply "pick[] and choose[]" which "religious programs and people" are eligible, does not "'single out' some religious people 'for special burdens,'" and does not allow the Department "unbridled discretion." Op. Br. 33–34. There are constitutional and statutory provisions, Va. Const. art. VIII, § 11; Va. Code §§ 23.1-610(A), -628(A), -631(C), as well as Supreme Court of Virginia precedent, *Lynn*, 260 Va. 608, and regulations and a command policy, 8 Va. Admin. Code

31

§ 40-71-10; COMMAND POLICY, *supra*, ¶ 7(a)(6)(c), that govern eligibility determinations. The Challengers have had to be corrected on these points before, JA290–296, Opp'n to Injunction Pending Appeal 17–20, and their characterizations lack any sound basis.

Third, the Council's treatment of CIP Code 38-series programs as eligible and CIP Code 39-series programs as ineligible is not materially different from Washington's eligibility determinations. Op. Br. 33. And here the Challengers and Amici simply recast one of Davey's losing arguments, Op. Br. 33; Amici States Br. 17–19; Amici ACLJ & Davey Br. 21–22, despite having been made aware of it already in this litigation, JA278, JA290–291; Opp'n to Injunction Pending Appeal 18–19. Davey argued that Washington impermissibly distinguished between scholarship-ineligible "degree[s] in religion or theology . . . taught from a perspective that is 'devotional in nature or designed to induce religious faith'" and scholarship-eligible degrees in religion or theology "taught from a 'secular' point of view," Davey's Br. *17–18, *35, *75–76, *supra*. The Supreme Court rejected his argument and expressly upheld distinctions between scholarship-ineligible "training for religious professions" and scholarship-eligible "training for secular professions."

32

*Davey*, 540 U.S. at 721–22, 725. The Council is drawing the same distinction that was upheld in *Davey*. It is denying scholarships for programs that "prepare individuals for the professional practice of religious vocations," *Detail for CIP Code 39*, NCES.ED.GOV, *supra*, but not those with a secular "focus on logical inquiry, philosophical analysis, and the academic study of organized systems of belief and religious practices," *Detail for CIP Code 38*, NCES.ED.GOV, *supra. See also* Nat'l Ctr. for Educ. Stats., FREQUENTLY ASKED QUESTIONS FOR CIP WEBSITE & CIP WIZARD, *supra*, at 6. It is entirely consistent with *Davey* to deny scholarship funding for CIP Code 39-series programs in religious vocational training.

Fourth, eligibility for a TAG Program grant if the student doubles in one eligible major and one otherwise-ineligible CIP Code-39 major does not materially distinguish *Davey* or amount to a constitutional violation. Op. Br. 33. This allowance permissibly "goes a long way toward including religion in its benefits" without "evincing . . . hostility toward religion." *Davey*, 540 U.S. at 724. And, in Washington, Davey could have "use[d] [his] scholarship to pursue a secular degree at a different institution from where [he was] studying devotional theology," without giving rise to any constitutional problem. *Id.* at 721 n.4. The Council's double-major

33

allowance does not "'single[] out' some religious people 'for special burdens,'" does not distinguish this case from *Davey*, and does not violate the Constitution. *Cf.* Op. Br. 33 (quoting *Davey*, 540 U.S. at 724 n.8).

Fifth, the Challengers and Amici cannot distinguish the STAG Program by misconstruing or ignoring its governing legal standards. Op. Br. 33–34; Amici States Br. 20–21. To begin with, nothing supports the Challengers' "worst reading" of the STAG Program as excluding "*all* 'religious degrees'" or "exclud[ing] religion *completely*."[3] Op. Br. 34 (emphasis added). The governing constitutional provision and statute make clear that programs in "religious training or theological education" are ineligible, Va. Const. art. VIII, § 11; Va. Code § 23.1-610(A), consistent with *Davey*'s recognition that States may deny grant funding for religious vocational training programs, 540 U.S. at 725. In addition, nothing supports the Challengers' "alternative reading" that the STAG Program "bars *only* majors housed in a divinity school." Op. Br. 34 (emphasis added). The Supreme Court of Virginia, in *Lynn*, held that

---

[3] This differs from the Challengers' narrower (and still wrong) argument, to the district court, that STAG Program grants are not available for majors that are "too religious" or not "secular[] enough." JA250.

34

programs within a school of divinity "ha[d] a specific purpose of theological education" and are ineligible for State funding under Article VIII, § 11, 260 Va. at 608, but that does not limit ineligible programs in "religious training or theological education" to those offered through divinity schools, Va. Const. art. VIII, § 11, or to those offered for or by "Christian denominations," Op. Br. 34. And lastly, nothing supports the Challengers' assertion that the Department "has unbridled discretion to determine when the exclusion applies" because its "Command Policy makes no mention of divinity-school programs." Op. Br. 34 (emphasis added). The Department's adherence to *Lynn*, interpreting Article VIII, § 11, does not need to be spelled out in a command policy. *Kamper v. Hawkins*, 3 Va. 20 (1788). And the Challengers' failure to acknowledge *Lynn*—despite having been repeatedly made aware of it, JA133, JA144, JA272, JA278, JA295, JA296, JA298, JA299; Opp'n to Injunction Pending Appeal 4, 17, 19, 22, 23, and having even cited it in the district court, JA184, JA323, JA326—cannot support their baseless assertion that the Department's decisions are based on "unbridled discretion," Op. Br. 34. The arguments for distinguishing the STAG Program are not supported.

35

Sixth, the purportedly "conflicting rules" of the Council and Department, Op. Br. 34, do not materially distinguish Virginia's grant programs from Washington's which "chose[] not to fund [the] distinct category of [religious vocational] instruction," *Davey*, 540 U.S. at 715. The TAG and STAG Programs are subject to the same constitutional rule against funding programs in "religious training or theological education," Va. Const. art. VIII, § 11, which is incorporated in their respective governing statutes, Va. Code §§ 23.1-610(A), -628(A), -631(C), and clearly reflects Virginia's "ch[oice] not to fund a distinct category of instruction"—that of religious vocational training, *Davey*, 540 U.S. at 715; *Lynn*, 260 Va. at 624. That is not altered by the supposed anomaly of Stevens's Religion major having been ineligible under the STAG Program, though it might have been eligible under the TAG Program.[4] And that anomaly results from Liberty's and Stevens's characterizations of the major. Liberty's website states that the major provides "ministry training" in its school of divinity, *Bachelor of Science in Religion – General*, LIBERTY.EDU (archived May 14, 2025), *available at*

---

[4] Nothing supports the Challengers' suggestion, made for the first time on appeal, that the STAG Program categorically excludes CIP Code 38-series majors. *Compare* Op. Br. 35, *with* JA150–152, JA156.

https://tinyurl.com/3btbkw8m; *Lynn*, 260 Va. at 617, 640 (holding that programs in a school of divinity "ha[d] a specific purpose of theological education" and were ineligible for funding), but Liberty classifies the major within the CIP Code-38 series, LIBERTY UNIVERSITY ACADEMIC PROGRAMS, *supra*, at 9; 8 Va. Admin. Code § 40-71-10. And Stevens failed to agree that the STAG Program funding would not be used for "religious training of theological education." JA150–152. That Liberty or Stevens may have misclassified the major does not withdraw Stevens's—much less any of the other Challengers'—case from *Davey*'s coverage.

The Challengers and Amici fail to materially distinguish the TAG or STAG Programs from Washington's scholarship program that was upheld in *Davey*. Their arguments fail to grapple with points actually decided in *Davey* and with the actual law of Virginia.

### 2. It is inapposite whether the university or the Commonwealth determine the program's classification.

The Challengers and Amici also fail to undermine the constitutionality of the TAG and STAG Programs on the assertion that they incorporate "government-imposed religiosity standards." Op. Br. 35; Amici States Br. 17–23.

First, while the background section in the *Davey* opinion mentioned that "[t]he institution, rather than the State, determines whether the student's major is devotional," *Davey*, 540 U.S. at 717, nothing in the opinion suggested that this was dispositive of the scholarship program's constitutionality. This "general background information" is best treated as obiter dicta, *see Avila v. Bondi*, 170 F.4th 1128, 1136 (8th Cir. 2026); *Mansion v. United States*, 945 F.2d 1115, 1117 (9th Cir. 1991), and as "immaterial facts" that do not "meaningful[ly] differen[tiate]" *Davey* from this case, *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 271 (4th Cir. 2025). *Davey*'s "rationale"—that States may deny funding for religious vocational training programs based on their historic and substantial antiestablishment interest, 540 U.S. at 722, 725—is still "bind[ing]" here, *Express Scripts*, 128 F.4th at 271.

Second, the institution's determination of an ineligible religious vocational degree was not under "its own religious principles." Op. Br. 35. Its eligibility determinations were based on legal standards under the Washington Constitution and governing statute, *Davey*, 540 U.S. at 716; Wash. Const. art. I, § 11; Wash. Rev. Code § 28B.10.814 (1997), as

38

determinations are based upon in Virginia, Va. Const. art. VIII, § 11; Va. Code §§ 23.1-610(A), -628(A), -631(C).

Third, the TAG and STAG Programs do not involve the Council or the Department making "sensitive religious decisions" by "imposing the CIP Code's standards on private institutions" or "drawing lines . . . with no standards or guidelines on a case-by-case basis." Op. Br. 35. To begin with, the demarcation does not reflect a "sensitive religious decision[]," Op. Br. 35, but instead gives effect to "historic and substantial" State "antiestablishment interests" against compulsory taxpayer support for religious vocational training, *Davey*, 540 U.S. at 722, 725. In addition, under the TAG Program, the institution makes the eligibility determination under governing constitutional, statutory, and regulatory provisions. Va. Const. art. VIII, § 11; Va. Code §§ 23.1-628(A), -631(C); 8 Va. Admin. Code § 40-71-10. This is essentially the same institutional role that existed in *Davey*, and the Challengers are wrong in saying that "[t]he Supreme Court faced nothing similar in" *Davey*. Op. Br. 35. And lastly, as has had to be repeatedly explained in this litigation, JA294–296, Opp'n to Injunction Pending Appeal 17, 19, the Challengers are wrong in saying that the Department "draw[s] lines . . . with no

39

standards or guidelines on a case-by-case basis," Op. Br. 35. In addition to how the institution structures its programs, *e.g.*, *Master of Divinity (M.Div.)*, CATALOG.LIBERTY.EDU, *supra*; *Religion Major (B.S.)*, CATALOG.LIBERTY.EDU, *supra*; JA156, the student's agreement that the scholarship cannot "fund degrees in religious training or theological education," JA120, JA150–152, informs the Department's eligibility determination under the standards of Virginia constitutional and statutory law, Va. Const. art. VIII, § 11; Va. Code § 23.1-610(A); *Lynn*, 260 Va. at 617, 624, 640. Nothing in any of this distinguishes the TAG or STAG Programs from *Davey*'s clear recognition that States may constitutionally deny taxpayer funding for religious vocational training programs.

The challengers, again, are wrong about *Davey* and wrong about Virginia law.

### 3. *Davey* and *Hall* upheld restrictions on funding religious vocational training programs, and open-mindedness to career options does not materially distinguish the Challengers.

The Challengers and Amici are also wrong in asserting that *Davey*'s "unique facts . . . aren't present here" because the Challengers are equivocal about their ultimate career plans, because Thomas is in a

religious vocational training program related to music, or because Stevens may use his religious vocational training to become a chaplain. Op. Br. 35–37; Amici States Br. 7–10; Amici ACLJ & Davey Br. 21–22; Amici Chaplains Br. 20–29.

First, the Challengers' equivocations over their career plans, Op. Br. 35–37, do nothing to distinguish Virginia's "denial of funding for" their "vocational religious instruction," which is supported by a "historic and substantial state interest" regardless of the student's claimed intent, *Davey*, 540 U.S. at 725. In *Davey*, the Supreme Court upheld Washington's "prohibit[ion on] even indirectly funding religious instruction that will prepare students for the ministry," regardless of the student's intended or eventual use of that instruction. 540 U.S. at 719. Washington "place[d] no . . . condition on the recipient['s]" "'plans to become a minister" but "restrict[ed] only the type of instruction that the state financial aid programs will underwrite." Wash.'s Br. *41 n.7, *in Davey*, No. 02-1315, *available at* 2003 U.S. S. Ct. Briefs LEXIS 613. The "student's motivation in seeking religious instruction" did not "play any part in applicability of" Washington's prohibition. *Id.* at *58. Despite having been made aware of this multiple times in this litigation, JA271–

41

272, JA298–290; Opp'n to Injunction Pending Appeal 22–23, the Challengers and Amici persist in the misbegotten argument that they can equivocate their way out of *Davey*'s coverage. They are wrong.

Second, the Challengers are wrong to suggest that *Davey* only concerned support for ministers and does not extend to other training for religious vocations related to music. Op. Br. 35–36. While Davey wished to become a church pastor, *Davey*, 540 U.S. at 717, the Supreme Court's binding rationale extended to States' "historic and substantial" "antiestablishment interests" against funding "training for religious professions" more broadly, *id.* at 721–22, 725. *Davey*'s "focus" was "on vocational religious degrees," *Carson*, 596 U.S. at 789, and this Court has held that Virginia's denial of funding for religious vocational training in a Music and Worship major is "directly analogous to" Washington's denial of funding for Davey's religious vocational training program, *Hall*, 175 F.4th at 512, 514. So, under *Davey* and *Hall*, it is clearly constitutional for the Department to treat Thomas's Music and Worship major as ineligible under the TAG Program.

Third, Stevens's "situation" does not "materially differ[]" simply because he may eventually use his religious vocational training as a

42

chaplain in the National Guard. Op. Br. 37; Amici Chaplains Br. 20–29. Stevens's case is about the Department's denial of State funding for his religious vocational training programs, *Davey* and *Hall* upheld denials of State funding for religious vocational training programs, and that disposes of his case. He is not now a chaplain, and his "argument[] outside of *Davey*'s branch of jurisprudence," as to "[t]he Constitution's treatment of chaplains, *is inapposite* and based on a different history and interest from that concerning a State's decision not to fund religious vocational training."[5] Opp'n to Injunction Pending Appeal 25 (emphasis added). Nothing about a possible future career in the chaplaincy, *cf. Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 297–98 (1963) (suggesting, in dicta, that government provision for a military chaplain may be necessary "to avoid infringing the free exercise guarantees" where the military setting "has deprived [servicemembers] the opportunity to

---

[5] The Challengers and Amici incorrectly suggest that this was a "conce[ssion]" that the "historic and substantial state interest" identified in *Davey* "doesn't apply to" Stevens. Op. Br. 37; Amici Chaplains Br. 4, 21. The Defendants-Appellees clearly said that "[t]he Constitution's treatment of chaplains, *is inapposite*" in this case, which is all about the relevant interest "concerning a State's decision not to fund religious vocational training." Opp'n to Injunction Pending Appeal 25 (emphasis added). Nothing in this aids Stevens's case.

practice their faith at places of their choice"), requires treating his past and present religious vocational training programs outside of *Davey* or *Hall*.

Again, nothing that the Challengers or Amici say materially distinguishes *Davey* or *Hall* or identifies a constitutional violation.

### 4. The history of the "Blaine Amendment" and of the desegregation of public schools is irrelevant here.

The "Blaine Amendment" and racial-segregation arguments of the Challengers and Amici also fail to withdraw this case from *Davey*'s or *Hall*'s coverage. Op. Br. 38–40; Amici States Br. 11–16. These arguments are inapposite and unpersuasive.

First, as in *Davey*, "the provision[s] in question" here are " not . . . Blaine Amendment[s]." 40 U.S. at 723 n.7. Virginia's pertinent restrictions on funding for programs in "religious training or theological education" trace to statutes enacted in 1972 Va. Acts, ch. 18, and 1996 Va. Acts, chs. 931 & 981, and to Article VIII, § 11, which first appeared in the 1971 Virginia Constitution, 2 Howard, *supra,* at 957–58. And these restrictions reflect a "historic and substantial state interest" in "the denial of funding for vocational religious instruction," *Davey*, 540 U.S. at

724, which has a pedigree dating back to Virginia's rejection of "A Bill for Establishing a Provision for Teachers of the Christian Religion" and enactment, instead, of the Statute for Religious Freedom, *Davey*, 540 U.S. at 722 n.6, and has been reflected in Virginia's Constitution since 1830, Va. Const. art. III, § 11 (1830), and is still so today, Va. Const. art. I, § 16. Whatever President Ulysses S. Grant of Ohio, Congressman James G. Blaine of Maine, or anyone else said, meant, or intended toward Catholics or any other religious persons in the 1870s has nothing to do with any of this. *Cf.* Op. Br. 9–10; Amici States Br. 12–13. And the Challengers and Amici cannot, and do not, show any anti-Catholic or anti-religious sentiment in the adoption of the Statute of Religious Freedom, Article I, § 16, Article VIII, § 11, Va. Code § 23.1-631(C) or Va. Code § 23.1-610(A). Because "[n]either [the Challengers] nor amici have established a credible connection between the Blaine Amendment and [Virginia's] relevant constitutional [and statutory provision[s,]" "the Blaine Amendment's history is simply not before" this Court. *Davey*, 540 U.S. at 723 n.7.

Second, as in *Davey*, other constitutional provisions contended to be Blaine Amendments are "not at issue in this case." 540 U.S. at 723 n.7.

45

The Challengers and Amici fail in their attempts to tie Virginia's relevant constitutional and statutory restrictions to Article IV, § 16 and Article VIII, § 10—which do not and cannot apply to the funding determinations at issue in this case[6] and are, themselves, questionably called Blaine Amendments.[7] Op. Br. 10–13, 38–40; Amici States Br. 11, 12–14. The Challengers overstate their case in citing the 1969 Commission on Constitutional Revision's characterization that Article VIII, § 11's restriction on funding programs in religious training or theological education "was based on 'the wall of separation between church and state so carefully erected in *other sections* of the [Virginia] Constitution."

---

[6] Article VIII, § 11 operates to displace "the restrictions which might otherwise apply because of [Article VIII, §] 10" and, thus, rendering "Section 10 . . . inapposite." *Miller v. Ayres*, 213 Va. 251, 261 (1972). And the matter of legislative appropriations to churches, sectarian societies, charitable institutions, and reform institutions, Va. Const. art. IV, § 16, do not bear on Article VIII, § 11's application or meaning.

[7] Contrary to the assertions of the Challengers and their Amici, Op. Br. 10, 11; Amici States Br. 13–14, coverage of "any church or sectarian society" under Article IV, § 16, and of any "public and nonsectarian private schools and institutions of learning" under Article VIII, § 10, should not be automatically read to single out Catholicism, *cf., e.g.*, 4 UNIVERSAL DICTIONARY OF THE ENGLISH LANGUAGE 4175 (1897) (defining "sect" as "a denomination : especially applied to a religious denomination"). And the interpretation of those inapposite constitutional provisions does not need to be resolved in this case.

46

Op. Br. 38–39 (alteration in original) (quoting REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION, *supra*, at 274). That is not "a direct signpost to" any "Blaine-Amendment-inspired provision." Op. Br. 39. Instead, it points to Thomas Jefferson's famous letter to the Danbury Baptist Association expressing that "religion is a matter which lies solely between Man & his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, & not opinions" and that the Establishment and Free Exercise Clauses "build[] a wall of separation between Church & State . . . in behalf of the rights of conscience." Letter from Thomas Jefferson to the Danbury Baptist Ass'n (Jan. 1, 1802), *reprinted in* 36 THE PAPERS OF THOMAS JEFFERSON 258 (Barbara B. Oberg, ed.) (2009). And it points to the constitutional "sections," consistent with those principles, then existing in Article I, § 16 and Article IV, § 58. REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION, *supra*, at 100–01. Those sections—combined, since 1971, in Article I, § 16—respectively trace to James Madison's contribution to Virginia's 1776 Declaration of Rights and to Thomas's Jefferson's Statute for Religious Freedom. REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION, *supra,* at 100–01. It is inaccurate for the

47

Challengers and Amici to suggest that there is anything anti-Catholic or anti-religious in this. *See also Falwell*, 198 F. Supp. 2d at 786 (cautioning against haphazard characterizations of unconstitutionality in Virginia law tracing to the Statute for Religious Freedom).

Third, the constitutional experience with public school desegregation is not relevant to this case, either. Article VIII, § 11 was not adopted "to serve racial segregation," Amici States Br. 16; *cf. also* Op. Br. 11–12, but adopted—almost two decades after *Brown v. Board of Education of Topeka*, 344 U.S. 1 (1952)—in 1971 for the benign purpose of supporting Virginians' education at private colleges and universities in the Commonwealth while respecting diversity in matters of religion and conscience, 2 Howard, *supra*, at 957–58; REPORT OF THE COMM'N ON CONSTITUTIONAL REVISION, *supra*, at 273; *see also* Op. Br. 12 ("[I]n 1971, massive resistance to desegregation was over."). So the history of racial segregation in public schools "is simply not before" this Court, either. *See Davey*, 540 U.S. at 723 n.7.

The Challengers' and Amici's "Blaine Amendment" and racial-segregation arguments are misplaced and do not help their case.

48

### 5. The Challengers' "new arguments" do not materially distinguish them from Davey or Hall.

The Challengers are also wrong in asserting that this "Court must delve deeper into the First Amendment" here because they "raise new arguments" that *Davey* "didn't rule on . . . because Davey didn't raise them" and are "based, at least in part, on precedent that did not exist" when *Davey* was decided. Op. Br. 38, 42–57. And they are wrong in contending that *Hall* is inapposite because they raise different and additional arguments from the ones Hall did. Op. Br. 40–42.

The precedential effects of *Davey* and *Hall* "do[] not disappear just because" the Challengers wish to trailblaze with some "fact, theory, or line of argument" that was not raised or decided in *Davey* or *Hall*. *Gibbons*, 99 F.4th at 213. All they are doing is trying to "ignore [*Davey*'s and *Hall*'s] holding[s], straining for a reason not to be bound by what [those cases] said." *Doe*, 2025 WL 2375386, at *9. And the weaknesses of their "new arguments," Op. Br. 38, are made all the more apparent by their repeated attempts treat *Davey*, *Hall*, and Virginia law as something other than what they actually are.

49

*Davey* and *Hall* apply, there is no basis to treat those cases as anything other than "normal First Amendment rules," and the Challengers' arguments, all in all, fail. Op. Br. 42.

### a.    The Challengers' discrimination argument is misplaced.

The Challengers incorrectly argue that the TAG and STAG Programs unconstitutionally "discriminate based on religious character, activity, or use." Op. Br. 42.

First, they incorrectly rely on *Trinity Lutheran*, *Espinoza*, and *Carson*. Op. Br. 42–45. In doing so, they act as if *Hall* did not distinguish those cases and act as if *Trinity Lutheran*, *Espinoza*, and *Carson* did not distinguish themselves from *Davey* and did not each "reaffirm" *Davey*. *Hall*, 175 F.4th at 514–16. That is not how these precedents are to be treated. *Gibbons*, 99 F.4th at 213; *Payne*, 998 F.3d at 654; *Doe*, 2025 WL 2375386, at *9.

Second, the Challengers are, again, wrong in how they characterize the TAG and STAG Programs. The test for eligibility is not whether the majors are "consider[ed] too 'sectarian'" under Article IV, § 16 or Article VIII, § 10, Op. Br. 44 (selectively quoting Va. Const. art. IV, § 16, and Va. Const. art. VIII, § 10), which have absolutely no application here, *see*

50

*supra* note 6 & corresponding text. Instead, the Challengers' majors are ineligible because they are for "religious training or theological education," Op. Br. 44 (quoting Va. Const. art. VIII, § 11), which means religious vocational training under Supreme Court of Virginia precedent, *Lynn*, 260 Va. at 624. And that is clearly compatible with *Davey* and *Hall*.

The discrimination argument fails.

### b.    The Challengers' neutrality/general-applicability argument is misplaced.

The Challengers incorrectly argue that the TAG and STAG Programs violate the Free Exercise Clause because they are not "neutral and generally applicable." Op. Br. 45–49.

First, they are wrong again in trying to tie Article VIII, § 11 to a "Blaine Amendment" or any anti-Catholic or anti-religious bigotry. *Compare* Op. Br. 45–47, *with supra* Argument pt. I.B.4. Article VIII, § 11's limitations on funding for "religious training or theological education"—i.e., religious vocational training programs, *Lynn*, 260 Va. at 624—trace to neutral antiestablishment principles in which States have historic and substantial interests consistent with the Free Exercise Clause, *Davey*, 540 U.S. at 721–22, 725.

Second, the Challengers again impermissibly act like *Davey* does not exist in asserting that the TAG and STAG Programs' non-funding of programs in "'religious training or theological education,'" "[b]y definition," has "the 'object or purpose' of . . . 'suppress[ing] . . . religion or religious conduct.'" Op. Br. 47 (quoting Va. Const. art. VIII, § 11, and *City Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993)). The Supreme Court rejected Davey's contention that the non-funding of his religious vocational training program was "not facially neutral with respect to religion" and held that "accept[ing]" his argument "would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Davey*, 540 U.S. at 715. Nothing takes this case out of *Davey*'s branch of jurisprudence and puts it into *Lukumi*'s—which concerned the unconstitutional criminalization of ritualistic animal sacrifices conducted according to the Santeria religion. 508 U.S. 520.

Third, the Challengers fail to show a lack of neutrality in how religious vocational training programs are treated relative to secularly-focused studies of religion. Op. Br. 47–48. Again, Davey made and lost this argument in the Supreme Court. *See supra* Argument pt. I.B.1. The Council's incorporation of the distinction between CIP Code 39-series

52

religious vocational training programs from secularly-focused CIP Code 38-series programs is constitutional under *Davey*. *See supra* Argument pt. I.B.1. And the apparent anomaly in the Department's treatment of Stevens's Religion major, relative to the way that the Council would apparently treat it, owes to Liberty's and Stevens's characterizations on the matter. *See supra* Argument pt. I.B.1. None of this shows that "Virginia law 'disfavor[s] [Plaintiffs'] religion." Op. Br. 48 (alteration in original) (quoting *Lukumi*, 508 U.S. at 532).

Fourth, the Challengers are wrong in arguing that the TAG and STAG Programs "aren't generally applicable . . . because they 'provide[] . . . mechanism[s] for individualized exemptions." Op. Br. 48–49 (alterations & second omission in original) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022)). The Challengers fail to identify any case finding an exemption, like any in the TAG and STAG Programs that they argue, to be unconstitutional. Op. Br. 48–49. And there is certainly nothing in those Programs like the offending exemption, in *Fulton v. City of Philadelphia*, that allowed the government, for any reason that it chose, to waive a requirement that

53

agencies provide services to prospective foster parents regardless of their sexual orientation. 593 U.S. 522, 534–38 (2021).

To begin with, the complained-of TAG Program exception for "disability or other medical reasons," Op Br. 48 (quoting 8 Va. Admin. Code § 40-71-40(C)(2)(c)), is to a "full-time student" condition for grant awards, has nothing to do with religious or theological matters, and is made "applicable under the federal Americans with Disabilities Act," 8 Va. Admin. Code § 40-71-40(C)(2)(c)). This does not violate the Challengers' constitutional rights.

Additionally, the non-substantive, per-semester accommodation for double majors—where an otherwise-eligible student is made ineligible because his coursework in the ineligible major exceeds that in the eligible major for that semester—only applies in "circumstances beyond the control of the student." 8 Va. Admin. Code § 40-71-10 (subpart (5)(b)(5) of the definition of "Eligible institution"); *cf.* Op. Br. 49. Those circumstances would seem to be limited to when it is impossible to select the appropriate proportion of courses as a result of the alignment of the institution's course offerings, or the available times for the courses

54

offered, in that particular semester. And nothing in that amounts to a constitutional violation.

Further, the Challengers' characterizations of the Department's administration of the STAG Program's "religious training and theological education" limitation are, as has had to be explained repeatedly to them, completely wrong. *See supra* Argument pts. I.B.1, I.B.2. Those eligibility determinations are governed by Supreme Court of Virginia precedent and constitutional and statutory standards with further guidance in the form of the Command Policy. *Lynn*, 260 Va. at 617, 624, 640; Va. Const. art. VIII, § 11; Va. Code § 23.1-610(A); COMMAND POLICY, *supra.* The Department does not have "virtually unlimited" authority, and the Command Policy's reference to ineligible "'theology degrees'"—with the example of those offered in a "'seminary school'"—is not "of the [Department's] own making" but specifically references Article I, § 16. Op. Br. 49 (quoting JA99), *with* JA99. *See also Lynn*, 260 Va. at 624 (interpreting Article VIII, § 11's use of "theological education" to include "a seminary or other institution whose purpose is to prepare students for vocations associated with ordination, such as rabbi, minister or priest"). And the apparent anomaly in how Stevens's Religion major is treated

55

across different Programs does not amount to an exception offending the Constitution. *See supra* Argument pt. I.B.1

Further, the STAG Program's discrete exemptions for "those studying 'outside of Virginia,'" "unable to re-enlist," or subject to 'recoupment,'" Op. Br. 49 (quoting JA99–100, JA105), have nothing to do with religious or theological matters and do not violate the Challengers' rights.

Again, nothing in what the Challengers says about any of this undermines the constitutionality of the TAG and STAG Programs.

### c. The Challengers' denominational-preference argument is misplaced.

The Challengers contend that the TAG and STAG Programs "pick and choose religious favorites" and "'impose[] a denominational preference.'" Op. Br. 50–53 (alteration in original) (quoting *Catholic Charities*, 605 U.S. at 254). But they do not identify any religion that is favored, or any denomination that is preferred, relative to their own. And their arguments, again, retread what Davey argued and lost.

*Catholic Charities* is not "directly on point." Op. Br. 29. In that case, the Supreme Court held that Wisconsin violated the Free Exercise Clause in denying a religious tax exemption to Catholic charitable

organizations because, in "their current charitable services," they did not "engage[] in proselytization or limit[] their services to fellow Catholics." 605 U.S. at 249. The challengers' "Catholic faith . . . barr[ed] them from satisfying those criteria," while certain evangelical Protestant faiths had "adopted a contrary approach" and, therefore, would qualify for the tax exemption. *Id.* at 250 (citing Amici Religious Liberty Scholars Br. 12, *in Catholic Charities Bureau v. Wis. Labor & Industry Review Comm'n*, No. 24-154 (U.S.), *available at* https://tinyurl.com/yjeu6xy8); *see also* Amici Religious Liberty Scholars Br. 12–13, *supra.* Thus, "Wisconsin's exemption . . . grant[ed] a denominational preference by explicitly differentiating between religions based on theological practices." 605 U.S. at 250. The Catholic organizations were ineligible because of their "inherently religious choices (namely, whether to proselytize or serve only co-religionists)" while certain evangelic Protestants' religious beliefs allowed for their eligibility. *Id.*

The Challengers fail to identify any religion that is favored, or any denomination that is preferred, through the TAG and STAG Programs. They merely repeat their arguments over the Programs' distinction between ineligible religious vocational training programs and eligible

secularly-focused studies of religion, Op. Br. 51–53, without acknowledging that Davey made and lost substantially the same arguments in the Supreme Court, *see supra* Argument pt. I.B.1. And they continue to mischaracterize the TAG and STAG Programs, *compare* Op. Br. 51–52, *with supra* Argument pts. I.B.1, I.B.2, in ways that still do not identify any favored religion or denomination preferred as in *Catholic Charities*.

The Challengers' losing arguments fail to take this case out of *Davey*'s and *Hall*'s coverage and fail to subject the TAG and STAG Programs to "the highest level of judicial scrutiny." Op. Br. 53 (quoting *Catholic Charities*, 605 U.S. at 254).

### d.     The Challengers' excessive-entanglement argument is misplaced.

The Challengers' excessive-entanglement arguments also fail, again relying on inapposite precedent instead of *Davey* and *Hall*, and again mischaracterizing the TAG and STAG Programs. Op. Br. 53–55.

The Challengers rely largely on the Tenth Circuit's materially-distinguishable decision in *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008). Op. Br. 53–55. The restrictions in the Colorado scholarship program there at issue differed considerably from

58

those at issue in *Davey*, *Hall*, and this case. The Colorado scholarships could not be used at any institution of higher education that was "pervasively sectarian." 534 F.3d at 1250 (quoting Colo. Rev. Stat. §§ 23-3.5-102(3)(b), -3.3-101(3)(d), -3.7-102(3)(f), -18-102(9)). Such an institution was "deemed not to be pervasively sectarian if it me[t] the following criteria":

- the institution's "faculty and students are not exclusively of one religious persuasion;"

- it did "no[t] require[] attendance at religious convocations or services;"

- it had "a strong commitment to principles of academic freedom;"

- there were "no required courses in religion or theology that tend to indoctrinate or proselytize;"

- its "governing board does not reflect nor is the membership limited to persons of any particular religion;" and

- its "[f]unds do not come primarily or predominantly from sources advocating a particular religion."

*Id.* at 1250–51 (quoting Colo. Rev. Stat. §§ 23-3.5-105, -3.3-101(3)(d), -3.7-104). Colorado's eligibility distinction "expressly discriminate[d] among religions" by "allowing aid to 'sectarian' but not 'pervasively sectarian' institutions." *Id.* at 1256. And its six-factor inquiry into the religious

59

affiliations, beliefs, practices, activities, and funding of the school, its leadership, its faculty, and its students were held to be overly "intrusive." *Id.*

Nothing in the TAG or STAG Programs entangles the Council or the Department in such matters as the religious affiliations, beliefs, practices, activities, and funding of any college or university, its leadership, its faculty, or its students. Instead, the question is simply whether a given program is for "religious training or theological education," Va. Const. art. VIII, § 11; Va. Code §§ 23.1-610(A), -631(C), which are plainly religious vocational education programs, *Lynn*, 260 Va. at 624, that may be identified and denied State funding consistent with *Davey* and *Hall*. The Council's incorporation of the distinction between CIP Code 39-series religious vocational training programs from secularly-focused CIP Code 38-series programs, again, does not support the Challengers' argument. *Compare* Op. Br. 53–54, *with supra* Argument pt. I.B.1. And nothing in the Department's application of governing constitutional and statutory standards, in view of the public-facing representations of the University or the express statement of the applicant, amounts to "broad discretion," "'contentious religious

60

judgment[]'" or "'intrusiveness.'" *Compare* Op. Br. 54–55 (quoting *Colo. Christian*, 534 F.3d at 1262, 1266), *with supra* Argument pts. I.B.1, I.B.2. There is no problem of excessive entanglement here.

The Challengers again fail in their attempt to miscast the TAG and STAG Programs as unconstitutional.

### e.    The Challengers' strict-scrutiny argument is misplaced.

Finally, the Challengers fail to show that the TAG and STAG Programs are subject to strict scrutiny, much less support a proposition that the Programs cannot survive under such scrutiny. Op. Br. 55–56. Here, they rehash their earlier-stated mischaracterizations of Virginia law along with selective quotations from their preferred precedents. Just as the Supreme Court in *Davey*, and this Court in *Hall*, "resolved the case" in the State's favor "without applying any particular level of scrutiny," *Hall*, 175 F.4th at 518 (Richardson, J., concurring), this Court can and should do so here, *Gibbons*, 99 F.4th at 213; *Payne*, 998 F.3d at 654; *Doe*, 2025 WL 2375386, at *9.

The Challengers' case fails on the merits. This Court should, accordingly, affirm the district court's denial of the preliminary injunction and its dismissal of Johnson's and Thomas's claims.

## II. The Challengers are not irreparably harmed without the preliminary injunction.

The preliminary injunction should also not issue because the Challengers are not "likely to suffer irreparable harm in [its] absence." *Winter*, 555 U.S. at 20.

First, the Challengers' claimed "hardship" of having to fund their education through other means "is a burden successfully borne by many college students each year." Order Denying Mot. for Prelim. Inj. (Mar. 17, 2000), *in Davey v. Locke*, No. C00-61R (W.D. Wash.). And they fail to establish any such hardship that is so "indisputably clear" as to justify the "disfavored" mandatory preliminary injunction that they seek. *2311 Racing*, 139 F.4th at 408 (quoting *Sun Microsystems*, 333 F.3d at 524–25, and *Taylor*, 34 F.3d at 270 n.2).

Second, because there is no constitutional violation, there is no such irreparable harm to the Challengers. Op. Br. 57. Instead, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people"—or constitutional provisions ratified by the people themselves—"it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351

62

(1977) (Rehnquist, J., in chambers)). Granting the preliminary injunction, thus, would irreparably harm Virginia, while denying it would not irreparably harm the Challengers.

This factor does not support the Challengers' requested injunction.

## III. The balance of the equities and the public interest disfavor the requested preliminary injunction.

Finally, neither the "balance of equities" nor the "public interest" support the preliminary injunction. *Winter*, 555 U.S. at 20.

The relative hardships are such that Virginia would suffer more harm from the injunction than the Challengers would without it. *See also supra* Argument pt. II. And there is little, if any, assurance that the Council or the Department would be able to recoup any funds that the Challengers would have received and used, if a preliminary injunction were granted and the Challengers ultimately lost on the merits.

And the public interest does not support the injunction, either. "[I]t is in the public interest to uphold the will of the people, as expressed by acts of the state legislature," and by the provisions of the state constitution, when they "appear harmonious with the Constitution." *Pavek v. Simon*, 967 F.3d 905, 909 (8th Cir. 2020). That is the case here under binding and controlling precedent. Moreover, the public interest

63

against funding the challengers' religious vocational training has a "historic and substantial" lineage in Virginia, *Davey*, 540 U.S. at 721 & 722 n.6; *see also supra* Statement pt. A, which would be disserved if the preliminary injunction were awarded.

The preliminary injunction should not issue.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of the preliminary injunction and its dismissal of Johnson's and Thomas's claims.

Respectfully submitted,

/s/ Robert S. Claiborne, Jr.
ROBERT S. CLAIBORNE, JR.
CHRISTOPHER P. BERNHARDT
 *Assistant Attorneys General*

JAY JONES
 *Attorney General*

GRETCHEN E. NYGAARD
 *Deputy Attorney General*

JACQUELINE C. HEDBLOM
 *Senior Assistant Attorney General/Trial Section Chief*

CALVIN C. BROWN
 *Senior Assistant Attorney General/Civil Unit Manager*

July 10, 2026

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 482-2275 – Telephone
(804) 371-2087 – Facsimile
rclaibornejr@oag.state.va.us
cbernhardt@oag.state.va.us

*Counsel for Appellees*

64

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Rule 32(a)(7)(B) because it contains 12,210 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook typeface.

/s/ Robert S. Claiborne, Jr.
ROBERT S. CLAIBORNE, JR.
*Assistant Attorney General*

## CERTIFICATE OF SERVICE

I certify that on July 10, 2026, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Robert S. Claiborne, Jr.
ROBERT S. CLAIBORNE, JR.
*Assistant Attorney General*