No. 26-1437

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CAMERON JOHNSON; LUKE THOMAS; and TRACE STEVENS,

*Plaintiffs-Appellants,*

v.

A. SCOTT FLEMING, in his official capacity as the Director of the State Council of Higher Education for Virginia; JOHN JUMPER, in his official capacity as the Chair of the State Council of Higher Education for Virginia; MAJOR GENERAL JAMES W. RING, in his official capacity as the Adjutant General of Virginia; and DONALD L. UNMUSSIG, in his official capacity as the Chief Financial Officer of the Virginia Department of Military Affairs,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of Virginia
Case No. 3:25-cv-00407-RCY

## REPLY BRIEF OF APPELLANT

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
jreed@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Ryan J. Tucker
Jeremiah J. Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

David A. Cortman
Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFflegal.org

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Table of Authorities..................................................................................ii

Introduction.......................................................................................... 1

Argument............................................................................................... 2

I.     Virginia's brief admits three key points. ....................................... 2

II.    *Locke* doesn't control this case. ..................................................... 4

III.   *Hall* is limited and doesn't apply here............................................13

IV.   Virginia's grants discriminate based on religious use. ................ 16

V.    Virginia's grants aren't neutral or generally applicable. ............. 17

       A.    Virginia's grants aren't neutral. ......................................... 17

       B.    Virginia's grants aren't generally applicable. ...................... 21

VI.   Virginia's grants impose a denominational preference................ 23

VII.  Virginia's grants result in excessive entanglement. .................... 24

VIII. Strict scrutiny applies, and the students satisfy the
       remaining preliminary-injunction factors. ................................... 25

Conclusion ..........................................................................................27

Certificate of Compliance...................................................................28

Certificate of Service ......................................................................... 29

i

# TABLE OF AUTHORITIES

**Cases**

*Ameur v. Gates,*
  759 F.3d 317 (4th Cir. 2014) ...................................................... 4, 13

*Art & Antique Dealers League of America v. Seggos,*
  121 F.4th 423 (2d Cir. 2024) ........................................................ 14

*Bates v. Pakseresht,*
  146 F.4th 772 (9th Cir. 2025) .................................................. 22, 23

*Carson ex rel. O.C. v. Makin,*
  596 U.S. 767 (2022) ........................................................... 16, 17, 24

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry
  Review Commission,*
  605 U.S. 238 (2025) ........................................................... 7, 11, 23

*Colorado Christian University v. Weaver,*
  534 F.3d 1245 (10th Cir. 2008) ............................................. passim

*Espinoza v. Montana Department of Revenue,*
  591 U.S. 464 (2020) ...................................................... 16, 17, 18, 26

*Fernandez v. Keisler,*
  502 F.3d 337 (4th Cir. 2007) ........................................................ 8, 9

*Fowler v. Rhode Island,*
  345 U.S. 67 (1953) ........................................................................ 21

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021) ...................................................................... 21

*Gibbons v. Gibbs,*
  99 F.4th 211 (4th Cir. 2024) ......................................................... 12

*Hall v. Fleming,*
  175 F.4th 510 (4th Cir. 2026) ....................................... 1, 14, 15, 16

*In re Liotti*,
   667 F.3d 419 (4th Cir. 2011) ...........................................................6

*Keathley v. Buddy Ayers Construction, Inc.*,
   146 S. Ct. 1532 (2026) ....................................................................1

*Kennedy v. Bremerton School District*,
   597 U.S. 507 (2022) .......................................................................17

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) .......................................................................15

*Locke v. Davey*,
   540 U.S. 712 (2004) ............................................................... passim

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025) .......................................................................26

*Margolin v. National Association of Immigration Judges*,
   146 S. Ct. 1285 (2026) ...................................................................15

*New England Mutual Life Insurance Company v. Mitchell*,
   118 F.2d 414 (4th Cir. 1941) .........................................................14

*Payne v. Taslimi*,
   998 F.3d 648 (4th Cir. 2021) ................................................... 13, 14

*Perry v. Marteney*,
   172 F.4th 315 (4th Cir. 2026).........................................................22

*Powell v. Maryland Trust Company*,
   125 F.2d 260 (4th Cir. 1942) .........................................................14

*Riley v. Bondi*,
   606 U.S. 259 (2025) .......................................................................14

*Thomas v. EOTech, LLC*,
   169 F.4th 259 (4th Cir. 2026).....................................................4, 13

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017) ............................................................... passim

iii

*United States v. Buster,*
    26 F.4th 627 (4th Cir. 2022) ............................................................5

*United States v. Sineneng-Smith,*
    590 U.S. 371 (2020) ......................................................................15

*Virginia College Building Authority v. Lynn,*
    538 S.E.2d 682 (Va. 2000) ..............................................................3

*Watson v. Jones,*
    80 U.S. (13 Wall.) 679 (1872) .......................................................11

*Wolford v. Lopez,*
    609 U.S. __, No. 24-1046, 2026 WL 1825723 (June 25, 2026) .......26

## Statutes

8 Va. Admin. Code § 40-71-10 .............................................................22

8 Va. Admin. Code § 40-71-40 .............................................................22

## Other Authorities

1 *Report of the Proceedings & Debates of the Constitutional
    Convention of the State of Virginia (1901–1902)* (Hermitage
    Press 1906) ...................................................................................20

Bryan A. Garner et al., THE LAW OF JUDICIAL PRECEDENT
    (2016) ................................................................................... passim

*Comm'n on Constitutional Revision*, THE CONSTITUTION OF VA.
    (1969) ...........................................................................................19

*Liberty Univ. Announces New School of Divinity*, LIBERTY
    UNIVERSITY (Mar. 5, 2015) ............................................................24

*Nat'l Guard Postsecondary Educ. Grant: Program Manual for Fin.
    Aid Adm'rs 2026-27*, WASH. STUDENT ACHIEVEMENT COUNCIL .....10

*Search Degree Inventory*, STATE COUNCIL OF HIGHER EDUC. FOR VA. ......23

## INTRODUCTION

Virginia deprives Cameron Johnson, Luke Thomas, and Trace Stevens of thousands of dollars of educational grants based solely on their religion. In so doing, Virginia does not value them as "member[s] of the community" worthy of the same public benefits enjoyed by their peers. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). Yet Virginia blames the *students* for seeking equal treatment, claiming the real victims are other "taxpayers" with inchoate and unenforceable objections to equal-educational funding. Response.Br.1. That argument is based on *Locke v. Davey*, 540 U.S. 712 (2004), a constitutional aberration and "stain on our Free Exercise jurisprudence" that's on its last legs. *Hall v. Fleming*, 175 F.4th 510, 520 (4th Cir. 2026) (Richardson, J., concurring).

Thankfully, the circumstances here are very different from *Locke* and *Hall*. So neither decision controls. Virginia's contrary arguments misconceive the nature of precedent. The law isn't a "one-size-fits-all" enterprise. *Keathley v. Buddy Ayers Constr., Inc.*, 146 S. Ct. 1532, 1540 (2026). And *Locke* didn't address conflicting religious exclusions, discrimination among religions, or individualized exemptions. Nor did it anticipate the subsequent development of First Amendment precedent.

The students are thus entitled to a preliminary injunction. The Court should reverse and remand with instructions for the district court to enter one without delay.

1

## ARGUMENT

### I. Virginia's brief admits three key points.

Virginia concedes three important points. *First*, the Founding-era concern was *mandatory tithes* to support clergy salaries and church buildings. Opening.Br.4–8. That is what "Support and Maintenance of the Church as by Law Established" and "the Regular Collecting and Paying of Parish Levies, as Relates to the Payment of the Salaries … Given to …Clergy" means. Response.Br.5. The Commonwealth cites no instance where Virginia's Founding generation objected to state-funded education—religious or not. It even accepts that the General Assembly funded religious schools that trained ministers. OpeningBr.6–8. Though Virginia claims this practice violated An Act for Establishing Religious Freedom, no one objected at the time. Response.Br.6. The Commonwealth's only supporting evidence is a state constitutional amendment drafted 182 years later. Response.Br.7.

*Second*, Virginia doesn't dispute that CIP Code 38-series and 39-series degrees are *functionally identical*. Opening.Br.16–18. The Commonwealth never contests Code 38-series degrees' religiosity or preparation of students for ministry, just like their Code 39-series counterparts. It identifies no significant difference in Code 38-series and 39-series course requirements. And Virginia tacitly accepts that Code 39-series programs most often lead to secular careers, like other college degrees.

*Third*, Virginia agrees that VANGSTAP's religious exclusion turns on the Guard's *unbridled discretion*. The Guard's standards aren't "spelled out in a command policy." Response.Br.35. It enforces unwritten rules that contradict the State Council of Higher Education's regulations, claiming to implement a Virginia Supreme Court decision that applies to *both* agencies. Response.Br.35–36, 53. (Whatever the Virginia Supreme Court said in *Virginia College Building Authority v. Lynn*, 538 S.E.2d 682 (Va. 2000), the issue here is how the State Council of Higher Education and the Guard *implement* state law. *Contra* Response.Br.35, 55. VTAG's and VANGSTAP's religious exclusions fundamentally differ and conflict, as the Guard concedes. JA.123; *accord* Response.Br.13–14.)

The Guard discloses only two factors that it considers: (1) whether the major is offered through a "school of divinity" and (2) whether Guard members pledge that their program isn't "religious training or theological education." Response.Br.14, 36. Yet the first criterion is a sham because the Guard "does not limit ineligible programs … to those offered through divinity schools," Response.Br.35, and the second is an unconstitutional condition, Opening.Br.54–55. So in the end, the Guard exercises unconstitutional discretion on a case-by-case basis, Opening.Br.21–22, 34, second-guessing the CIP Code designations that religious schools give their own programs, Response.Br.14, 37.

3

## II.   *Locke* doesn't control this case.

Virginia says that *Locke* controls this case. Response.Br.20–50. But *Locke*'s "general language" can't be separated from its "context." *Thomas v. EOTech, LLC*, 169 F.4th 259, 268 (4th Cir. 2026) (citation modified). That general language applies only to situations "similar to the circumstances then before the Court" in *Locke*, not to the "*quite different circumstances*" presented here. *Id.* (citation modified, emphasis added).

*First,* Virginia's "broadest-possible-reading approach [to *Locke*] is inconsistent" with how this Court "appl[ies] Supreme Court opinions." *Ameur v. Gates*, 759 F.3d 317, 324 (4th Cir. 2014). Prior courts can't address "every … variation which might be suggested by the circumstances of [other] cases not before" it. *Id.* (citation modified). So this Court reads "general expressions, in every opinion, … in connection with *the case in which those expressions are used.*" *Id.* (citation modified, emphasis added); *accord Thomas*, 169 F.4th at 268.

Virginia flouts this principle, giving *Locke* a boundless reading that unmoors the decision from its context. Specifically, Virginia says that *Locke* allows States to "constitutionally deny taxpayer funding for religious vocation training programs" *no matter the circumstance.* Response.Br.40; *accord* Response.Br.18, 29. That argument conflicts with what the Tenth Circuit has ruled: that *Locke* "does not imply that [S]tates are free to discriminate in funding against religious institutions

4

[or degrees] *however they wish*" and that States' "latitude with respect to [such] funding decisions *has limits.*" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1255–56 (10th Cir. 2008) (emphasis added). This Court should not overread *Locke*.

*Second*, *Locke*'s holding is precise and narrow: the Supreme Court "uph[eld] the Promise Scholarship Program *as currently operated* by the State of Washington." *Locke*, 540 U.S. at 725 (emphasis added). When the Court "tries to make its holding explicit, [courts] should pay close attention to how it formulates that holding." Bryan A. Garner et al., THE LAW OF JUDICIAL PRECEDENT 59 (2016). That is especially true of "specific" statements in Supreme Court holdings, which have more "precedential value" than "general ones." *Id.* at 58.

The upshot is that *Locke* upheld Washington's scholarship and grant programs that operate in materially similar ways. *Accord id.* at 21 ("Like cases should be decided alike."). *Locke* didn't write a blank check for States to discriminate against religion anyway they see fit. *Contra* Response.Br.23–24. Ignoring the Court's expressly limited holding would "abuse" *Locke*, not apply it. Garner, *supra*, at 93.

*Third*, *Locke* doesn't apply to the "quite different circumstances" here. *United States v. Buster*, 26 F.4th 627, 633 (4th Cir. 2022) (quotation omitted). Virginia's contrary argument hinges on considering VTAG and VANGSTAP piecemeal. Response.Br.30–35. That misses the forest for the trees.

*Locke* said that Washington chose not to fund "a distinct category of instruction" because the case involved *one* grant with *one* uniform religious exclusion. 540 U.S. at 721. But this case involves *two* grants that employ *contradictory* religious exclusions. Opening.Br.21, 41. And Virginia doesn't try to meaningfully explain the difference. It just blames the victims—Trace and Liberty University—who have no control over Virginia's conflicting standards. Response.Br.36–37, 53.

*Locke* also concluded that Washington's "overall approach" didn't "single[ ] out anyone for special burdens" because it treated all religious majors the same. 540 U.S. at 724 n.8 (citation modified). Virginia's does the opposite by playing favorites. For example, VTAG *funds* civilians who double major in secular programs and applies a *narrower* religious exclusion, whereas VANGSTAP *excludes* Guard members who double major and applies a *broader* religious exclusion. Opening.Br.14, 19–22. So Virginia "singles out" Guard members "for special burdens" civilian students don't face. *Locke*, 540 U.S. at 724 n.8 (citation modified).

Virginia says it singles out no one. Response.Br.31, 34. But "facts are stubborn things," and the State's conclusory assertions can't "alter the … evidence." *In re Liotti*, 667 F.3d 419, 429 (4th Cir. 2011) (quotation omitted). The record shows that if Joshua Davey had double-majored "in pastoral ministries and business management/administration" in Virginia, he would have received VTAG, *Locke*, 540 U.S. at 717, while Cameron, who single majored in Pastor Leadership, is *denied* it,

6

Opening.Br.23–24. Virginia targets certain students who are focused on pursuing religious degrees.

VTAG also engages in religious favoritism. On one hand, VTAG *funds* CIP Code 38-series majors, which the evidence shows may "prepare individuals for the professional practice of religious vocations." Response.Br.33 (quotation omitted); *accord* Opening.Br.16–18. On the other, VTAG *excludes* Code 39-series majors that do the same thing. Opening.Br.15–18. The distinction turns not on how a religious major *functions* but on how that major is *labeled*. Virginia punishes students for choosing majors that *look* sectarian or too religious, which "singles out" those who pursue Code 39-series majors based on their "religious calling." *Locke*, 540 U.S. at 724 n.8 (citation modified).

Ask Cameron, whose Code 39-series undergraduate major is VTAG *ineligible*, while Trace's Code 38-series major was VTAG *eligible*. Opening.Br.34. *Locke* confronted no such arbitrary distinction. *Contra* Response.Br.33. And *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238 (2025), condemns it. By punishing majors that may focus more on devotionalism and rewarding majors that may focus more on objective study, Virginia "establishes a preference for certain religio[us]" beliefs, *id.* at 250, and "facially favors some [religious students] over others," *id.* at 252.

VANGSTAP is worse. Though Washington went "a long way toward including religion in its benefits," *Locke,* 540 U.S. at 724,

VANGSTAP doesn't. *Contra* Response.Br.33–35. Virginia confirms that the Guard exercises unbridled discretion over VANGSTAP's religious exclusion. The Guard declines to reduce its criteria for a devotional-theology degree to a written policy, Response.Br.35, and discloses only two applicable factors, Response.Br.14, 36. But the Guard later negates the first divinity-school factor, Response.Br.35, and *Locke* seems to disapprove the second certification-signing factor, 540 U.S. at 717 n.1. Plus, the Guard second-guesses religious schools' CIP Code classification of their own majors. Response.Br.14, 37. So the only one who knows what VANGSTAP excludes is the Guard, and the Guard isn't telling. That allows state officials to pick and choose among religious programs and people, rewarding some and punishing others. Washington's scholarship permitted nothing of the sort. *Locke*, 540 U.S. at 717.

*Fourth*, *Locke*'s "authority as precedent is limited to the points of law raised by the record, considered by the [C]ourt, and determined by the outcome." Garner, *supra*, at 84. So Virginia's claim that *Locke* "binds [this Court] even by what it *did not do or say*[ ] is … mistaken." *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007). *Contra* Response.Br.49–50. The students raise legal issues that the record in *Locke didn't* support, and the Supreme Court *didn't* decide.

For starters, the students' claims are largely based on precedent that post-dates *Locke* by a decade or two. *Infra* Parts IV–VII. Since the relevant case law didn't yet exist, *Locke* couldn't have considered or

resolved legal questions based on it. Opening.Br.38. Simply put, there is no credible argument that *Locke* controls "non-litigated issues," *Fernandez*, 502 F.3d at 343 n.2 (quotation omitted), including Virginia's (1) denial of benefits based on religious use, (2) creation of grants that aren't evenhanded or generally applicable, (3) playing of religious favorites, and (4) excessive entanglement with religion. *Contra* Response.Br.50–61. Especially in such "developing areas of the law," lower courts should "proceed cautiously, to make sure [they're not] over-reading [a prior] Supreme Court decision." Garner, *supra*, at 61.

Nor did *Locke*'s record support the type of claims that the students' raise here. Davey's "only reason" for pursing "a college degree" was "to prepare himself … for a lifetime of ministry, specifically as a church pastor." *Locke*, 540 U.S. at 717, 721. So Davey *couldn't* deny that his scholarship necessarily implicated what *Locke* called a historic interest in not "supporting the clergy." *Id.* at 723. But Cameron *can* because he's open to secular careers in real estate or leading a community-building nonprofit. Opening.Br.35–36.

Nor could Davey raise the *very different* considerations applicable to students interested in studying music or becoming military chaplains because he had no interest in either pursuit. Opening.Br.35–37. *Contra* Response.Br.41–44. Yet Luke may enter the music industry, and Trace is on his way to becoming a Guard chaplain. Opening.Br.36–37. Their situations don't clearly implicate the historic interests that *Locke*

raised. 540 U.S. at 722 (quotation omitted). Military chaplains, in particular, implicate a different history and interest than those *Locke* considered. *Accord* Response.Br.43–44.

In fact, the Virginia Guard's religious discrimination is highly unusual. Counsel's extensive research turned up only *one* other State that similarly excludes certain religious majors from educational grants offered to Guard members. *Nat'l Guard Postsecondary Educ. Grant: Program Manual for Fin. Aid Adm'rs 2026-27*, at 5, WASH. STUDENT ACHIEVEMENT COUNCIL, https://perma.cc/4QLS-4YJ3 (excluding Guard members "pursuing a degree in Theology").

Virginia's assertion that such distinctions are irrelevant because Trace "is not *now* a chaplain" or Luke isn't *now* a worship leader ignores *Locke*'s rationale. Response.Br.43 (emphasis added). Davey wasn't a pastor; he was a college student. *Locke*, 540 U.S. at 717. *Locke*'s ruling turned not on Davey's *current* employment but on his *future* plans. *Id.* at 717, 721. Ironically, Davey never used his education for professional ministry: he became a lawyer. So Washington's alleged interest in not supporting clergy via scholarships wasn't served by denying Davey a grant. ACLJ.Amicus.Br.13–14. But unlike in *Locke*, the students' interests in non-religious careers are plainly in the record here.

Nor did *Locke*'s record support a claim that Washington was engaged in an unconstitutional attempt to decide religious questions by defining devotional-theology degrees. Opening.Br.35. Religious schools

made that decision on their own. *Locke*, 540 U.S. at 717. There was no CIP-Code-based minutia foisted upon schools or government overruling of school's religious decisions, as Virginia unabashedly does here, Response.Br.10–11, 14, 37.

Virginia says that distinguishing between academic study and religious faith involves no "sensitive religious decisions." Response.Br.39 (quotation omitted). That argument flies in the face of 154 years of Supreme Court precedent, spanning from *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872), through *Catholic Charities*, since Plaintiff's "eligibility for [VTAG] ultimately turns on inherently religious choices." 605 U.S. at 250. The First Amendment doesn't allow the government "to have an ecclesiology, or to second-guess the ecclesiology espoused by our citizens." *Colo. Christian Univ.*, 534 F.3d at 1265. Virginia does both.

Plus, *Locke* explicitly did not consider any Blaine Amendment concerns. 540 U.S. at 723 n.7. The students here colorably connect the Blaine Amendment to the state constitutional provisions at issue. Opening.Br.9–12, 39–40, 45–47. That factor alone distinguishes *Locke*. *Contra* Response.Br.44–48. Fresh consideration of Blaine Amendment concerns shouldn't come as a surprise to Virginia. "In hard cases, judges rarely have binding precedents, or four-square holdings to dictate the outcome." Garner, *supra*, at 783. This case is no different.

11

*Last*, Virginia's reliance on *Gibbons v. Gibbs*, 99 F.4th 211 (4th Cir. 2024), is misplaced. Response.Br.28, 49–50, 61. There, the Court refused to consider the defendants' arguments because "a published opinion of this Court affirmed a district court's grant of the same relief [the plaintiff sought] under *circumstances materially identical* to" those at hand. 99 F.4th at 214. So the Court couldn't "adopt [the defendants'] proposed rule without saying" that prior decision was "*wrong*[ ]." *Id.* at 215 (emphasis added). Because the panel was bound by how "a previous court … *resolved the actual legal issue* before it," the Court declined to consider "a fact, theory, or line of argument the previous panel could have but did not consider." *Id.* at 213, 215 (emphasis added).

None of that is true here. *Locke*'s circumstances are materially *different*; ruling for the students doesn't require *overruling Locke*, e.g., *Colo. Christian Univ.*, 534 F.3d at 1256; and *Locke didn't resolve* the legal issues raised by the students. So *Gibbons* is inapposite. Quoting *Gibbons*' language out of context simply confirms that Virginia misapprehends how precedent works. Response.Br.28, 49.

12

### III.  *Hall* is limited and doesn't apply here.

Virginia says that *Hall* applies here "'as a mechanical mandate.'" Response.Br.28 (quoting *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021)). In so doing, Virginia adopts the broadest-possible reading of *Hall*, which "uphold[s] Virginia's denial of taxpayer funding for religious vocational training programs" against *any* First Amendment challenge imaginable. Response.Br.27. *Contra Ameur*, 759 F.3d at 324. But Virginia again misunderstands precedent and divorces *Hall* from its context.

*First*, not "everything said in a panel opinion binds future panels." *Payne*, 998 F.3d at 654. The test is whether a prior panel's statement was "necessary to the outcome"—if so, it's binding. *Id.* at 655. So the mechanical-mandate rule's scope is limited: it applies only where a court can't reach a particular result without "overrul[ing] a [prior] decision." *Id.* at 654 (quotation omitted). More often, courts distinguish a prior ruling because a new case involves "quite different circumstances." *Thomas*, 169 F.4th at 268 (quotation omitted). That limits the scope of a prior decision *without* overruling its holding. *Accord* Garner, *supra*, at 45 (courts "[l]ook[ ] at the general reasons" for a prior decision and strip away "the modifications … suggested by the peculiarities of the case[ ]" *before* they "arrive at a ground or principle of decision" that applies "to cases of a class") (citation modified). Here, the students ask

13

this Court to distinguish *Hall*. Opening.Br.40–42. So the mechanical-mandate rule is irrelevant.

*Second*, *Hall* is a narrow decision with little precedential weight. *Contra* Response.Br.24–27. Bethany Hall "concede[d] that the facts" of her case were "are on all fours or identical with *Locke*." *Hall*, 175 F.4th at 514 (citation modified); *accord* Response.Br.26. So the "question" whether *Locke* applied to Bethany's First Amendment claim wasn't "presented," and *Hall* had "no obligation to consider it." *Riley v. Bondi*, 606 U.S. 259, 273 (2025). Any analysis *Hall* gave on this point "cannot be relied on as … binding authority" because "the case [didn't] call[ ] for its expression." *Powell v. Md. Trust Co.*, 125 F.2d 260, 270 (4th Cir. 1942); *accord New England Mut. Life Ins. Co. v. Mitchell*, 118 F.2d 414, 420 (4th Cir. 1941). That language isn't "necessary to [*Hall*'s] outcome," and future panels aren't "bound" by it. *Payne*, 998 F.3d at 655; *accord Art & Antique Dealers League of Am. v. Seggos*, 121 F.4th 423, 437 (2d Cir. 2024) ("a party's concession … does not necessarily establish a legal precedent … [that] control[s] … unrelated cases").

*Hall* recognized this fact. The panel said that "the *only question* before us [was] whether the Supreme Court … [had] abrogated *Locke* … into oblivion." *Hall*, 175 F.4th at 514 (quotation omitted, emphasis added). *Hall* said no. *Id.* But it didn't purport to determine *Locke*'s application in all circumstances. Otherwise, Judge Richardson would have declined to join the opinion because he "would not extend [*Locke*]

14

to any novel setting," *Id.* at 520 (Richardson, J., concurring). As explained, this case is novel in multiple respects. *Supra* Part II.

Virgina's overreading of *Hall* violates the party-presentation principle. *Contra.* Response.Br.18–21, 24–44. Under that rule, judicial proceedings must be "adversarial," and courts must "rely on the parties to frame the issues for decision." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) (quotation omitted). In *Hall*, the parties agreed that *Locke* controlled a First Amendment challenge to VTAG's religious exclusion. 175 F.4th at 512, 514. Because the parties didn't "argue[ ]" the "point[ ]" that the situation in *Locke* was different, there was no reason for *Hall* to "consider[ ]" that issue. *Margolin*, 146 S. Ct. at 1288 (quotations omitted).

Indeed, Bethany made zero arguments distinguishing *Locke* from her VTAG-related case. So *Hall* lacked the "adversary confrontation" and "zeal" required for a judicial decision on that point. *United States v. Sineneng-Smith*, 590 U.S. 371, 376 n.3 (2020) (citation modified); *cf. Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (discussing "the necessary zeal" required for Article III standing). *Hall's* discussion of *Locke*'s applicability is dicta that doesn't bind any future case.

*Finally*, *Hall's* ruling is precedential in only one respect that is relevant here. Because the parties disputed whether the Supreme Court has overruled *Locke* sub silentio, *Hall*, 175 F.4th at 512–14, "the only question" that *Hall* considered was "whether the Supreme Court …

15

[had] abrogated *Locke* … into oblivion." *Id.* at 514 (quotation omitted). Thus, *Hall*'s conclusion that "*Locke*'s holding[ ] … is still [good] law" is precedential and binds future panels until the Supreme Court or the en banc court says otherwise. *Id.* at 516. But the students here don't argue that *Locke* has been overruled (though they do maintain that the Supreme Court should overrule it), they argue that it's distinguishable. Opening.Br.30–40.

## IV.  Virginia's grants discriminate based on religious use.

Under the *Trinity Lutheran*, *Espinoza*, and *Carson* trilogy, the general First Amendment rule is that public benefit programs can't "exclude otherwise eligible [people] on the basis of their religious exercise." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 789 (2022). It makes no difference whether the government invokes "antiestablishment interest[s]," *id.* at 781, or bases the exclusion on religious status, activity, or use, *id.* at 782–88. The exclusion is unlawful all the same. *Id.* at 781; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475–79, 484–89 (2020); *Trinity Lutheran*, 582 U.S. at 458–64, 466–67.

*Locke* is a "narrow" exception to that rule. *Carson*, 596 U.S. at 789. Because *Locke* involved different circumstances where state "funding … was intended to be used to prepare for the ministry" and "turned on" inapt "reasoning" about an "identified … historic … interest against using taxpayer funds to support church leaders," the trilogy

16

distinguished it. *Id.* at 788–89 (citation modified); *accord Espinoza*, 591 U.S. at 479–83; *Trinity Lutheran*, 582 U.S. at 464–65.

Here, *Locke* and *Hall* are distinguishable for the reasons discussed above: the facts are too different, and the logic doesn't apply. *Supra* Parts II–III. So the trilogy's general First Amendment rule governs. Opening.Br.42–45. *Contra* Response.Br.50. Virginia doesn't contend that VTAG's and VANGSTAP's religious exclusions survive it. Response.Br.50. And that makes the students' entitlement to injunctive relief clear.

## V.    Virginia's grants aren't neutral or generally applicable.

### A.    Virginia's grants aren't neutral.

Virginia says that VTAG and VANGSTAP are religiously neutral, even though they incorporate exclusions "specifically directed at religious practice." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (citation modified). That turns neutrality on its head. Response.Br.51–53. Virginia, "[b]y its own admission, … sought to restrict [the students'] actions … because of their religious character." *Kennedy*, 597 U.S. at 526; *accord* Response.Br.1–2 (castigating the students for asking Virginia to be religiously neutral and fund their majors on an equal basis).

*First*, the Commonwealth contends that VTAG's and VANG-STAP's religious exclusions aren't connected to Blaine-Amendment-

17

related sections of the Virginia Constitution. Response.Br.44–48, 51. Virginia cites *Locke* in support. Response.Br.44–45. But *Locke* was concerned with Washington's Constitution, not Virginia's. All *Locke* said about the Blaine Amendment's history is that it wasn't before the Court. 540 U.S. at 723 n.7. So *Locke* is no help.

More specifically, Virginia argues that VTAG's and VANGSTAP's religious exclusions are based on portions of An Act for Establishing Religious Freedom, passed in 1786, that are enshrined in Article I, § 16, which dates from 1830, and Article VIII, § 11, which originated in 1971. Response.Br.44–45. But Virginia presents no evidence that *anyone* prior to the 20th Century thought that the Act's (or Article I, § 16's) language prohibiting compelled "support [for] any religious worship, place, or ministry" barred educational funding. In fact, history shows that *no one* contemporaneously ascribed such a meaning to the Act. Opening.Br.6–8. And later "development[s]" can't, on their own, "establish an early American tradition." *Espinoza*, 591 U.S. at 482.

So Virginia is left with Article VIII, § 11, which is only 55-years old. That provision draws a line between "collegiate or graduate education" and "religious training or theological education," which is reminiscent of the law the Tenth Circuit struck down in *Colorado Christian University. Accord* 534 F.3d at 1262. The drafters drew this line to avoid "weakening the wall of *separation between church and state* so carefully erected in *other sections of the Constitution.*" *Comm'n*

18

*on Constitutional Revision*, THE CONSTITUTION OF VA. 274 (1969), https://perma.cc/6UWF-EEFQ (emphasis added).

Virginia suggests that Article VIII, § 11's drafters were merely referring to two prior constitutional provisions combined in Article I, § 16. Response.Br.47. But that's not plausible. By "the Constitution," the drafters clearly meant the *version they proposed*, i.e., the 1971 Constitution, not "*the present Constitution*," which is how the drafters referred to the 1928 version three lines before. *Comm'n on Constitutional Revision, supra*, at 274 (emphasis added).

We also know what "other sections" of the 1971 Constitution Article VIII, § 11's drafters meant. *Id.* In their words, "[t]he *separation of church and state* is … reinforced by the ban on appropriations to religious bodies in *section 16 of the Legislative article* … and by the exclusion of sectarian schools from the private schools for which public funds may be appropriated pursuant to *section 10 of the Education article.*" *Id.* at 101 n.38 (emphasis added); *accord id.* at 271–72. So there's a direct connection between Article VIII, § 11 (at issue here) and Article IV, § 16 and Article VIII, § 10 (Virginia's Blaine-Amendment-connected provisions). The drafters of the current Virginia Constitution spelled it out. *Accord* Opening.Br.9–11, 38–40.

Virginia's rejoinder is that Article IV, § 16 and Article VIII, § 10 don't "bear on Article VIII, § 11's application or meaning." Response. Br.46 n.6. Not so. Under *Locke*, "a credible connection between the

19

Blaine Amendment" and a "relevant [state] constitutional provision" makes Blaine's "history" relevant to neutrality. 540 U.S. at 723 n.7.

Article IV, § 16's history demonstrates why. The 1901 debates center on topics directly linked to the Blaine Amendment: (1) Catholic organizations, (2) public schools, and (3) indoctrination. Take the convention's focus on two Catholic charities—the Little Sisters of the Poor and St. Joseph's Orphan Asylum. *E.g.*, 1 *Report of the Proceedings & Debates of the Constitutional Convention of the State of Virginia (1901–1902)*, at 792–93, 802–04, 807–08, 811–12 (Hermitage Press 1906), https://bit.ly/3TebNPx. Then consider Article IV, § 16's main proponent's attack on "Catholic schools" and desire "not [to] give a reward out of the public moneys for an indirect assault upon the *public free school system* of Virginia." *Id.* at 803 (emphasis added). Add a concern that orphan children at St. Joseph's were "being *indoctrinated* in the creed of the Roman Catholic Church," *id.* at 804 (emphasis added), and you have the Blaine Amendment's ingredients *simpliciter*.

In short, the Blaine Amendment animated Virginia's first religious funding exclusion. And the Commonwealth's other religious exclusions are a result of its domino effect. *Accord* Opening.Br.9–13.

*Second*, Virginia's "antiestablishment" interests aren't "neutral," Response.Br.51, because they "single out the religious for disfavored treatment." *Trinity Lutheran*, 582 U.S. at 460. Only taxpayer objections to incidentally funding religious majors are accommodated. Religious

20

taxpayers' objection to indirectly funding *others*' majors—such as Women, Gender & Sexuality—aren't considered. If people of faith must cope with this conscience harm, their neighbors can too. What's sauce for the goose is sauce for the gander.

*Finally*, Virginia "treat[s]" some functionally indistinguishable religious degrees "differently" from others, which "amounts to the state preferring some religious" people. *Fowler v. Rhode Island*, 345 U.S. 67, 69 (1953). *Contra* Response.Br.52–53. Under VTAG's and VANGSTAP's conflicting rules, *civilians* are more likely to receive a grant for a religious major than *Guard members*. *Supra* pp. 3, 6. The State Council for Higher Education excludes majors with more *faith-oriented labels*, even while it includes majors with more *secular labels* that are materially identical in religiosity, course requirements, and employment outcomes. *Supra* pp. 2–3, 7. And VANGSTAP subjects Guard members to a *standardless regime* under which officials exclude whatever majors they deem "religious training or theological condition" on a *case-by-case* basis. *Supra* pp.3, 8. These are "indirect way[s] of [Virginia] preferring one religion over another." *Fowler*, 345 U.S. at 70.

## B.    Virginia's grants aren't generally applicable.

VTAG and VANGSTAP aren't "generally applicable" because they create "formal mechanism[s] for granting exceptions." *Fulton v. City of Phila.*, 593 U.S. 522, 537 (2021); *accord* Opening.Br.48–49. Virginia

says that *Fulton*'s exemption mechanism was more flawed. Response.Br.53–54. But that makes no difference. The question is whether Virginia law articulates a narrow exemption with "clearly articulate[d]" criteria akin to a "yes-or-no inquiry" or instead a "case-by-case system" that allows officials to grant exemptions "on an individualized basis." *Perry v. Marteney*, 172 F.4th 315, 324 (4th Cir. 2026) (quotation omitted). Here, the latter is true.

VTAG makes an exemption to its no-CIP-Code-39-series-majors rule for those called to a secular double major under certain conditions. VTAG allows secular exemptions to those conditions "based on circumstances beyond the control of the student," i.e., on an individualized basis. 8 Va. Admin. Code § 40-71-10. And Virginia doesn't even purport to know when that case-by-case exemption applies. Response.Br.54–55. So the inquiry isn't yes or no. Plus, VTAG waives a basic eligibility requirement (i.e., that students be full-time) on a "case-by-case" basis for "disability or other medical reasons," 8 Va. Admin. Code § 40-71-40(C)(2)(c), using broad and subjective criteria that elevate secular reasons for an exemption over religious ones.

VANGSTAP fares no better. The Guard doesn't "maintain a formal set of criteria" to define ineligible religious degrees. *Bates v. Pakseresht*, 146 F.4th 772, 797 (9th Cir. 2025); *accord* Response.Br.35. So VANGSTAP's case-by-case determinations depend to a large "extent on the judgments of" Guard officials. *Bates*, 146 F.4th at 797. And that

22

"incorporates ad hoc decision making based on non-objective criteria, in an area that implicates unique religious concerns." *Id.*; *supra* pp. 3, 8.

## VI. Virginia's grants impose a denominational preference.

Virginia doesn't dispute that it "differentiat[es] between religions based on theological practices" and makes grants "turn[ ] on inherently religious choices." *Cath. Charities*, 605 U.S. at 250. It merely says that the students haven't "identif[ied] any religion that is favored, or any denomination that is preferred." Response.Br.56. But the religious favoritism is plain to see.

Take VTAG. Colleges associated with *mainline denominations* are likely to offer *eligible* Code 38-series majors based on their religious beliefs, and students of their religious persuasion are likely to *receive* a grant. In contrast, colleges associated with *evangelicalism* are likely to offer *ineligible* Code 39-series majors based on their religious beliefs, and students who share their beliefs are likely to be *denied* a grant.

For example, VTAG-eligible Code 38-series majors like Religion/Religious Studies (38.0201) are the only options at colleges associated with mainline denominations like Emory and Henry College (Methodist), Mary Baldwin University (Presbyterian), and Roanoke College (Lutheran).[1] VTAG-ineligible Code 39-series majors like

---

[1] The State Council of Higher Education allows CIP-Code based searches of colleges' degree inventory. *Search Degree Inventory*, STATE COUNCIL OF HIGHER EDUC. FOR VA., https://bit.ly/45fdEX2.

23

Bible/Biblical Studies (39.0201) are offered exclusively by evangelical colleges, such as Liberty University and Regent University.

Next consider VANGSTAP. The Guard denied Trace a grant because his CIP Code 38.0201 undergraduate major was housed in evangelical Liberty's School of Divinity. Response.Br.14, 34–37. If Liberty closed its divinity school or separated the undergraduate Religion Department, Trace would have received a grant. *Accord Liberty Univ. Announces New School of Divinity*, LIBERTY UNIVERSITY (Mar. 5, 2015), https://perma.cc/5P56-2FD6. Yet students with Code 38.0201 majors at mainline-affiliated colleges receive grants because their theology hasn't inspired the creation of separate divinity schools.

Virginia's justification is *Locke*. Response.Br.58. But *Locke* didn't address religious favoritism. *Colo. Christian Univ.*, 534 F.3d at 1256. And *Catholic Charities* forecloses religious favoritism. Opening.Br.50–53. So *Catholic Charities*, not *Locke*, controls.

## VII.  Virginia's grants result in excessive entanglement.

Viginia enforces its anti-establishment principles by delving into "how a religious school pursues its educational mission," resulting in excessive "state entanglement with religion." *Carson*, 596 U.S. at 787; *accord* Opening.Br.53–55. Virginia attempts to distinguish *Colorado Christian University*. Response.Br.58–61. But that effort fails.

24

Virginia's grants turn on considerations directly related to religious college's "affiliations, beliefs, practices, [and] activities." Response.Br.60. As explained, VTAG's and VANGSTAP's eligibility factors result in differential treatment between students at mainstream-denomination-affiliated colleges and students at evangelical colleges. Religious practices associated with the former are rewarded; religious activities associated with the latter are punished. *Supra* Part VI.

There is nothing "simpl[e]" about Virginia's determination that "a given program is for religious training or theological education." Response.Br.60 (quotation omitted). The CIP Code is a complex and subjective morass that VTAG forces religious colleges to apply instead of their own religious criteria. Opening.Br.14–19; *supra* pp. 2, 7. VANGSTAP goes even further, digging into "how the [religious] institution structures its programs" in accordance with its beliefs, Response.Br.40, and freely rejecting their determinations, Response.Br.37. That is excessive entanglement with religion. *Accord Colo. Christian Univ.*, 534 F.3d at 1261–66.

## VIII.   Strict scrutiny applies, and the students satisfy the remaining preliminary-injunction factors.

Virginia's only argument against strict scrutiny is *Locke* and *Hall*, which, as explained, don't apply. *Supra* Parts II–III. *Contra* Response.

Br.61. The Commonwealth doesn't even attempt to satisfy that demanding standard. So the students' right to an injunction is clear.

The Commonwealth's position on irreparable harm also misapprehends the law. That the students could pay their own way—or go into debt—is irrelevant. *Contra* Response.Br.62. Denying them a generally available public benefit based on religion violates the Religion Clauses. *Trinity Lutheran*, 582 U.S. at 463. And there's no harm in requiring Virginia to respect the First Amendment: "[o]ur federal system prizes state experimentation, but not state experimentation in the suppression of … the free exercise of religion." *Espinoza*, 591 U.S. at 485 (citation modified); *cf. Wolford v. Lopez*, 609 U.S. __, No. 24-1046, 2026 WL 1825723, at *11 (June 25, 2026) (addressing the Second Amendment).

Virginia can't plausibly claim that a few thousand dollars in scholarships would cause it more harm than the deprivation of the students' constitutional rights, which are priceless. *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025). And given "the strong showing made by the [students] here, and the lack of a compelling interest supporting [Virginia's] policies, an injunction is … in the public interest." *Id.*; *Contra* Response.Br.63.

26

## CONCLUSION

For these reasons and those stated in the students' merits brief, the Court should reverse and remand with instructions for the district court to enter a preliminary injunction barring Defendants from denying—or delaying—Cameron and Luke VTAG grants, and Trace VANGSTAP grants, based on their chosen religious degree program.

Dated: July 24, 2026

Respectfully submitted,

s/Rory T. Gray

James A. Campbell
Jacob E. Reed
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlega.org
jreed@ADFlegal.org

Ryan J. Tucker
Jeremiah J. Galus
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rtucker@ADFlegal.org
jgalus@ADFlegal.org

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

David A. Cortman
Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFflegal.org

*Counsel for Plaintiffs-Appellants*

27

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because it contains 5,710 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: July 24, 2026

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by that system.

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Plaintiffs-Appellants*

29